**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

2019 JAN 15  PM 2: 38

MIDDLE DIST. OF FLORIDA
TAMPA, FLORIDA

| | | |
|---|---|---|
| [UNDER SEAL] | : | **CIVIL ACTION NO. :** |
| | : | **8:17-cv-983-T-17AEP** |
| | : | |
| Plaintiff | : | Hon. Elizabeth A. Kovachevich |
| | : | |
| v. | : | |
| | : | **FILED UNDER SEAL** |
| [UNDER SEAL] | : | |
| | : | |
| Defendants | : | |

**FIRST AMENDED *QUI TAM* COMPLAINT FOR VIOLATIONS OF
FEDERAL AND STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL**

# UNDER SEAL

# DO NOT FILE

# WITH PACER

S-20

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF FRAUD ALLEGATIONS.......................................2

II.     JURISDICTION AND VENUE ...................................................................................10

III.    PROCEDURAL HISTORY..........................................................................................11

IV.     THE PARTIES...........................................................................................................12

A.      Relators Cho and Baker ..........................................................................................12

Relator Baker's Interactions with Surgery Partners' William Milo...............................................13

B.      The Surgery Partners Defendants ...........................................................................15

1.      Defendant Surgery Partners, Inc. ...........................................................................15

2.      H.I.G. Capital, Inc., Surgery Partners Acquisition Company, Inc., H.I.G. Capital, LLC, and H.I.G. Surgery Centers, LLC. (The H.I.G.  Defendants) ...................................16

a)      Defendant H.I.G. Capital, Inc. ...............................................................................16

b)      Defendant Surgery Partners Acquisition Company, Inc. ........................................17

c)      Defendant Surgery Center Holdings, Inc. ..............................................................18

d)      Defendant HIG Capital Group, LLC ......................................................................18

e)      Defendant Surgery Center Holdings, LLC..............................................................18

f)      Defendant Surgery Partners, Inc. – Surgery Partners' Reorganization ....................19

g)      The Bain Defendants ..............................................................................................21

Surgery Partners' Ancillary Services 2011 – Present: Pain Relief Centers and Logan Labs ...........21

3.      Surgery Partners' Pain Management Physician Practices Segment...........................22

a)      Defendant Tampa Pain Relief Centers, Inc. (TPRC) ..............................................23

b)      Defendant Denver Pain Relief Center, PC ..............................................................25

c)      Defendant Asheville Pain Relief Center, P.C. .........................................................26

d)      Defendant Lebanon Pain Relief Center, PC.............................................................27

e)      Defendant Dallas Pain Relief Center, PC................................................................27

f)      Georgia Pain Management Physician Practices .......................................................28

4.      Defendant Logan Laboratories, LLC (Logan Labs)................................................28

a)      Individual Defendants ............................................................................................32

(1)     Defendant Michael T. Doyle ...................................................................................32

(2)     Defendant William Milo .........................................................................................33

(3)     Defendant Christopher Utz (Chris) Toepke .............................................................34

i

V.    BACKGROUND ON FEDERAL & STATE-FUNDED
      HEALTH INSURANCE PROGRAMS.............................................................35

A.    Medicare Program: Coverage Only for Medically Necessary Services ..................35

B.    The Medicaid Program ...........................................................................................39

C.    Other Federal Healthcare Programs .......................................................................40

VI.   APPLICABLE LAW ...............................................................................................40

A.    The Federal False Claims Act.................................................................................40

B.    Self-Referral Prohibitions 42 U.S.C. 1395nn (the "Stark Law")..........................41

C.    The Federal Anti-Kickback Statute ........................................................................42

VII.  DEFENDANTS' SCHEME TO PRESSURE AND INDUCE PHYSICIANS
      ACROSS THE UNITED STATES TO ORDER COSTLY QUANTITATIVE
      URINE DRUG TESTS .............................................................................................45

A.    The Urine Drug Tests at Issue ................................................................................45

      The Value of Confirmation Testing – Limited to Unexpected Screening Results...........48

      Guidelines on Urine Drug Testing ...........................................................................48

B.    Surgery Partners' Two Schemes to Fraudulently Generate UDT Referrals
      for Logan Labs........................................................................................................51

C.    Surgery Partners' Pressure on Physicians and Mid-Level Providers and
      Manipulation of Office Practices and EMR to Generate Referrals to
      Logan Labs Without Regard for Medical Necessity................................................52

1.    Surgery Partners executives improperly interfered with the physicians' and
      mid-level provider's independent medical judgment by pre-selecting patients, including
      Government healthcare program beneficiaries, for expensive quantitative UDT services
      when the patients arrived at the Surgery Partners practice -- before the patients were even
      seen by their physician or a mid-level provider. ....................................................52

2.    Surgery Partners fraudulently obtained the consent of patients, including Government
      healthcare program beneficiaries, to UDT by falsely representing that quantitative
      UDT services were required multiple times per year in order to comply with state
      and/or federal laws. ...............................................................................................54

3.    Surgery Partners employed company-wide policies PROHIBITING physicians and
      mid-level providers from using simple screening UDT methods (i.e., inexpensive and
      effective dip-stick cups) in the office, which caused gross over-utilization of expensive
      quantitative UDT.....................................................................................................56

      Dr. Cho's Resistance to Surgery Partners' UDT Fraud ..........................................58

4.    Surgery Partners steered Government healthcare program beneficiaries  to Logan Labs
      for quantitative UDT, even when the physician or mid-level provider ordered or preferred
      a dip stick test for qualitative UDT  or a different UDT laboratory.........................70

ii

5.  Surgery Partners pressured physicians and mid-level providers to refer patients for UDT services by closely monitoring the patients who were not referred to UDT at each visit........71

6.  Surgery Partners implemented UDT policies that resulted in the creation of false electronic medical records (EMRs) to support medically unnecessary UDT services. ...........74

7.  Surgery Partners' corporate policies and conduct caused Logan Labs to perform excessive, medically unnecessary quantitative UDT on Government healthcare program beneficiaries, then to submit claims for such to Government-funded healthcare programs. ............................75

a)  Surgery Partners Pushed for Providers to Order UDTS More Frequently Than Needed .........75

b)  Surgery Partners' Subsidiary Logan Labs, Uses Excessive Quantitative UDT Panels. ...........76

8.  Defendants fraudulently unbundled the claim for quantitative UDT and billed government-funded healthcare programs for more than 40 separate "confirmation" tests. .........................78

9.  Surgery Partners pressured physicians and mid-level providers to sign false attestations of medical necessity for quantitative UDT to respond to or avoid denials of Logan Labs UDT claims from Government- funded healthcare programs, including Medicare. .........................78

10. Defendants Billed for "Confirmation" UDTs that Were Medically Unnecessary and/or Were Not Performed After a Screening UDT....................................................................................80

11. Defendants waived co-pays and/or failed to collect co-pays related to quantitative UDT performed by Logan Labs from beneficiaries of Government-funded healthcare programs, including TRICARE and Medicare Part C...............................................................................81

12. Surgery Partners Pressured Its Physicians Nationwide to Refer to Logan Labs.......................81

D.  Defendants' Financial Relationships with Physicians Who Order UDT Services From Logan Labs Violate Stark Laws and Anti-Kickback Statutes..............................................................84

E.  Defendants Had Knowledge of the Illicit Nature of the Kickback Scheme .............................90

VIII. DEFENDANTS' COMPENSATION ARRANGEMENT VIOLATES THE STARK LAW ..................................................................................................91

IX.   CAUSES OF ACTION ..........................................................................................................93

COUNT I - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
31 U.S.C. § 3729(A)(1)(A), (B)......................................................................................................93

COUNT II - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
31 U.S.C. § 3729(A)(1)(C) CONSPIRACY ...................................................................................94

COUNT III - FLORIDA FALSE CLAIMS ACT
Fla. Stat. §§ 68.081, et seq. ..........................................................................................................95

COUNT IV - COLORADO FALSE CLAIMS ACT
Colo. Rev. Stat. § 25.5-4-303.5, et seq. .......................................................................................96

COUNT V - GEORGIA STATE FALSE MEDICAID CLAIMS ACT
Ga. Code Ann. §§ 49-4-168, et seq. .............................................................................................98

COUNT VI- NORTH CAROLINA FALSE CLAIMS ACT
N.C. Gen. Stat. § 1-605, et seq. ....................................................................................................99

COUNT VII -TEXAS MEDICAID FRAUD PREVENTION ACT
Tex. Hum. Res. Code §§ 36.001, *et seq.* ........................................................................................101

DEMAND FOR JURY TRIAL ......................................................................................................103

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* SHELDON CHO, MD, and <br> DAWN BAKER, Relators, <br> and on behalf of the STATES of FLORIDA, <br> COLORADO, GEORGIA, NORTH CAROLINA <br> and TEXAS, <br><br> Plaintiffs <br><br><br> v. <br><br> SURGERY PARTNERS, INC., <br> SURGERY PARTNERS ACQUISITION <br>     COMPANY, INC., <br> SURGERY PARTNERS, LLC, <br> SURGERY CENTER HOLDINGS, INC., <br> SURGERY CENTER HOLDINGS, LLC, <br> H.I.G. CAPITAL, INC., H.I.G. CAPITAL, LLC, <br> H.I.G. SURGERY CENTERS, LLC, <br> TAMPA PAIN RELIEF CENTERS, INC. <br> TAMPA PAIN MANAGEMENT, INC. <br> DENVER PAIN RELIEF CENTER, PC <br> ASHEVILLE PAIN RELIEF CENTER, PC <br> LEBANON PAIN RELIEF CENTER, PC <br> DALLAS PAIN RELIEF CENTER, PC <br> LOGAN LABORATORIES, LLC, <br> BAIN CAPITAL LP, <br> BAIN CAPITAL INVESTORS, LLC <br> BCPE SEMINOLE HOLDINGS, LP, <br> BCPE SEMINOLE GP LLC, <br> MICHAEL T. DOYLE, <br> WILLIAM MILO, AND <br> CHRISTOPHER UTZ TOEPKE, <br>           Defendants. | **QUI TAM COMPLAINT** <br><br> **CIVIL ACTION NO.:** <br> **8:17-cv-983-T-17AEP** <br><br> **Hon. Elizabeth A. Kovachevich** <br><br><br> <u>**FILED UNDER SEAL**</u> <br><br><br> <u>**DO NOT PLACE ON PACER**</u> <br><br><br><br> <u>**DO NOT PLACE IN PRESS BOX**</u> |

**FIRST AMENDED *QUI TAM* COMPLAINT FOR VIOLATIONS OF
FEDERAL AND STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION AND SUMMARY OF FRAUD ALLEGATIONS

1.    This *qui tam* action alleges violations of the federal False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), and analogous state false claims acts by Defendants, Surgery Partners, Inc., Surgery Center Holdings, Inc., Surgery Center Holdings, LLC, and H.I.G. Surgery Centers, LLC (hereinafter, "Surgery Partners"),  the Pain Relief Center Defendants, Logan Laboratories, LLC ("Logan Labs"), H.I.G. Capital, Inc., H.I.G. Capital, LLC, Bain Capital, LP, Bain Capital Investors, LLC, BCPE Seminole Holdings, LLP, BCPE Seminole GP, LLC, and corporate executives who personally created, participated in, and/or profited from the scheme, including, but not limited to: Michael T. (Mike) Doyle ("Doyle"), President and Chief Executive Officer (CEO) of Surgery Partners, and its subsidiaries, including Logan Labs; William Milo, former Vice President of Operations & Physician Services, and Vice President of Administration at Surgery Partners and Vice President of Logan Labs, and Christopher Utz  (Chris) Toepke ("Toepke"), Group President, Ancillary Services of Surgery Partners. Collectively, Surgery Partners, the Pain Relief Center Defendants, Logan, Doyle, Milo, and Toepke are referred to herein as "Defendants."

2.    Surgery Partners owns and operates a national network of surgical facilities and ancillary services located in 29 states.  The company's ancillary services include multi-specialty physician practices, and laboratory services. Defendants' physician practices include pain management specialists.

3.    Defendant Logan Labs is a wholly-owned subsidiary of Surgery Partners, through which Defendants purport to provide ancillary laboratory services. Logan Labs is a nation-wide provider, specifically and nearly-exclusively, of urine drug testing (UDT), also called "urine toxicology" testing services.

4.    Since its founding, Logan Labs' business has been dependent upon UDT referrals

of beneficiaries of Government–funded healthcare programs, with a special emphasis on Medicare beneficiaries.

5.      Urine drug testing (UDT), when used appropriately, either detects the presence of drugs (qualitative UDT) or the specific amount of a particular substance in the patient's system (quantitative UDT).

6.      Qualitative UDT can be either point-of-care testing (POCT), which is performed in the physician's office, or laboratory-based, meaning it is performed at an outside laboratory.

7.      In-office drug screening (a/k/a POCT) is an easy and cost-efficient method of qualitative UDT because it is performed to detect the presence of drugs while the patient is in the presence of the provider.  The urine cup dip stick test, using immunoassay (the same technology used in home pregnancy tests) is the most common form of in-office qualitative UDT.

8.      In order to bill for POCT, a medical facility needs a Clinical Laboratory Improvement Amendments of 1099 (CLIA) certification or waiver. However, a medical provider can choose to perform POCT without a CLIA waiver – it just cannot bill the government or private insurers for the test.

9.      Qualitative UDT can also be lab-based, if POCT is not available. However, in either setting, the same immunoassay technology is used (immunoassay).

10.     Both types of qualitative UDT (in-office and lab-based) are far less expensive than quantitative UDT.

11.     Quantitative UDT, on the other hand, can be used to determine the specific levels of a variety of prescription or illegal substances present in a patient's body.  Quantitative UDT is only performed in a laboratory using properly calibrated equipment and appropriately qualified laboratory professionals.

12.     Confirmation drug testing is medically appropriate only for specific and limited indications, including to "confirm" unexpected results of in-office drug screening. Quantitative UDT is not medically necessary for every patient or at every clinic visit.

13.     In the pain management setting, providers may determine that quantitative UDT is medically necessary to confirm a positive qualitative UDT, in other words, to rule out a false positive qualitative UDT. Quantitative UDT may also be medically necessary in limited circumstances to rule out a false negative UDT. In summary, quantitative UDT is medically indicated only for a narrow subset of patients for whom qualitative UDT is medically necessary.

14.     Quantitative UDT is expensive, resulting in charges by UDT laboratories to Government healthcare programs ranging from hundreds to thousands of dollars per testing episode, depending on the number of separate tests performed and/or billed.

15.     Since its founding, Defendant Logan Labs has generated most of its revenues from "confirmatory" quantitative UDT.

16.     Whatever drug testing method is used, either urine dip stick (in-office drug screening or lab-based qualitative UDT), or confirmation (quantitative) UDT), it must be medically necessary to legally obtain reimbursement from Government-funded healthcare programs. In other words, no type of UDT is automatically reimbursable.

17.     Both pain medicine and addiction specialists prefer random in-office POC drug screening, (the dip stick cup) when medically necessary, to ensure patient safety and to determine patient adherence to treatment.

18.     For the vast majority of patients, including those treated for chronic pain management by Surgery Partners' affiliated pain specialists, laboratory-based quantitative UDT is not medically necessary as an initial or follow-up test. Instead, when any UDT is medically

necessary, the patient should receive a screening UDT (office-based POC drug testing). If the dip stick cup results are not the expected results based on the provider's assessment of the patient, or other specific medical indications warrant it, the patient should then be referred to laboratory-based quantitative UDT.

19. Nonetheless, the Defendants implemented fraudulent schemes to refer patients of Surgery Partners-affiliated physicians to Logan Labs for extensive and expensive confirmatory quantitative UDT. They prohibited the use of office-based UDT without medical or scientific justification, leaving their affiliated physicians with only laboratory-based UDT (either qualitative or quantitative). They monitored their physicians' and mid-level providers' use of "confirmation" UDT, and exerted great pressure on physicians to order confirmation UDT for every patient.

20. The Defendants implemented fraudulent schemes to refer patients of Surgery Partners-affiliated physicians to Logan Labs for extensive and expensive confirmatory quantitative UDT, and for up to 12 testing episodes per year, for each patient, in order to increase revenues generated through Logan Labs.

21. Surgery Partners' conduct resulted in extreme over utilization of government-funded healthcare program resources in light of the fact that quantitative UDT is medically necessary for a very narrow subset of the patients who are treated by Surgery Partners' employed physicians and mid-level providers.

22. In fact, since its founding in late 2011, the primary (if not sole) sources of referrals to Logan Labs are the physicians, including pain specialists, who are employed by or affiliated with Surgery Partners subsidiaries and practice at Surgery Partners locations throughout the United States.

23. During the relevant time period (late 2011 to the present), the Defendants have

knowingly (as that term is defined in the FCA): 1) generated false records that were material to a false or fraudulent claim for Logan Labs services; 2) submitted, or caused the submission by Logan Labs of millions of dollars' worth of false claims to Government-funded programs, including, but not limited to, Medicare, Medicaid, TRICARE, and The Veterans' Administration (VA), for UDT, including confirmatory quantitative UDT, that were not reasonable or necessary; 3) conspired to cause the submission of false claims by Logan Labs to Government-funded healthcare programs; and 4) failed to return to Government-funded healthcare programs overpayments received by the Defendants for medically unnecessary UDT.

24.    As illustrated below, Defendants' illegal conduct demonstrates a carefully orchestrated, corporate-led effort to steer lucrative referrals of beneficiaries of Government-funded healthcare programs to their wholly-owned Logan Labs for unnecessary and over-utilized lab-based UDT services. During the relevant time period, Defendants have knowingly engaged in the following conduct:

(a)    improperly interfered in the medical decision making of their affiliated physicians by pre-selecting patients, including beneficiaries of Government-funded healthcare programs, for expensive lab-based UDT services at the time the patient arrives at the Surgery Partners practice -- before the patients were or are examined by their physician or a mid-level provider;

(b)    fraudulently obtained the consent of patients, including Government healthcare program beneficiaries, to lab-based UDT by falsely representing to patients that frequent quantitative UDT services were required in order to comply with state and/or federal laws;

(c)    employed company-wide policies prohibiting physicians and mid-level

providers from using simple in-office drug screening (qualitative UDT), i.e., inexpensive and effective dip-stick cups;

(d)     interfered in the medical decision making of their affiliated physicians after the physician or mid-level provider saw the patient by steering Government healthcare program beneficiaries to Logan Labs after the provider had referred the patient to a different lab for UDT;

(e)     pressured physicians and mid-level providers to refer patients for lab-based UDT services (particularly, Logan Labs) by closely monitoring when providers did not refer patients for lab-based UDT at each visit;

(f)     implemented UDT policies that resulted in the creation of false electronic medical records (EMRs) in an effort to support medically unnecessary lab-based UDT services billed by Logan Labs to Government-funded healthcare programs;

(g)     caused Logan Labs to perform excessive, medically unnecessary UDT, which the Defendants billed or caused Logan Labs to bill to Government-funded healthcare programs;

(h)     fraudulently unbundled claims for lab-based quantitative UDT and billed Government-funded healthcare programs for medically unnecessary separate tests;

(i)     falsely identified UDT as "confirmation" testing on claims submitted by or on behalf of Logan Labs to Government-funded healthcare programs when "confirmation" testing was not warranted. For example, when UDT was not indicated by the physician's examination, or no in-office drug screening (qualitative UDT) had been performed, there were no "unexpected" results to "confirm;"

(j)     pressured physicians and mid-level providers to deviate from the standard

of care and sign false attestations of medical necessity for lab-based UDT in order for defendants to either respond to and/or avoid denials of Logan Labs UDT claims by Government-funded healthcare programs, including Medicare;

(k)     waived co-pays and/or failed to collect co-pays from Government-funded healthcare program beneficiaries, including TRICARE beneficiaries, for lab-based UDT performed by Logan Labs; and

(l)     failed to return known overpayments when Defendants had full knowledge that they had submitted or caused the submission of false claims to Government-funded healthcare programs.

25.     Defendants also violated the federal FCA and analogous state false claims acts by submitting and/or causing the submission of false claims for Logan Labs UDT services that were furnished pursuant to prohibited referrals that resulted from Defendants' improper financial relationships with physicians, in violation of the physician self-referral prohibition, 42 U.S.C. 1395nn (the "Stark Law"), the federal Anti-Kickback Statute, 42 U.S.C. 1320a-7b(b), and analogous state statutes.

26.     In particular, Defendants interfered with the objective medical decision-making process by offering Surgery Partners' employed and affiliated pain management specialists incentive compensation that was based largely on revenues generated through UDT referrals to Logan Labs.

27.     Through the conduct described herein, Defendants knowingly submitted and/or caused the submission of false claims, created false records material to false claims, and/or conspired to submit false claims for UDT services to Government-funded healthcare programs, both federal and state, including Medicare, Medicaid, TRICARE, and the VA.

28.     Knowing that the claims submitted by Logan Labs were false or fraudulent, Defendants failed to return required overpayments, and are also liable under the FCA for failure to pay a known obligation to the Government.

29.     As a result of the Defendants' unlawful conduct, Defendants submitted, caused the submission, and/or conspired to submit false claims for quantitative UDT to Government-funded healthcare programs.

30.     For each quantitative UDT episode, Defendants' conduct caused the submission of a claim to Government-funded healthcare programs of approximately $2,700 to $4,600, and the fraud involved multiple testing episodes per beneficiary per year.

31.     The value of UDT claims submitted by or on behalf of Logan Labs to Government-funded healthcare programs exceeds $150 million. Government-funded healthcare programs have reimbursed Logan Labs for these UDT claims on a fee-for-service basis.

32.     Qui Tam Relators Sheldon Cho, M.D., and Dawn Baker (hereinafter Dr. Cho and Ms. Baker, and collectively "Relators"), through their legal counsel, Pietragallo Gordon Alfano Bosick & Raspanti, LLP, and Smith, Gambrell & Russell, bring this action on their own behalf, and on behalf of the United States of America and the sovereign States of Florida, Colorado, Georgia, North Carolina, and Texas, against Defendants.

33.     Dr. Cho is a board-certified pain medicine specialist who was hired by Surgery Partners in 2015, and since that time, witnessed the Defendants' efforts to refer patients to Logan Labs for unnecessary and excessive quantitative UDT services.

34.     Ms. Baker is a professional physician recruiter who has placed physicians with Surgery Partners since 2009, and through the course of her interactions with Surgery Partners and its affiliated physicians, has direct and independent knowledge of Defendants' fraudulent practices

nationwide.

## II.    JURISDICTION AND VENUE

35.    This action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, the physician self-referral prohibition, 34 U.S.C. 1395nn (commonly known as the "Stark Law"), and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

36.    Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

37.    The Court has jurisdiction over Defendants' violations of the False Claims Acts and Anti-Kickback Statutes of the plaintiff States of Florida, Colorado, and North Carolina, pursuant to 31 U.S.C. § 3732(b), because Defendants' violations of these laws and their violations of the federal FCA arise from the same transactions or occurrences.

38.    Moreover, the Court has supplemental jurisdiction over Defendants' state law violations and causes of action pursuant to 28 U.S.C. § 1367(a) because these state law violations and claims and Defendants' violations of the federal FCA arise out of a common nucleus of operative facts.

39.    The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants have at least minimum contacts with the United States, and can be found in, transact or have transacted, business in the Middle District of Florida.

40.    Surgery Partners and Logan Labs regularly offer and perform healthcare services and submit or cause the submission of thousands of claims for payment to federal and state healthcare programs, including, but not limited to, Medicare, Medicaid, TRICARE, and the

Veterans' Administration.

41.     Defendant Toepke resides in Tampa, Florida. Defendants Doyle, Milo, and Toepke regularly conduct business in the Middle District of Florida, and each was personally involved in the Defendants' schemes to cause Surgery Partners' physicians to refer lab-based UDT to Defendant Logan Labs, without regard to medical necessity, as well as the Defendants' nationwide violations of the Stark Law and AKS. Accordingly, all Defendants are subject to the jurisdiction of this Court.

42.     Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Middle District of Florida is a district in which the Defendants can be found or transacts business and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

43.     The specific facts, circumstances, and allegations of the Defendants' violations of the federal FCA and analogous state False Claims Acts have not been publicly disclosed in a civil suit, criminal suit, or administrative civil money penalty proceedings in which the government is already a party.

**III.    PROCEDURAL HISTORY**

44.     Relators Dr. Cho and Ms. Baker are the original source of all the information upon which this Complaint is based, as that phrase is used in the federal FCA and analogous state FCAs. There has been no public disclosure of the allegations herein.

45.     To the extent any such disclosure has been made, such disclosure is unknown to Relators and Relators remain "original sources" under 31 U.S.C. § 3730(e)(4), and the similar provisions of analogous state FCAs.

46.     Relators have direct and independent knowledge of the information on which the allegations herein are based and voluntarily provided this information to the federal government

and all relevant state governments prior to filing this action. See 31 U.S.C. § 3730(e)(4).

## IV.   THE PARTIES

### A.   Relators Cho and Baker

47.   Plaintiff/Relator Sheldon Cho, M.D., a board certified pain medicine specialist, is a resident of the state of Florida and a naturalized citizen of the United States.  He graduated from Seoul National University College of Medicine in 1992, and has been practicing medicine since that time.

48.   Dr. Cho is licensed to practice medicine in the states of California and Florida.

49.   Before he moved to Florida in 2015, Dr. Cho had extensive experience in both pain management and addiction treatment.

50.   Pursuant to a September 16, 2015 employment Agreement, Dr. Cho became an employee of Defendant Tampa Pain Relief Center, Inc. (TPRC).

51.   Pursuant to that agreement, From November 2015 to the present, Dr. Cho has been in private medical practice at Surgery Partners' Florida Pain Institute (FPI) – Merritt Island, Florida.

52.   Dr. Cho also performs procedures at Defendants' Space Coast Surgery Center, which is located in the same building as FPI – Merritt Island.

53.   Space Coast is also the name of the Surgery Partners' region that includes six locations, including FPI – Merritt Island. The other Surgery Partners' pain management practices in the Space Coast Region are: FPI-Palm Bay; FPI-Melbourne (New Haven Ave); FPI-Melbourne (N. Wickham Rd); FPI-Viera; and FPI-Titusville.

54.   From time to time, Dr. Cho sees patients at Surgery Partners' FPI locations in addition to Merritt Island, including Viera, and Titusville.

55.     Plaintiff/Relator Dawn Baker, a professional physician recruiter, lives in the state of Missouri and a resident of the United States.  Ms. Baker graduated from Jackson College of Ministries. She has been a professional physician recruiter since 1995.   Based in St. Louis, Missouri, Ms. Baker places physicians with healthcare providers throughout the United States.

<u>**Relator Baker's Interactions with Surgery Partners' William Milo**</u>

56.     Since 2009, Ms. Baker has worked closely with Surgery Partners to provide physician recruitment services. In that capacity, she has interacted with Surgery Partners' physician recruitment executives, including Defendant William Milo.

57.     Milo served as Surgery Partners' Director of Human Resources from 2007 until mid-2010, and then as Vice President of Operations & Physician Services, and Vice President of Administration at Surgery Partners. He also served as Vice President of Logan Labs from 2011 until sometime before his departure in late 2015.

58.     Defendant Milo holds a bachelor's degree in Marketing from Florida State University, a master's degree in Business Administration from Hodges University, and a Senior Professional in Human Resource (SPHR) certification from the Society for Human Resources Management.

59.     Prior to Surgery Partners, Milo served as the Associate Administrator of Medical Surgical Specialists, a 70 physician group practice of Health Management Associates (HMA, now a part of CHS). He has no formal medical training or clinical experience.

60.     As Vice President of Operations/Administration, Defendant Milo oversaw Surgery Partners' physician services division, including the Pain Relief Center Defendants, as well as the startup of Logan Labs.

61.     During 2011, Defendant Milo related to Ms. Baker that he approached Surgery

13

Partners' CEO, Doyle, and proposed that Surgery Partners would benefit from owning its own laboratory. Thereafter, Mr. Milo drafted a formal proposal, which Mr. Doyle approved.

62. As a result, in the fall of 2011, Surgery Partners began operating a subsidiary UDT laboratory, Defendant Logan Labs. Defendant Milo initiated and was responsible for the startup of Defendant Logan Labs.

63. Milo was intimately involved in establishing Logan Labs, including establishing the lab's ability to bill Government healthcare programs for UDT services. In September 2011, when Surgery Partners applied the NPI for Logan Labs, 1720361173, Defendant Milo was identified as the Vice President associated with the application.

64. When Defendant Toepke arrived at Surgery Partners in August 2014 and became Group President, Ancillary Services, Defendant Milo's title was changed to Vice President of Operations and Physicians Services. From that time, Defendant. Milo was no longer directly responsible for Logan Labs operations.

65. From 2011 until his departure in December 2015, upon information and belief, Defendant Milo was personally involved in implementing Surgery Partners' efforts to generate revenues from Logan Labs, including through referrals of Government healthcare programs beneficiaries, by Surgery Partners' physicians, including those at the Pain Relief Center Defendants to Logan Labs for UDT services.

66. At the time of the September 2015 IPO for Surgery Partners, Inc., Defendant Milo was the beneficial owner of 243,661 shares of common stock. In December of 2015, after the Surgery Partners' IPO, Milo left Surgery Partners. At the time, Surgery Partners paid him millions of dollars for redemption of his Surgery Partners stock.

67.     Although he is no longer actively working for Surgery Partners or its subsidiaries, the Surgery Partners website continues to list Milo as an employee.   This may be because Surgery Partners has exercised an option in Mr. Milo's contract to extend the restrictive covenant for two years while paying him his full salary.

68.     When Defendant Milo left Surgery Partners in December of 2015, Chrissy Infinger, Assistant Vice President (AVP), Business Development assumed physician recruitment responsibilities and became Ms. Baker's point of contact going forward.

69.     Over eight years, from 2009 through December of 2016, based on her years of experience in the industry, Dawn Baker recruited more than 30 physicians for Surgery Partners practices throughout the country, including: Florida (Orlando, Tampa, Miami metro areas, as well as Jacksonville, Sarasota, Merritt Island, Melbourne, Wellington/West Palm); Colorado (Denver and Colorado Springs); Asheville, North Carolina, and Lebanon, Pennsylvania.

70.     Ms. Baker recruited predominantly pain management physicians and orthopedic surgeons for Surgery Partners, but she also recruited some ophthalmologists. Ms. Baker receives a flat fee from Surgery Partners for each physician she successfully placed.

B.     **The Surgery Partners Defendants**

1.     **Defendant Surgery Partners, Inc.**

71.     Defendant Surgery Partners, Inc. is a Delaware corporation which is headquartered at 40 Burton Hills Boulevard, Suite 500, Nashville, Tennessee 37215.

72.     Surgery Partners, LLC is a Florida limited liability company that was formed in 2004 by a Florida pain specialist. From 2007 until 2014, the principal place of business for Surgery Partners, LLC was 5501 W. Gray Street, Tampa, Florida.

73.     In 2010, Surgery Partners, LLC, and its chain of pain relief clinics was sold to Defendant H.I.G. Capital, Inc. acquired for more than $153 million.

74.     In November 2011, Defendant Surgery Partners, LLC (now owned by H.I.G. Capital) merged with NovaMed, which had a focus on ophthalmology services.

75.     After the 2011 NovaMed merger, Mr. Doyle remained as CEO of the merged entity, Surgery Partners, LLC. It was during Mr. Doyle's tenure as CEO of both TPRC and Surgery Partners that Logan Labs was formed.

76.     In 2014, Surgery Partners, LLC acquired Nashville-based Symbion Healthcare, a large national multi-specialty provider of ambulatory surgery centers and hospitals, for $792 million. At the time, Surgery Partners had headquarters in Chicago, Illinois, and Tampa, Florida.

77.     Between 2011 until September of 2015, Surgery Partners, LLC operated a number of privately held Delaware corporations and Florida subsidiaries.

78.     In April 2015, after the Symbion merger, but before the IPO, the principal place of business for Surgery Partners, LLC was changed to 40 Burton Hills Blvd., Suite 500, Nashville, TN.

79.     As related below, Surgery Partners became a publicly-traded company in September of 2015.

80.     On November 2, 2015, Surgery Partners, LLC filed a registration to use the name of a Delaware corporation, Surgery Partners, Inc., within the state of Florida.

     **2.**     **H.I.G. Capital, Inc., Surgery Partners Acquisition Company, Inc., H.I.G. Capital, LLC, and H.I.G. Surgery Centers, LLC. (The H.I.G. Defendants)**

     **a)**     **Defendant H.I.G. Capital, Inc.**

81.     H.I.G. Capital, Inc. is a privately-held Florida corporation headquartered at 1001 Brickell Bay Drive, 27th Floor, Miami, Florida, 33131.

82.     H.I.G. Capital is an American-based global investor with private equity, growth equity, real estate, and other holdings in more than 200 companies, including several located in Florida. H.I.G. Capital currently has $21 billion of equity capital under management.

83.     In 2010, Defendant H.I.G. Capital, Inc. purchased Surgery Partners, LLC, and its chain of pain relief clinics for more than $153 million.

84.     Upon information and belief, both before and after the sale to H.I.G. Capital, Inc., Surgery Partners owned and operated its pain management clinics through Defendant Tampa Pain Relief Center, Inc. ("TPRC").

85.     When H.I.G. Capital, Inc. acquired Surgery Partners, LLC in 2010, Mr. Doyle, who had been the COO since 2004, became the CEO of Surgery Partners, LLC, and Tampa Pain Relief.

86.     Mr. Doyle has been the Surgery Partners' CEO for the duration of the H.I.G. defendants' ownership and/or control of Surgery Partners and its subsidiaries, including Logan Labs.

### b)     Defendant Surgery Partners Acquisition Company, Inc.

87.     In August 2011, one year after H.I.G. Capital purchased Surgery Partners, CEO, Doyle formed Defendant Surgery Partners Acquisition Company, Inc. (Surgery Partners Acquisition), a Florida corporation. The address for Surgery Partners Acquisition is the same as defendants Surgery Partners, LLC and Tampa Pain Relief: 5501 West Gray Street, Tampa, Florida.

88.     Since August 2011, Defendant Doyle has been the CEO of Surgery Partners, Surgery Partners Acquisition, and Tampa Pain Relief Center, Inc.

17

89.     As was the case for Defendant Surgery Partners, LLC, in 2015, the principal place of business for Surgery Partners Acquisition was changed to Burton Hills Blvd., Nashville, TN.

### c)     Defendant Surgery Center Holdings, Inc.

90.     As described below, Defendants formed Logan Labs in September 2011, nearly two years after H.I.G. Capital, Inc. purchased Surgery Partners and its chain of pain relief clinics (operated through subsidiaries, including defendant TPRC).

91.     In September 2011, when Surgery Partners' executive William Milo applied for the National Provider Identifier (NPI) for Logan Labs, the parent organization of Logan Labs was identified as "Surgery Center Holdings, Inc."

### d)     Defendant HIG Capital Group, LLC

92.     In August of 2015, just before the Surgery Partners IPO, Defendant H.I.G. Capital, Inc. formed HIG Capital Group, LLC, a Florida limited liability company with a principal place of business at 17401 NW 78 Avenue, Miami, Florida 33015.

93.     Defendant H.I.G. Capital Group, LLC owns or operates H.I.G. Surgery Centers, LLC. The principal business address of H.I.G. Surgery Centers, LLC is c/o H.I.G. Capital, LLC, 600 Fifth Avenue, New York, NY 10020.

### e)     Defendant Surgery Center Holdings, LLC

94.     Just before the September 2015 IPO of Surgery Partners, Inc., Defendant H.I.G. Surgery Centers, LLC, an affiliate of Surgery Partners, held 47,054,245 Class A Units of Surgery Center Holdings, LLC.

95.     At the time of the September 30, 2015 IPO, Defendant H.I.G. Surgery Center Holdings, LLC received 82 %, or 27,780,115 shares of Surgery Partners, Inc.

18

    **f)**  **Defendant Surgery Partners, Inc. – Surgery Partners'
       Reorganization**

  96.  Surgery Partners, Inc. was formed on or about April 2, 2015, as a holding company in order to facilitate an initial public offering (the "IPO") of shares of common stock.

  97.  Between April 2, 2015 and September 30, 2015, Surgery Partners, Inc. conducted business through Defendant Surgery Center Holdings, Inc. and its subsidiaries.

  98.  On September 30, 2015, Surgery Partners, Inc. became the direct parent and sole member of Surgery Center Holdings, LLC (the "Reorganization"). In the Reorganization, all of the equity interests held by the pre-IPO owners of Surgery Center Holdings, LLC were contributed to Surgery Partners, Inc. in exchange for shares of common stock of Surgery Partners, Inc. and certain rights to additional payments under a tax receivable agreement.

  99.  Between 2011 and September 2015, the Surgery Partners defendants, the H.I.G. Capital defendants, and defendants Doyle and Toepke operated Surgery Partners and its affiliates and physician practice subsidiaries (including its pain management practices), as well as Defendant Logan Labs.

  100.  On or about October 1, 2015, Surgery Partners, Inc. completed its IPO. Since that time, the Surgery Partners defendants (owned largely by the H.I.G. Capital defendants) operate their Surgery Centers and ancillary services nationwide through a publicly-traded entity, Surgery Partners, Inc.

  101.  Defendant Surgery Partners, Inc. is a holding company, and its sole material asset is an equity interest in Surgery Center Holdings, LLC.

  102.  Defendant Surgery Center Holdings, LLC was and is the sole indirect owner of the equity interests of Surgery Center Holdings, Inc. and has no other material assets.

103.    Surgery Partners' operating segments include surgical facility services, ancillary services, and optical services. Through these segments, Surgery Partners provides healthcare services in 29 states.

104.    Surgery Partners' surgical facilities segment owns or operates at least 104 surgical facilities (99 ASCs and five surgical hospitals). Surgery Partners owns these facilities in partnership with physicians and, in some cases, healthcare systems in the markets and communities it serves.

105.    Surgery Partners' surgical facilities include ambulatory surgical centers (ASCs) and surgical hospitals which primarily provide non-emergency surgical procedures across many specialties, including: otolaryngology, gastroenterology, general surgery, ophthalmology, orthopedics, cardiology and pain management.

106.    Of the 99 ASCs operated by Surgery Partners, 71 are pain ASCs, providing treatments to patients who suffer from chronic pain, including Government healthcare program beneficiaries. These treatments include: cervical and lumbar epidural injections; facet joint blocks; Radio Frequency Ablation (RFA) of the Sacro-Iliac (SI) Joint; Spinal Cord Stimulator (SCS) Trial and implantation; etc.

107.    Since 2011 (when Logan Labs was formed), Surgery Partners has owned or operated 71 pain ASCs, 28 within the state of Florida. Surgery Partners operates another 43 pain ASCs in 21 other states: Colorado (1), Georgia (2), North Carolina (2), Pennsylvania (3), Alabama (1), California (5), Delaware (1), Hawaii (1), Illinois (2), Indiana (2), Kansas (1), Louisiana (1), Michigan (1), Mississippi (2), Missouri (4), Montana (1), New Hampshire (1), Ohio (1), Tennessee (7), Texas (2), and Washington (2).

g)      **The Bain Defendants**

108.    Defendant Bain Capital, L.P. ("Bain") is an American-based global investment entity with private equity, venture capital, real estate, and other holdings in more than 800 companies, including several operating in Florida.  Bain currently has approximately $105 billion of assets under management. Bain operates and invests in other companies through various investment vehicles which it controls.

109.    Defendant BCPE Seminole Holdings, L.P. is a Delaware limited partnership created by Bain to invest on behalf of itself and its clients.  Defendant Bain Capital Investors, LLC, a Delaware limited liability company, is the sole member of Defendant BCPE Seminole GP LLC, a Delaware limited liability company, which is the general partner of Defendant BCPE Seminole Holdings, L.P.  These additional Defendants are collectively referred to as the "Bain Investments Vehicles."

110.    Defendant Bain purchased a controlling equity interest in Defendant Surgery Partners on or about August 31, 2017 via the Bain Investment Vehicles.  Specifically, Defendant BCPE Seminole Holdings LP purchased the equity in Surgery Partners' from Defendant H.I.G. Surgery Centers, LLC pursuant to a Stock Purchase Agreement dated May 9, 2017.   Upon information and belief, both before and after the sale to Bain, Surgery Partners owned and operated its pain management clinics through Defendant Tampa Pain Relief Center, Inc. ("TPRC").

**Surgery Partners' Ancillary Services 2011 –Present: Pain Relief Centers and Logan Labs**

111.    Surgery Partners also provides services that are ancillary to its main ASC business. The company's ancillary services segment includes multi-specialty physician practices, a diagnostic laboratory (Defendant Logan Labs), a specialty pharmacy, urgent care facilities, etc.

112.   Surgery Partners' network of 53 multi-specialty physician practices include pain management, otolaryngology, gastroenterology, general surgery, ophthalmology, orthopedics, and cardiology.

113.   The sources of Surgery Partners "ancillary service revenues" include, but are not limited to fees for patient visits to the Surgery Partners' physician practices (*i.e.* E&M services), reimbursements for diagnostic tests ordered by physicians (i.e., UDT), and pharmacy services.

114.   As of September 30, 2016, revenues from Surgery Partners' ancillary services subsidiaries represented 7.5% of all Surgery Partners' revenues. Of the $1.1 billion in Surgery Partners 2016 revenues, Surgery Partners' ancillary services subsidiaries generated approximately $75 Million.

115.   In 2016, the largest contributor to Surgery Partners' ancillary services revenues was Defendant Logan Lab.

### 3.   Surgery Partners' Pain Management Physician Practices Segment

116.   Since 2011, Surgery Partners has owned and/or operated at least 40 pain management physician practices in six states (collectively "the Pain Relief Center Defendants"). Surgery Partners owns and/or operates its pain management physician practices through corporate subsidiaries.

117.   While most of the pain management physician practices are located in Florida (30), during the relevant time period, Surgery Partners and the Pain Relief Center Defendants have owned and/or operated 11 pain clinics in other states:  Georgia (6), Colorado (2, Denver and Colorado Springs); Asheville, North Carolina (1); Lebanon, Pennsylvania (1), and Chesterfield, Missouri (1).

### a)      Defendant Tampa Pain Relief Centers, Inc. (TPRC)

118.    Through its subsidiary, Defendant Tampa Pain Relief Centers, Inc. (TPRC),
Surgery Partners operates the vast majority (30) of its pain management physician practices
within Florida

119.    TPRC was formed in 1996 by a Florida-based pain specialist, who expanded the
company to include a chain of surgery centers throughout the Tampa Bay area.

120.    From 2004 through 2009, Defendant Doyle served as the Chief Operating Officer
(COO) of TPRC.

121.    When H.I.G. Capital acquired TPRC in 2010, Mr. Doyle became the CEO of
Tampa Pain Management, Inc., located at 5501 W. Gray St, Tampa, FL. He held that position
through at least 2014.

122.    In 2015, the address for Tampa Pain Management, Inc. was changed to 40 Burton
Hills Blvd., Suite 500, Nashville, TN, the headquarters of Surgery Partners.

123.    From at least 2011 and the present, the Defendants, through Defendant TPRC,
operated pain management practices in the state of Florida where pain management specialists
referred most, if not all, lab-based UDT to Logan Labs.   These Surgery Partners' pain
management practices included, but were not limited to:

(a)      Pain Medicine Institute Bradenton;

(b)      Tampa Pain Relief Brandon (a/k/a Brandon Pain Management, Brandon
Pain Medicine, and Pain Medicine Inst. Brandon);

(c)      Tampa Pain Relief Fletcher;

(d)      Tampa Pain Relief Habana;

(e)      Kendall Pain Relief Center;

(f)     Central Florida Pain Centers – Lake Mary (a/k/a Lake Mary Pain Relief Center);

(g)     Tampa Pain Relief Oldsmar;

(h)     Orlando Pain Relief Center;

(i)     Central Florida Pain Relief Centers – Downtown (Orlando).   (f/k/a Rehabilitation Medical Group, Inc.).   Defendant Doyle has been the CEO of Rehabilitation Medical Group since approximately 2011. Rehabilitation Medical Group, Inc. was voluntarily dissolved on December 21, 2016;

(j)     Central Florida Pain Relief Centers – Altamonte Springs;

(k)     Central Florida Pain Relief Centers – Sandlake (f/k/a Florida Spine Sports & Rehab);

(l)     Pinellas Pain Management;

(m)     Sarasota Pain Relief Centers – Lakewood Ranch;

(n)     Sarasota Pain Relief Centers – Bee Ridge;

(o)     Sarasota Pain Relief Centers – Venice;

(p)     Sarasota Pain Relief Centers – Central Sarasota;

(q)     Palm Beach Pain Relief Center – Wellington;

(r)     South Florida Pain Relief Center – Miami;

(s)     Florida Orthopedic Partners – Armenia – Tampa; and

(t)     Space Coast Pain Institute (a/k/a Florida Pain Institute (FPI) - Merritt Island. Surgery Partners acquired this pain management practice on or about June 2015 from Dr. Golovac and Dr. Gayles.

124.   When Surgery Partners acquired Dr. Golovac's pain management practices, he

became Surgery Partners' Medical Director for all Surgery Partners' physician pain management practices, including those in Florida, Colorado, and North Carolina.

125.    During the relevant time period, Defendants tracked all referrals by physicians and mid-level providers at these Florida pain management practices to Defendant Logan Labs.

126.    Defendants identified Defendant TPRC as the referring "practice" for all of these Florida pain management physician practice locations.

127.    TPRC is identified as the "employer" for pain management specialists working at Surgery Partners pain treatment centers throughout the state of Florida.

128.    In November 2015, TPRC identified the following Officers and/or Directors in its Amended Annual Report filed with the Florida Division of Corporations: CEO and President, Michael Doyle; Senior Vice President and Secretary, Jennifer Boyd Baldock; Vice President, John Byron Crysel; Vice President, Anthony Wayne Taparo; Executive Vice President and CFO, Teresa Lynn Sparks; Vice President, George Middleton Goodwin; and Vice President, Christopher Utz Toepke.

129.    Like Defendants Doyle and Toepke, Anthony Taparo and George Goodwin held simultaneous positions with both TPRC (the referring entity for the vast majority of referrals to Logan Labs) and Surgery Partners (the owner of Logan Labs).  From the 2014 merger with Symbion, Mr. Taparo has served as President of Surgery Partners' Atlantic Group, as well as the Executive Vice President and CFO of TPRC.  From the 2014 merger with Symbion, Mr. Goodwin served as both President of Surgery Partners' American Group, and Vice President of TPRC.

### b)    Defendant Denver Pain Relief Center, PC

130.    Between 2011 and the present, Defendants operated two pain management

physician practices in the state of Colorado, one in Denver and another in Colorado Springs.

131. Defendant Denver Pain Relief Center, P.C., is a Colorado professional corporation which was formed on or about August 26, 2011.

132. Since April 27, 2012, Defendant Denver Pain Relief Center, PC (Denver Pain Relief) has done business as Colorado Springs Pain Relief Center, a physician-owned pain management practice.

133. Denver Pain Relief Center, P.C. was formed by former Senior Vice President and General Counsel of Surgery Partners, John Lawrence. At the time, Mr. Lawrence was responsible for all legal matters relating to Surgery Partners and its operations, including structuring and negotiating all acquisitions and other transactions.

134. Since April 2012, the defendants operated and/or referred to the Surgery Partners pain management practices located in Colorado as Denver Pain Relief Center, PC (Denver) and Denver Pain Relief Center, PC (COS), d/b/a Colorado Springs Pain Relief Center.

135. Through Denver Pain Relief Center, P.C., Defendants operated these two pain management practices in the state of Colorado where pain management specialists referred most, if not all, lab-based UDT to Logan Labs: Denver Pain Relief Center and Colorado Springs Pain Relief Center.

136. On October 26, 2015, Defendants changed the principal address for Denver Pain Relief Center, PC from 799 E. Hamden Avenue, Englewood, Colorado, to 40 Burton Hills Blvd., Nashville, TN. At that time, Jennifer Baldock, the Vice President of Defendants Surgery Partners and Tampa Pain Relief, effectuated the address change.

c)    **Defendant Asheville Pain Relief Center, P.C.**

137. Since approximately July of 2015, Defendants operated one pain management

physician practice in the state of North Carolina, Asheville Pain Relief Center, P.C., a North Carolina corporation.

138.    Lesco Lloyd Rogers, MD is identified on filings with the North Carolina Secretary of State as the President and incorporator of Asheville Pain Center, P.C.

139.    During the relevant time period, Defendants' pain management specialists at Asheville Pain Relief Center referred most, if not all, lab-based UDT to Logan Labs.

140.    During the relevant time period, Defendants tracked the referrals from Asheville Pain Relief Center to Defendant Logan Labs.  Defendants identified "Asheville Pain Relief Center, PC" as the referring "practice" for all referrals to Logan Labs from this North Carolina pain management physician practice.

### d)      Defendant Lebanon Pain Relief Center, PC

141.    Between 2011 and the present, Defendants operated one pain management physician practice in the state of Pennsylvania, Defendant Lebanon Pain Relief Center, PC.

142.    During the relevant time period, Defendants tracked the referrals from Surgery Center of Lebanon, LP to Defendant Logan Labs.  Defendants identified "Lebanon Pain Relief Center, PC" as the referring "practice" for all referrals from this Pennsylvania pain management physician practice.

143.    During the relevant time period, Defendants' pain management specialists at Lebanon Pain Relief Center referred most, if not all, lab-based UDT to Logan Labs.

### e)      Defendant Dallas Pain Relief Center, PC

144.    During the relevant time, Defendants operated one pain management physician practice in the state of Texas, Dallas Pain Relief Center, PC, which was registered with the Texas Secretary of State in May of 2013.

145.   Dallas Pain Relief Center was located at 7709 San Jacinto Place, Plano, Texas.

146.   During the relevant time period, Defendants' pain management specialists at Dallas Pain Relief Center referred most, if not all, lab-based UDT to Logan Labs, and Defendants tracked the referrals from Dallas Pain Relief Center to Logan Labs.

**f)      Georgia Pain Management Physician Practices**

147.   During the relevant time, Defendants operated six pain management physician practice locations in the state of Georgia: Brunswick, Dublin, Savannah, St. Mary's, Vidalia, and Waycross.

148.   The defendants operated their Georgia practices under the names Coastal Pain Center and/or Consultants in Pain Medicine.

149.   During the relevant time period, Defendants' pain management specialists in Georgia referred most, if not all, lab-based UDT to Logan, and Defendants tracked all of the referrals from Georgia pain specialists to Logan Labs.

**4.      Defendant Logan Laboratories, LLC (Logan Labs)**

150.   Defendant Logan Laboratories, LLC is a limited-liability corporation, incorporated in the State of Delaware, and headquartered at 5050 West Lemon Street, Tampa, Florida.

151.   Logan Labs was incorporated on or about September 19, 2011. That same day, the company was registered with the Florida Division of Corporations as a foreign limited liability company. On September 22, 2011, defendants obtained an NPI for Logan Labs: 1720361173.

152.   Logan Labs is a wholly-owned subsidiary of Surgery Partners. In its registration as a foreign limited liability company, Logan Labs identified its managing members as Michael

Doyle, CEO, 5501 West Gray Street, Tampa, Florida 33609. Its business in Florida was identified as "medical laboratory services."

153.    Logan Labs is a national provider of diagnostic services, namely urine toxicology testing (a/k/a UDT) services.

154.    Patient urine samples must be collected at physician practices, packaged and transported to Logan Labs' facility in Tampa, Florida. Logan Labs has a billing address in Cincinnati, Ohio.

155.    The Logan Labs results are not available for one to two weeks after the specimen is collected. Curiously, even though Surgery partners' wholly-owned subsidiary is providing the laboratory testing and issuing a report, the EMR at Surgery Partners' physician practice was not integrated with the Logan Labs software until around October 2016 (five years after Logan Labs was created). During this time, Logan Labs reports had to be printed, and paper copies were transferred to the patient record by scanning them into the EMR to achieve integration.

156.    Physicians at Surgery Partners practices do not have prompt access to UDT results when samples are sent to Logan Labs. They must wait for Logan Labs' final report and integration in the patient EMR before they can consider the effect of Logan Labs UDT on patient care.

157.    Defendants, through Logan Labs, submit, or cause the submission of claims for Logan Labs services to Government-funded healthcare programs.

158.    Defendants know that, as a condition of payment by Government-funded healthcare programs, the qualitative UDT or quantitative UDT services on the Logan Labs claim must be medically necessary as determined by the unfettered and independent medical judgment of the treating physician.

29

159.    When Defendants submitted or caused the submission of Logan Labs claims for UDT that resulted from Defendants' policies and procedures requiring referrals of UDT to Logan Labs without regard to medical necessity, and in interference with the independent medical judgment of the treating physician, these claims were false.

160.    Since its founding in 2011, Logan Labs has derived a significant portion of its revenue from claims for UDT services that the Defendants submitted or caused to be submitted to government-funded healthcare programs.

161.    Defendant Logan Labs was reimbursed by Government-funded healthcare programs on a fee-for-service basis, including, but not limited to: Medicare, Railroad Medicare, Medicaid (including Florida, Colorado, Georgia, North Carolina, and Texas); TRICARE; The Veterans' Administration (VA); and CHAMPVA.

162.    For example, between 2012 and June of 2015, Defendants submitted or caused Logan Labs to submit in excess of $130 million in claims for quantitative UDT ("confirmation tests") to Medicare, including Medicare Part B of Florida and Railroad Medicare.

163.    In addition, Medicare Part B data for 2014 shows that Logan Labs had the highest average Medicare payment per patient for the state of Florida, $1,834, while the average statewide was $237. Logan Labs also billed Medicare for an average of 82 services per patient, where the average for other laboratories in Florida was 19.

164.    During this same time period, Defendants submitted or caused Logan Labs to submit in excess of $17 million in claims for quantitative UDT ("confirmation tests") to TRICARE.

165.    Defendants submitted or caused Logan Labs to submit in excess of $570,000 in claims for quantitative UDT ("confirmation tests") to Florida Medicaid. In contrast, Defendants

billed Medicaid for only $3,469 in urine drug screening (qualitative) tests, and this was during 2013 only.

166.    In addition, since its founding in 2011, Logan Labs also derived substantial revenues from claims for UDT services billed to private insurers who administer government healthcare programs, including: Eden Health (Medicare Advantage and Medicaid managed care); United Healthcare (UHC) Medicare Part C plans; Humana Medicare; AARP Medicare; and CarePlus Medicare plans.

167.    For example, between 2012 and June of 2015, Defendants submitted or caused Logan Labs to submit in excess of $41 million in claims to UHC seeking reimbursements for quantitative UDT ("confirmation tests") services provided by Logan Labs to UHC participants in Medicare Part C (Medicare Advantage) Plans, including UHC Evercare and UHC Medicare Complete.

168.    Logan Labs also billed the United States Department of Labor for testing performed relative to the workers compensation program of the Federal Employees' Compensation Act (FECA).

169.    Defendants also knowingly steered referrals of lab-based UDT from physicians who have a financial relationship with Surgery Partners to Logan Lab. For example, Defendants did not establish the robust sales force needed to market its services to physicians who are not financially related to the Surgery Partners Defendants. On information and belief, at one time, Logan Labs had approximately five sales representatives who marketed to unaffiliated physicians. Currently, Logan Labs has only two or three such sales representatives, one of whom is Terry McNamara.

170.    During the relevant time period, nearly all of the claims submitted by Logan Labs

to Government-funded healthcare programs were for lab-based UDT services referred by physicians working at Surgery Partners' pain management physician practice subsidiaries: Defendant TPRC; Defendant Denver Pain Relief Center, PC; Defendant Lebanon Pain Relief Center, and pain relief subsidiaries located in Georgia, North Carolina and Texas.

a)      **Individual Defendants**

(1)      **Defendant Michael T. Doyle**

171.    Defendant Michael T. Doyle currently resides at 3417 S Beach Drive, Tampa, Florida 33629.

172.    Since 2004, Doyle has served in a leadership position at Defendant Surgery Partners and its related entities. Prior to joining Surgery Partners, Doyle served as SVP of Operations for HealthSouth.  Mr. Doyle does not have medical training or experience.

173.    From 2004 through 2009, Defendant Doyle was the Chief Operating Officer of Defendant Surgery Partners, LLC. From 2010 until 2014, Mr. Doyle served as the CEO of Surgery Partners, LLC. Since 2011, Defendant Doyle has also served as the CEO of Defendant Logan Labs.

174.    Mr. Doyle has been with Surgery Partners since its beginning and has been touted with "growing the company organically and through acquisitions." Mr. Doyle's compensation is based in part on his ability to grow the company "organically."

175.    Organic growth refers to generating revenues from the company's current assets (i.e., pain management practices who generate revenues for the company's wholly-owned lab), rather than through acquisitions of additional surgery centers or physician practices.

176.    Upon information and belief, in approximately 2011, Defendants Doyle and William Milo established Surgery Partners' own urine drug testing laboratory (Defendant Logan

Labs) in order to generate "organic" revenue from Surgery Partners' affiliated physicians, including its employed pain management specialists.

177.    At the time of the Surgery Partners' September 2015 IPO, Michael Doyle owned 9.5% (3,208,389) of the shares of common stock of Surgery Partners, Inc.

178.    Defendant Doyle's stock is valued at an estimated $62.5 million (based on a March 31, 2017 closing price of $19.50 per share).

179.    During the relevant time period, Mr. Doyle has transferred a portion of his shares of common stock of Surgery Partners, Inc. to a trust for the benefit of his immediate family.

### (2)    Defendant William Milo

180.    Defendant Milo currently resides at 12622 Stanwyck Circle, Tampa, Florida 33626 and does business at 4730 N Habana Avenue, Suite 204 Tampa, Florida 33614.

181.    As alleged above, from 2007 until mid-2010, Milo served as Surgery Partners' Director of Human Resources. Thereafter he was Surgery Partners' Vice President of Operations & Physician Services, and Vice President of Administration at Surgery Partners. He also served as Vice President of Logan Labs from 2011 until sometime before his departure in late 2015.

182.    As alleged above, while Vice President of Operations/Administration, Defendant Milo oversaw Surgery Partners' physician services division, including the Pain Relief Center Defendants, as well as the startup of Logan Labs.

183.    As also alleged above, Milo was directly responsible for establishing Logan Labs, including establishing the lab's ability to bill Government healthcare programs for UDT services. In September 2011, when Surgery Partners applied the NPI for Logan Labs, 1720361173, Defendant Milo was identified as the Vice President associated with the application.

### (3)    Defendant Christopher Utz (Chris) Toepke

184.    Defendant Toepke currently resides at 4922 New Providence Ave., Tampa, Florida, 33629.

185.    From August 2014 to the present, Toepke has served as Surgery Partners, Inc. Group President, Ancillary Services. In that capacity, Toepke is responsible for Surgery Partners' division made up of the company's non-surgical business lines, including physician services and the company's diagnostic laboratory subsidiary, Defendant Logan Labs. Since joining Surgery Partners, Defendant Toepke has also served as a Vice President for Defendant TPRC.

186.    Mr. Toepke is responsible for "setting strategic direction, driving growth both organically and through acquisition, building an organization dedicated to operational excellence and physician and other key stakeholder relationship management."

187.    Like Defendant Doyle, Mr. Toepke has been focused on generating revenue through "organic" growth, which upon information and belief, includes growing Surgery Partners revenue through physicians who are employed and/or otherwise affiliated with Surgery Partners.

188.    Since his arrival at Surgery Partners and its subsidiaries in August of 2014, Defendant Toepke has been an enthusiastic proponent and enforcer of the Defendants' policies and strategies aimed at causing Surgery Partners' pain management physicians, including Dr. Cho, to refer patients to Defendant Logan Labs without regard for medical necessity.

189.    At the time of the September 2015 IPO for Surgery Partners, Inc., Defendant Toepke was the beneficial owner of 67,316 shares of common stock. Mr. Toepke's stock is valued at an estimated $1.3 million (based on a 3/31/2017 closing price of $19.50 per share).

190.    In his capacity as Defendant Surgery Partners' Vice President, Mr. Toepke also speaks at conferences related to ASC management and physician practices.  For example, in February 2017, Mr. Toepke was a panelist at the 2017 ASC & Physician Practice Management Symposium held in Miami, Florida. His panel addressed the following topics: "hot specialties, including...pain management;" "Strategies and issues related to expanding platforms and bolt-on acquisitions...The carrot: incentivizing productivity post-transaction through bonus pools, rollover equity and earnouts...The stick: incentivizing productivity post-transaction through clawbacks and holdbacks."

191.    Prior to August 2014, Toepke served as a Business Unit President for One Call Care Management, a leading third-party vendor of specialty medical services to workers' compensation payers. Before that, Mr. Toepke was a management consultant with Bain & Company, where he focused on growth strategy, performance improvement and private equity due diligence projects.

192.    Mr. Toepke has a BA from Lafayette College and an MBA from the J.L. Kellogg School of Management, Northwestern University. Other than his experience in the workers' compensation arena, Mr. Toepke does not have any medical or healthcare experience.

193.    Mr. Toepke lacks medical training and professional experience, including the areas of clinical laboratory services, pain management or addiction treatment.

## V.    BACKGROUND ON FEDERAL & STATE-FUNDED HEALTH INSURANCE PROGRAMS

### A.    Medicare Program: Coverage Only for Medically Necessary Services

194.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled.  Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and

people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant). Medicare now has four parts: Part A (inpatient hospital treatment); Part B, Part C (managed care plans), and the Part D (prescription drug) Program.

195.     Medicare Parts A and B are often referred to, collectively, as "Original Medicare".

196.     Medicare Part B (Medical Insurance) covers certain medical services, such as clinical laboratory test services, doctors' services and other outpatient care. Part B pays for covered health services and supplies only when they are medically necessary. 42 U.S.C. § 1395k(a)(2)(B).

197.     Defendants submitted claims to and received payment from Medicare Part B for the UDT services provided by Surgery Partners' subsidiary, Logan Labs.

198.     Medicare Part C (Medicare Advantage) provides Medicare recipients with additional, private healthcare plans that provide coverage consummate with that provided in Original Medicare (Parts A and B) and may provide additional coverage as well. These private healthcare plans, referred to as Medicare Advantage plans, receive substantial federal funds. Thus, when providers submit claims to Medicare Advantage or Medicare Part C plans, they are submitting claims to government-funded healthcare programs.

199.     Defendants also submitted claims to and received payment from Medicare Part C plans (Medicare Advantage) plans for the UDT services provided by Surgery Partners' subsidiary, Logan Labs

200.     Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

201.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS. Much of the daily administration and operation of the

Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

202.    To participate in the Medicare program as a new enrollee, clinical laboratories such as Logan Labs must submit a Medicare Enrollment Application, CMS Form-855B. Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

203.    Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. §424.516(a0(1).

204.    An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the]supplier to all of the laws, regulations, and program instructions of the Medicare program."

205.    Authorized officials for Logan Labs were required to sign the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

206.    The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

207.    To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent (known as the 837P form).

208.    Among the information the provider or supplier includes on a CMS 1500 or 837P

form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

209.    Each request for payment or bill submitted for an item or service payable under Medicare Part B must include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

210.    During the relevant time period, Defendant Logan Labs performed all of its UDT in its single facility in Florida, and submitted all claims to the Medicare contractor responsible for processing Medicare Part B claims in that state,

211.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are, medically necessary.

212.    Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act, establish that, as a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. § 424.10. Regardless of the rules governing the particular type of care, in order for the federal government to cover services under Medicare Part A or Medicare Part B, or for a Medicare Part C plan to provide coverage, all care must be "medically necessary."

213.    Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area.

214.    Medicare programs, both Part B and Part C plans, provide reimbursement to

healthcare providers or urine drug testing (UDT) services.

215.    However, the Medicare program covers UDT only when medically necessary as determined by the independent medical judgment of the beneficiary's physician.

**B.    The Medicaid Program**

216.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people. Medicaid is a cooperative federal-state public assistance program which is administered by the states.

217.    Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant. For example, in fiscal year 2017, in the state of New Jersey, the federal government provides 50% of the funding for Medicaid, while the state pays 50% of the funding. The federal government also provides greater than 50% of the funding for Medicaid programs in the plaintiff states of Florida, Colorado, Georgia, North Carolina, and Texas. The remaining funds are provided by the state. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

218.    Medicaid reimburses healthcare providers for medically necessary urine toxicology testing services.

219.    Like the Medicare Program, Medicaid only covers services or supplies that are medically necessary for the diagnosis or treatment of a medical condition, in keeping with the standards of good medical practice in the local area.

C.      **Other Federal Healthcare Programs**

220.    In addition to Medicaid and Medicare, the federal government reimburses a portion

of the cost of diagnostic services (including urine toxicology testing and the interpretation of those

results) under several other federal healthcare programs, including but not limited to

CHAMPUS/TRICARE, CHAMPVA, and the Federal Employees Health Benefit Program

("FEHBP").

221.    CHAMPUS/TRICARE, administered by the United States Department of Defense,

is a healthcare program for individuals and dependents affiliated with the armed forces.

CHAMPVA, administered by the United States Department of Veteran Affairs, is a healthcare

program for the families of veterans with a 100 percent service-connected disability.  The Federal

Employee Health Benefit Program, administered by the United States Office of Personnel

Management, provides health insurance for hundreds of thousands of federal employees, retirees,

and their survivors.

VI.    **APPLICABLE LAW**

A.      **The Federal False Claims Act**

222.    The federal False Claims Act ("federal FCA") provides, in pertinent part:

(a)      Any person who (1) knowingly presents, or causes to be presented, a false

or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or

used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a

violation of (1) or (2) is liable to the United States Government for a statutory civil penalty, plus

three times the amount of damages which the Government sustains because of the act of that

person.  31 U.S.C. §3729(a)(1)(A)-(C).

(b)      "[T]he terms 'knowing' and 'knowingly' (A) mean that a person, with

respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

**B.**   **Self-Referral Prohibitions 42 U.S.C. 1395nn (the "Stark Law")**

223.   The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for "designated health services" ("DHS"), including clinical laboratory services, if: 1) such services were referred to the entity by a physician with whom the entity had a financial relationship; and 2) the financial relationship does not fall within a statutory or regulatory exception. 42 U.S.C. §§ 1395nn; 42 C.F.R. §§ 411.351 et seq.

224.   Because compliance with the Stark Law is a condition of payment by the Medicare program, an entity may not request or receive payment for any DHS provided in violation of the Stark Law. See 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

225.   Further, federal regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

226.   A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. See 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

227.   Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing

DHS if -- (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

228.    Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ." 42 C.F.R. § 411.351.

229.    A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

230.    The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements. The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R.

### C.    The Federal Anti-Kickback Statute

231.    Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.

232.    When an entity pays kickbacks to a provider in order to induce him/her to refer or recommend patients to the entity for goods and/or services, it fundamentally compromises the integrity of the doctor-patient relationship.  Government-funded healthcare programs, such as Medicare and Medicaid, rely upon providers to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program.  As a condition of its reimbursement, government healthcare programs require that the physicians must

render their services without the conflict inherent in receipt of a kickback.

233.   The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

(1)   to refer an individual to a person for the furnishing of any item or service covered under a federal healthcare program; or

(2)   to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program.

42 U.S.C. § 1320a-7b(b)(1) and (2).

234.   The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

235.   Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. § 1320a-7b(b)(1).

236.   The federal Anti-Kickback Statute has been interpreted by the federal courts to cover any arrangement involving federal healthcare program funds where <u>one</u> purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Proof of an explicit *quid pro quo* is not required to show a violation of the Anti-Kickback Statute.

237.   A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal healthcare programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

238.   Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider

from federal healthcare programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

239.    HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse.  *See* 42 C.F.R. § 1001.952.  However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection.

240.    Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

241.    The Anti-Kickback Statute expressly provides that claims that arise from a kickback scheme are false and violate the False Claims Act.  No further express or implied false statement is required to render such infected claims false, and none can wash the claim clean.

242.    It is the very fact that the healthcare decision-maker has accepted a kickback that *per se* renders not payable the claims for goods or services as to which the kickback was given, not whether the decision-maker would have otherwise selected that good or service.

243.    Moreover, as a prerequisite to participating in federally-funded healthcare providers, like Alliance, must certify (expressly or, through their participation in a federally-funded healthcare program, impliedly) their compliance with the federal Anti-Kickback Statute.

244.    As a prerequisite to participating in the various state Medicaid programs, providers of healthcare services must certify (expressly or, through their participation in the state-funded healthcare program, impliedly) their understanding of and compliance with both the federal Anti-Kickback Statute and applicable state anti-kickback laws.  Compliance with the

44

Anti-Kickback Statute is a precondition for payment.

245.   Even in absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, *i.e.,* that it is properly payable. Consequently, if a healthcare provider pays a kickback to induce the referral or recommendation of a patient for inpatient or out-patient services and related goods, it renders false the submitter's implied or express certification of compliance that the resulting claim meets the requirements of the Anti-Kickback Statute.

246.   Many states, including those states identified as Plaintiffs herein, have enacted similar prohibitions against the provision of illegal inducements to healthcare decision-makers.

## VII.   DEFENDANTS' SCHEME TO PRESSURE AND INDUCE PHYSICIANS ACROSS THE UNITED STATES TO ORDER COSTLY QUANTITATIVE URINE DRUG TESTS

### A.   The Urine Drug Tests at Issue

247.   Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system. Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte). Different testing methodologies have different capabilities and limitations.

248.   Drug testing is performed in a number of contexts. In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

249.   Urine is the most common medium used for drug testing, and during the relevant period is was nearly the exclusive medium for testing used by Logan Labs.

250.   There are different types of urine drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

251.    "Point of care" or "POC" testing—at a physician's office or clinic—is generally performed by "immunoassay" methodologies. Three types of immunoassays that are in common use:  1) enzyme immunoassay (EIA), 2) fluorescence polarization immunoassay (FPIA) and 3) radioimmunoassay (RIA). These three types of immunoassay are based on the same general principle: binding antibodies are used to detect specific drugs or groups of drugs. Immunoassays generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels.

252.    In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips (usually 8 to 12), each of which tests for a specific drug or drug class.

253.    In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

254.    Under CLIA, CMS oversees all laboratory testing services. UDT performed using POC drug test strips and test cups is generally "CLIA-waived." CLIA-waived tests are categorized as simple laboratory examinations and procedures that have an insignificant risk of an erroneous result or pose no risk of harm to the patient if the test is performed incorrectly. 43 C.F.R. § 493.15(b). To perform CLIA-waived tests, physicians need to enroll in CLIA and obtain a waiver. 42 C.F.R. § 493.35.  To operate a benchtop or desktop analyzer, physician practices are generally required to obtain CLIA certification to perform moderate or high complexity laboratory tests.

255.    There is little difference between office-based POC drug testing and lab-based qualitative UDT except cost.  Lab-based qualitative UDT is more expensive than office-based POCT if more sophisticated technology (FPIA or RIA) is utilized.

256.    As discussed in the next section, since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer versus POC test cup with embedded test strips). As of January 1, 2011, the Medicare reimbursement for POC tests is determined by the complexity of the test under CLIA (HCPCS billing code "G0434" for CLIA-waived tests and "G0431" for high-complexity analyzer tests).

257.    POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management. Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

258.    Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and/or high-performance liquid chromatography ("HPLC"). These testing methodologies can provide quantitative results, identifying the concentration of a drug or metabolite in a sample. Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes. Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

259.    Logan Labs performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").

260.    Logan Labs' LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine.

**The Value of Confirmation Testing – Limited to Unexpected Screening Results**

261.    The clinical value of Logan Labs' "confirmatory" or "quantitative" laboratory testing depends on the physician's independent assessment of his or her patient's medical condition. The clinical utility of a "confirmation" or "quantitation" of UDT screening test results depends in part on the patient's history of compliance with drug treatment, whether there is any history of drug abuse, their clinical presentation, and whether the UDT screening test result is expected or unexpected.

262.    If a drug screening test is warranted and the results are negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory test for that drug is not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

**Guidelines on Urine Drug Testing**

263.    Professional organizations issue guidelines regarding UDT in the clinical setting, including UDT for chronic pain patients prescribed opioids. According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of UDT guidelines in the clinical setting draws on the experience of workplace drug testing, including the 21 Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines"). 73 Fed. Reg. 71858 (Nov. 25, 2008).

264.    Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class." Id. at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is

48

negative[.]" Id. at 71894. Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method. See id.

265.    Logan Labs is well aware that professional organizations and national experts have published guidelines regarding the use of UDT in clinical pain management.

266.    As Logan Labs knew, none of these guidelines recommended the routine use of quantitative laboratory testing, such as the LC-MS/MS testing that Logan Labs performs, to "confirm" expected negative immunoassay results.

267.    Instead, published guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first and then only unexpected results are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

268.    For example, recommendations are made by other authoritative entities, including the ASIPP and SAMSHA. *See* Manchikanti L, Abdi S, et al., Pain Physician 2012; 15:S67-S116, ISSN 1533-3159, ASIPP Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain; Substance Abuse and Mental Health Services Administration, Clinical Drug Testing in Primary Care, Technical Assistance Publication (TAP) 32, HHS Publication No. (SMA) 12-4668. D. Reimbursements for Laboratory Tests

269.    Different types of urine drug tests have different costs. Since January 2011, POC test cup tests have been billed to Medicare using HCPCS code G0434 and reimbursed at a fixed rate of approximately $20-25 per patient encounter—regardless of the number of substances tested. Also since January 2011, POC high-complexity immunoassay tests have been billed to Medicare using HCPCS code G0431 and reimbursed at a fixed rate of approximately $100 per patient encounter—again, regardless of the number of substances tested.

270.    Relators believe that prior to their involvement with Surgery Partners, the vast majority of competent pain management providers affiliated with the Defendants who provide care to Government healthcare beneficiaries would have used qualitative UDT (a/k/a drug screening tests) to detect the presence of alcohol or drugs in the beneficiaries' bodies.

271.    The simple and quick urine dip stick test is an example of "qualitative" or "drug screening" test. It is simple to administer, inexpensive, and the results are available immediately while the patient is still in the provider's office.

272.    When the urine dip stick UDT is used, because the results are available while the patient is still in the office and can be considered for the patient's plan of care, there is no need for a follow-up visit to consider UDT results.

273.    In contrast, quantitative UDT (a/k/a confirmation testing) such as Logan Labs' LC-MS/MS technology requires that the patient's urine sample is referred to an outside lab for testing. It is expensive and the results are not available during the patient's appointment. When quantitative or confirmation UDT results are received weeks later, the patient must return for a follow-up visit to consider these results in the patient's plan of care (even when quantitative UDT was not medically necessary at the initial visit).

274.    In pain management, when medically necessary, providers first employ drug screening, or qualitative UDT. When medically indicated, after the qualitative (drug screening) UDT, Pain management providers will refer patients for medically necessary quantitative (confirmation) UDT.  For example, when the result of the drug screening test is different from what the provider would expect based on the patient's medical history, clinical presentation, or the patient's own statements, the provider may confirm the results of their examination and screening UDT by referring the patient to an outside lab for quantitative UDT.

50

275.   Although quantitative UDT can be ordered in the first instance in the rare situations that it is medically necessary, pain management specialists do not regularly refer patients for quantitative (confirmation) UDT without the benefit of qualitative (screening) UDT.

276.   For example, before November of 2015, when Dr. Cho worked at a California Detox Clinic, his practice involved use of random drug screening tests (dip stick cups) whenever medically necessary. If the drug screening test results yielded unexpected positive or negative results, and Dr. Cho determined it was medically necessary to order confirmation (qualitative) UDT, he would order only those tests that were medically warranted.

277.   In general, based on Dr. Cho's 20 years of experience in pain management, between 10% and 15% of medically necessary qualitative UDT (drug screening tests) will require a quantitative test to confirm the result of a drug screening UDT (urine cup test) to eliminate the possibility of a false positive or negative result. This statistic varies depending on the age and prevalence of drug abuse among the clinic population.

**B.     Surgery Partners' Two Schemes to Fraudulently Generate UDT Referrals for Logan Labs**

278.   Since late 2011, Defendants have concurrently employed at least two fraudulent schemes aimed at interfering with the independent medical judgment of providers (both physicians and mid-level providers) working at physician practices owned or operated by Surgery Partners in order to generate hundreds of millions of dollars in referrals to Defendant Logan Labs, located in Tampa, Florida.

279.   First, Defendants pressure physicians and manipulate Surgery Partners' physicians' office practices and patient records to create referrals of medically unnecessary UDT to Logan Labs.

280.   Second, Defendants offer incentive compensation to Surgery Partners' affiliated

physicians, who are in a position to refer to UDT services to Logan Labs, that is based on profits generated by Surgery Partners' ancillary services subsidiaries, including Logan Labs.

C.    **Surgery Partners' Pressure on Physicians and Mid-Level Providers and Manipulation of Office Practices and EMR to Generate Referrals to Logan Labs Without Regard for Medical Necessity**

281.    Defendants knew that Government-funded healthcare programs, including Medicare, Medicaid, TRICARE, and the VA only cover laboratory testing that is reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, as determined by the patient's provider, based on his or her medical condition. See, e.g., 42 U.S.C. § 1395y(a)(10(A).

282.    The medical necessity for each test for each patient must be individually assessed and documented in the patient's medical record. 42 C.F.R. §§410.32(a),(d)(2).

283.    For years, Surgery Partners has employed various schemes whose purpose was to steer patient referrals for UDT, including Government healthcare program beneficiaries, to Surgery Partners' wholly-owned subsidiary, Logan Labs.

284.    As described below, this scheme was employed at Surgery Partners' practices nationwide.

1.    **Surgery Partners executives improperly interfered with the physicians' and mid-level provider's independent medical judgment by pre-selecting patients, including Government healthcare program beneficiaries, for expensive quantitative UDT services when the patients arrived at the Surgery Partners practice -- before the patients were even seen by their physician or a mid-level provider.**

285.    In September of 2015, Dawn Baker recruited Dr. Cho as a pain specialist for Surgery Partners' FPI - Merritt Island, Florida location, which is part of the defendants' Space Coast region.

286.     When Dr. Cho arrived at Surgery Partners' FPI – Merritt Island two months later, in November of 2015, he came to learn that Surgery Partners' employees obtained urine samples for UDTs from his patients before he either saw the patient or ever ordered any type of UDT.

287.     Dr. Cho also observed that the names of patients whose insurance would cover Logan Labs tests, including beneficiaries of Government healthcare programs, were highlighted in yellow, which meant that they were pre-selected for referral for UDT services.

288.     When he asked for the reason behind this unusual practice, he was informed by Tracy Helfeldt, the Administrator at FPI-Merritt Island, that Surgery Partners' policy was to obtain urine samples from pre-selected patients as soon as they checked in for their appointment.

289.     When he challenged this policy, Ms. Helfeldt responded that Surgery Partners implemented this practice of ordering UDT for pain management patients at each office visit purportedly to comply with Florida law. She remarked that being from California, Dr. Cho was just not familiar with the local laws in Florida.

290.     Dr. Cho also questioned Surgery Partners executives about the policy of collecting urine samples for UDT even before he had seen the patient or determined that UDT was needed.

291.     For example, after Dr. Cho reviewed the relevant law and confirmed that it did not require UDT at every patient visit, he complained about this practice to Chris Toepke during July of 2016.

292.     Beginning in November of 2016, the physicians who Ms. Baker had recruited began to inform her that they had given Surgery Partners notice and they discussed with her the circumstances leading to their decision to leave Surgery Partners. Many of the pain specialists whom she had recruited cited Surgery Partners' scheme to use their physician practices as a conduit for UDT referrals to Logan Labs.

293.     Other Surgery Partners pain specialists across the country who had been recruited by Ms. Baker had also experienced Surgery Partners' policies and procedures aimed at steering UDT referrals to Logan Labs.  For example, in May of 2015, Ms. Baker had recruited pain specialist Damaceo Howard, MD to practice at Surgery Partners' Colorado Springs Pain Relief Center. Dr. Howard has been practicing as a pain specialist in Surgery Partners' Colorado Springs Pain Relief Center since that time.

294.     From the time he began there, Dr. Howard also experienced Surgery Partners' program of obtaining urine samples from his patients before he had seen them. He had concluded that this practice was implemented in order to create referrals of lab-based UDT (expensive quantitative testing) to Logan Labs.

295.     Dr. Howard implemented a number of tactics to attempt to avoid medically unnecessary referrals of lab-based UDT to Logan Labs. For example, when he could, Dr. Howard would attempt to intercept urine samples and throw them away. He did this so that Surgery Partners employees could not send the urine sample would not be available for Surgery Partners to refer the patient for unnecessary expensive lab-based UDT.

> **2.     Surgery Partners fraudulently obtained the consent of patients, including Government healthcare program beneficiaries, to UDT by falsely representing that quantitative UDT services were required multiple times per year in order to comply with state and/or federal laws.**

296.     Since at least May 2016, Surgery Partners' Florida Pain Institute (FPI) has used a New Patient Intake Form which includes its "Urine Toxicology Screen Policy." Surgery Partners' policy purports to "inform patients as to why you have been asked to give a urine specimen and information regarding the billing of the specimen." Surgery Partners tells patients that changes in Florida law in 2010, specifically 64B8-9.0131, Training Requirements for Physicians Practicing in

Pain Management Clinics (https://www.flrules.org/gateway/ruleno.asp?id=64B8-9.0131)   require

pain management practices to test patients at least twice per year   (**"whether you are being**

**prescribed no medications or multiple medications"**) and that "if there are inconsistencies in

your results, it is up to the physician /practitioner to retest randomly as needed." (Emphasis in the

original).

297.     Surgery Partners also clearly attempts to shift the responsibility for UDT to the

physicians at their pain practices: "In an effort to provide timely service while reducing energy and

cost to our patients, the physicians have assumed the responsibility of providing laboratory services

for urine confirmations. The physicians have an ownership interest, but understand if you, the

patient request to send your lab work to a secondary facility, we will honor that request."

298.     The Urine Toxicology Policy also states: "Florida pain understands that this testing

may come as an added expense to you…We will make every effort to keep your expenses down and

still maintain our contracts with you [sic] insurance carrier, as to keep claims 'in network,' with

your insurance. Therefore, it is important to confirm correct insurance at every visit, to ensure that

your claim is filed properly."

299.     This patient notice is a pretext to justify referring Surgery Partners patients for UDT

at every visit and to shift responsibility for Surgery Partners' corporate UDT policies to the

physicians and mid-level providers who work at Surgery Partners' pain management practices.

300.     Surgery Partners notice contains both misrepresentations and false statements. It

misrepresents Florida rule 64B8-9.013 in order to justify expensive and unnecessary UDT.  The

false statements in this patient notice include: 1) there are no in-office laboratories permitted by

Surgery Partners (even Dr. Cho's location had a lab and Surgery Partners closed it) so that all UDT

is sent to outside labs, particularly Logan Labs; 2) Surgery Partners does not "make every effort to

keep your expenses down." Instead, Surgery Partners causes their providers to order expensive quantitative UDT, particularly for Medicare patients, who are sent to Logan Labs; and 3) Surgery Partners' UDT policy requires UDT of every patient – they do not permit providers to use their independent medical judgment to determine type or frequency of UDT.

301.    The mention of the physicians' "ownership interest" in the confirmation testing, upon information and belief, refers to Surgery Partners' ownership interest in Logan Labs, which received the vast majority of UDT referrals from Surgery Partners' physicians and mid-level providers.

> **3.    Surgery Partners employed company-wide policies PROHIBITING physicians and mid-level providers from using simple screening UDT methods (i.e., inexpensive and effective dip-stick cups) in the office, which caused gross over-utilization of expensive quantitative UDT.**

302.    When Dr. Cho first arrived at Surgery Partners' FPI - Merritt Island in November of 2015, he presumed that he would follow the good medical judgment that he had formed in more than 20 years as a pain management specialist, as well as his professional experience in addiction treatment.

303.    This means that, only when medically necessary, would he order screening (qualitative) UDT using a simple dip stick cup, while the patient was in the office.

304.    When physicians use simple qualitative UDT, they obtain the test results while the patient is present at the physician's office. If the simple dip stick UDT is negative, there is usually no need to perform additional quantitative UDT (confirmation testing) to confirm an unexpected negative result.

305.    Although quantitative (confirmation) UDT can be ordered without first performing the inexpensive dip stick drug screening, this is very rarely medically necessary.

306.    Dr. Cho also knew that, because it was not necessary to subject patients to

quantitative UDT at every clinic visit, Medicare prohibited the routine use of confirmation UDT.

307.     Dr. Cho learned soon after arriving at FPI – Merritt Island that Surgery Partners did not permit its providers to use inexpensive dip stick tests (a/k/a screening or qualitative UDT) that could be administered while the patient was present at its pain management centers.

308.     Surgery Partners prohibition of qualitative UDTs to be administered while the patient was in their pain clinics resulted in all urine samples being sent to outside referral labs, particularly Logan Labs.

309.     There is no medical necessity for an outside lab to perform screening UDT because the utility of these tests is that they are inexpensive, they are administered in the physician's office, and they provide immediate results while the patient is still in the physician's office.

310.     Thus, when a patient's urine sample was collected at Surgery Partners' physician practices, it was referred to outside labs, particularly Logan Labs, for expensive confirmation UDT.

311.     Surgery Partners' practices caused false claims to be submitted by Logan Labs submitted to Government-funded healthcare programs, including fee-for service programs (Medicare Part B, Tricare, VA, Medicaid) and managed care plans (including Medicare and Medicaid) were for lab-based "confirmation" quantitative UDT.

312.     One reason that Logan Labs' claims were false was that the referring Surgery Partners physicians and mid-level providers were prohibited, when medical necessity warranted, from ordering and/or performing the inexpensive screening UDT for the presence of drugs. This caused gross over-utilization of "confirmation" quantitative UDT to be performed by Logan Labs and to be billed to Government-funded healthcare programs.

313.     Surgery Partners' policies also caused patients to return to the Pain Clinic more frequently than is necessary, causing additional false claims for unnecessary physician services.

314.    Each time Surgery Partners physicians employ the corporate practice of ordering quantitative UDT before prescribing pain medication, it requires the patient to submit to lab-based quantitative UDT, wait for the results to come back from Logan Labs, and return to the office for the pain medication.

### Dr. Cho's Resistance to Surgery Partners' UDT Fraud

315.    Between February and June 2016, Dr. Cho received serious complaints from patients regarding unreasonably expensive UDT bills from labs, ranging $3,200 to $4,600 at each testing episode.

316.    Before this, Dr. Cho had been informed that using quantitative UDT was Surgery Partners' company policy and he had to comply as an employed physician. However, Surgery Partners did not have a written UDT policy.

317.    On July 11, 2016, Surgery Partners' Practice Administrator, Tracy Helfeldt sent an email to the providers at FPI-Merritt Island notifying them of a provider meeting with Surgery Partners corporate leadership on July 26, 2016.

318.    That same day, in response, Dr. Cho wrote an email and "replied all" to the recipients of Ms. Helfeldt's email.  In his communication, Dr. Cho expressed concerns about being required to use Logan Labs, the excessive charges associated with UDT performed by Logan Labs, and the poor quality of the test results coming from defendant Logan Labs, compared to other lab companies, such as LabCorp or Quest.

319.    In particular, Dr. Cho cited that 20 to 30% of Logan Labs reports include critically high levels (over the reference limit) of opioids, nearly all of which do not match with the providers' clinical observations. Dr. Cho opined that Logan Labs had "critical problems in calibration or quality control process or they keep using broken equipment without repair."

320.    Dr. Cho also cited increases in Logan Labs' UDT fees from $2,400 to $4,600 "without reason," and unbundling of charges.

321.    The next day, July 12th, Matthew Richardson, Surgery Partners' Senior Vice President of Physicians Services, responded to Dr. Cho. After indicating that he had contacted Logan Labs "to correct [Dr. Cho's] perceptions." Mr. Richardson admonished Dr. Cho to contact Surgery Partner executives (Mr. Richardson or Chris Toepke) in the future so that they could "quickly clarify any questions that you may have with Logan and processes that may appear inaccurate. A group email such as this is not the forum for this."

322.    On July 12, 2016, Defendant Chris Toepke, Surgery Partners' Group President, Ancillary Services, also wrote in response to Dr. Cho's email of the day before. Toepke opined that the Logan Labs report layout, not the quality of the equipment, was somehow responsible for inaccuracies in UDT lab results that Dr. Cho raised.

323.    Toepke also employed a tactic that Surgery Partners often uses to shield their fraudulent practices. He wrote to Dr. Cho that he was free to use any lab services and that none of his compensation is tied to Logan Labs.

324.    In reality, this is not the case. Surgery Partners' executives use oral communications to pressure providers; they track physicians' UDT referrals to outside labs; and they manipulated the EMR software used by physicians and mid-level providers to justify referrals for lab-based UDT, particularly to Logan Labs.

325.    On July 13, 2016, Dr. Cho wrote a letter to Dr. Golovac, Surgery Partners' Medical Director, outlining his concerns with the Surgery Partners' UDT policy, and made suggestions to allow practitioners to use an opioid abuse risk tool to determine the medical necessity of UDT for their patients, rather than Surgery Partners' pre-determined number of UDT episodes per patient per

year.

326.     On July 26, 2016, Surgery Partners' corporate leadership held an evening meeting with providers associated with six practices located in Surgery Partners' Space Coast region at a local restaurant. Surgery Partners executive leaders and Logan Labs management were in attendance, including, but not limited to:  Chris Toepke; Monica Aliberti; Tracy Helfeldt, Practice Administrator; Robert Williams, PhD, Laboratory Director of Logan Labs; Joseph Sorly, Logan Labs Manager. FPI providers in attendance included: Dr. Cho; Dr. Michael Esposito; Dr. Ashish Udeshi; and mid-level providers Beth Holtham, Patricia Dunn, Susan Clark, Michael Thomas, Richard Pectol, and Nicole Malerba.

327.     Just before the meeting, Dr. Cho met separately with Surgery Partners executives, including Defendant Chris Toepke, and with Dr. Williams, the Logan Labs Medical Director, and Joseph Sorly, the Logan Labs supervisor.  Dr. Cho highlighted the poor quality of Logan Labs quantitative UDT.  Dr. Cho noted that Logan Labs reports included false positive results and frequent above-limit measurements just marked "high," rather than providing a specific number (quantification). Dr. Cho also provided examples of two patients whose results were clearly erroneous.

328.     At this July 26, 2016 meeting, Dr. Cho point blank told the Surgery Partners and Logan Labs leaders them that they had serious quality control problems. Dr. Cho told the Logan Labs director: "I believe that either you don't know what you are doing, or all of your machines are broken."

329.     Later that evening there was a meeting between corporate leaders and Surgery Partners providers.  Chris Toepke, Surgery Partners' Group President, Ancillary Services, attempted to respond to Dr. Cho's emails regarding Surgery Partners long-standing practices requiring patient

referrals for quantitative UDT to Logan Labs. Toepke claimed that Surgery Partners would not interfere in medical decision making, including UDT, and that physicians had full autonomy to make these decisions.

330.    At the same meeting, Surgery Partners' executives and Logan Labs managers made a presentation entitled: "Surgery Partners Spacecoast [sic] Providers Meeting, July 2016." The presentation was marked "Not for Distribution."

331.    The presentation covered a number of topics, including: new growth targets by provider; "provider and patient concerns;" "UDS testing and billing discussion;" and "Logan laboratories update."

332.    During the presentation, the defendants discussed Surgery Partners' markets, including pain management practices in Florida, Colorado, North Carolina, and Pennsylvania, and growth in these markets over the past year.

333.    The Surgery Partners' presentation related to Logan Labs focused largely on the "disadvantages" of immunoassay, the method used for screening or qualitative UDT. At the same time, the discussion stressed the advantages of quantitative UDT.

334.    Surgery Partners did not issue a urine drug screen policy until September of 2016. Before that time, they performed UDT on every patient, at every visit, without any specific indication of necessity. When multiple physicians (including Dr. Cho) complained and requested appropriate clinical support for the mandatory UDT practice, Dr. Golovac created Surgery Partners' urine drug screen policy under the guise of participation by a medical advisory committee.

335.    On July 31, 2016, Dr. Golovac announced that Surgery Partners would be issuing a UDT policy. The Surgery Partners first written UDT policy would include recommendations that for patients in the high risk group, providers should order 10 to 12 UDTs annually (screen or

confirmation or both) and that patients in the low risk group were recommended to receive two to six UDTs per year.

336.    Dr. Cho responded to Dr. Golovac that he had reviewed Surgery Partners' NEXTGEN EMR software, and he was concerned that the EMR software required the provider to select from several specific reasons why the UDTs were or were not being ordered -- without exception. This is another means for Surgery Partners to pressure physicians to order UDT.

337.    Beginning in August 2016, Dr. Cho made a concerted effort to avoid Logan Labs quantitative UDT, to use screening or qualitative UDT as he deemed necessary.

338.    On September 19, 2016, Matthew Richardson, Surgery Partners' Sr. Vice President, Physician Services, sent an email to Surgery Partners providers and attached the "Urine Drug Testing and Compliance Program that will be adopted by Surgery Partners Effective October 1, 2016. Mr. Richardson represented that the Surgery Partners UDT policy was the:

> product of many hours of work from a representative group of our employed physicians, as well as outside counsel and is a reflection of best practices we've seen in the industry...in line with guidance we have received from various regulatory boards...we will be training on the contents for NextGen users in the upcoming week. The continued key is proper documentation in our EMR, and this document will serve as a guidance tool to assist you in the necessary criteria to order specific tests on behalf of your patients. Our Medical Director, Stanley Golovac MD states the following ...The document attached will stand as a reference as how to stratify and **help us monitor our patients who are either being prescribed or not**, the types of medications that can be habit forming and potentially abused...The document is guidance to better serve as a reference to validate why we prescribe the types of medications that can be potentially abused and/or misused. Each patient will need to undergo a written stratification exam that will categorize them into three categories...We are eager to train and adopt this guidance. Please be looking for the training opportunities from your practice leader the week of September 26[th]. If you have any questions please reach out to your practice administrator or to Dr. Golovac directly...POD leaders and office managers, please ensure that this is distributed to all providers that you are responsible for.

(emphasis added).

339.   The Executive Summary for Surgery Partners' October 1, 2016 UDT policy states:

> This document provides for the local implementation of a
> Compliance Plan that will allow the individual physician care team
> to provide urine toxicology testing within a rational, non-prejudicial
> and clinically legitimate framework....This is a guideline, and as
> such, is non-binding to the clinician and does not replace the
> conscientious decision-making process of a knowledgeable and
> dedicated physician who is most familiar with any one patient's
> particular situation.

340.   However, the Surgery Partners' October 1, 2016 UDT policy document reveals that

Surgery Partners sought to use this policy to justify over-utilization of UDT, particularly UDT

referred to Logan Labs.  For example:

(a)     Section I.3. Surgery Partners Physicians have determined that patients are

frequently unreliable in reporting their medication compliance, history of drug additional and

substance abuse, medication over-utilization, use of non-prescribed medications, drug diversion,

and/or other aberrant behaviors.  This can lead dangerous and uninformed decision-making by the

medical staff;

(b)     Section I.5. Surgery Partners, Inc., and their subsidiary companies are

located in states in which a high incidence of illicit drug use has been observed.  These guidelines

are designed to help our physicians make geographically and medically appropriate decisions when

prescribing controlled substances, in order to reduce or eliminate possible abusive, addictive and

dangerous prescribing outcomes;

(c)     Section I.8. Surgery Partners Physicians has encountered innumerable

otherwise "legitimate-appearing" patients who have been identified through urine toxicology as

using illicit or non-prescribed controlled substances....it is critical to immediately catch and correct

these behaviors and have the opportunity to counsel and/or discontinue controlled substance prescriptions before the behavior escalates to a full-blown abusive, addictive or lethal situation;

(d)      Section II.2. Direct to Quantitative Testing.  It may be reasonable and necessary to proceed directly to quantitative testing without qualitative testing in the circumstances described in section II(1)(b)(i)(-(iv) above;

(e)      Section III.1. Risk Assessment, Risk Classification and Testing Frequency Recommendations.   Qualitative urine drug testing with quantitative confirmation **will be performed** on patients prior to the initial issuance of a controlled substance prescription, **and then at an overall frequency of one (1) to twelve (12) times per year** as determined by the patient's risk level classification.  Any additional testing **beyond the recommended frequencies** included in this protocol must be justified by the clinician in the patient's medical record. (Emphasis added);

(f)      Testing Procedures & Frequency Recommendations 1. A prescribing provider may collect a patient urine/oral specimen in the office and send the specimen to a certified laboratory.... 3. Surgery Partners Physicians shall ensure that it maintains chain-of-custody of the urine or oral fluid specimen once received from the patient up until the specimen testing is completed by the in-office laboratory or shipped to an off-site laboratory for testing. The frequency of UDT will depend upon the patient's risk classification... 1. Red Patients. ...Red patients generally undergo qualitative immunoassay drug testing with quantitative confirmation testing one to three times every three months.  2. Yellow Patients are tested at random intervals approximately one to two times every six months.  3. Green Patients. .... done at random intervals approximately one to two times every twelve months;

(g)      Section IV. 1. Due to the perception of runaway testing, payers have progressively emphasized and required full comprehensive documentation of the clinical situation

and the circumstances which require urine toxicology testing… blanket statements such as 'per LCD' or **'per our Corporate Protocol'** are not adequate to justify the clinical need for testing. … Although PANELS are allowable for IA testing, LCMS testing requires selection of a specific and risk-adjusted PROFILE. The practitioner will select an LCMS PROFILE that fits the risk level of the patient, which will then be further customized to the patient based on the prescribed medications, and furthermore customized based on the unexpected positive and negative results of the presumptive IA testing. … If the prescribing provider so believes s/he should document that the "testing is medically necessary for the safe prescribing and/or treatment of the patient…". (emphasis added); and

      (h)    1.g. The medical record should indicate "This clinical document cannot by itself provide a comprehensive overview of the testing protocol; therefore, we include by reference the Surgery Partners Urine Drug Testing and Compliance Program; Recommendations for Physicians dated 10/1/2016."

341.    Around this time, Surgery Partners' management continued to subject providers, including Dr. Cho, to significant pressure to order expensive UDT. The company email system was changed from "floridapaininstitute.net" to"surgerypartners.com," and many emails detailing pressure to order UDT exerted on Dr. Cho by Surgery Partners executives and managers were deleted or no longer available to Dr. Cho.

342.    In late 2016, several physicians discussed their concerns regarding Surgery Partners' UDT policies and practices with Ms. Baker. In addition to Dr. Cho, Ms. Baker spoke with Dr. Howard from Surgery Partners' Colorado Springs location.

343.    In addition, in late 2016, Dr. Le, a physician practicing at Surgery Partners' Palm Beach Pain Relief Center – Wellington, discussed with Ms. Baker that he had considered leaving

Surgery Partners.  Also, Dr. Robert Kent, who had practiced at Surgery Partners Central Florida Pain Relief Centers – Downtown (Orlando), f/k/a Rehabilitation Medical Group, Inc. and Central Florida Pain Relief Centers – Altamonte Springs resigned.

344.    In January of 2017, Surgery Partners issued a revised UDT policy which required that its affiliated physicians order a very expensive (approximately $3,000) confirmation (quantitative) UDT for every new patient and for every patient that receives a change in medication, including dose adjustment. Surgery Partners directed their pain specialists that no new prescriptions could be issued until the results of the "confirmation" testing were received. (This typically took one to two weeks). Surgery Partners issued this directive, again, under the guise of monitoring medication compliance.

345.    Dr. Golovac insisted in an email of January 13, 2017 that the confirmation UDT (which costs thousands of dollars) was medically necessary for every patient seen at the clinic to ensure opioid safety.

346.    On January 30, 2017, Surgery Partners, through Dr. Golovac, issued "Revised: Urine Drug Testing and Compliance Program: Recommendations for Physicians," with an effective date of January 23, 2017.  These revisions included:

(a)    Section I.10 of the revised policy stated: "patients requiring opioids, benzodiazepines, sleep inducing medicines and TCA's are of higher risk." Surgery Partners requires "with few exceptions, qualitative urine drug testing with quantitative confirmation" on patients before "the initial issuance of a controlled substance prescription. Thereafter, qualitative and/or quantitative testing will be performed at an overall frequency of one (1) to twelve (12) times per year as determined by the patient's risk level classification. Any additional testing beyond the recommended frequencies included in this protocol must be justified by the clinician in the patient's

medical record, such as the use of opioids, benzodiazepines, TCA's and sleep inducing medicines;"

(b)     "With very few exceptions that must be well documented, every new consulted patient should undergo a preliminary screening of a UDT (qualitative and quantitative analysis) to establish baseline metrics and ensure both the prescribing physician and/or extender, understands what our patients may be taking for other medical reasons and not as well as to check for the presence of illicit drugs;"

(c)     Patients will be stratified into three risk categories (red being high, yellow being moderate and green being low). Patients stratified into the "RED" category should be tested 1 -3 times every 3 months (depending on clinical assessments and patient specific circumstances), Patients in the "Yellow" category should be tested every 1-3 times every 6 months. Patients in the "green" category should be tested 1-2 times per year;

(d)     Any patient with a medication (family) change, will also require a follow up UDT (qualitative and quantitative) on the next office visit to determine if the level in the urine is consistent with the "new" medication;

(e)     "In addition to the areas mentioned above, it is the responsibility of each of us to fully read and understand what the policy intent is and the importance of why it is administered. Should anyone have any questions or concerns please do not hesitate to contact me personally thru email or my personal cell (321) 403-1893."

347.     Surgery Partners manipulated the patient risk classification tool in the EMR software so that more patients would be stratified into the high risk (RED) group, in an effort to justify more frequent UDT.

348.     On February 1, 2017, Dr. Cho had a conversation with Dr. Golovac. Dr. Cho again stated that he did not agree with Surgery Partners' position that neither the less expensive lab-based

qualitative UDT (which costs approximately $200) or the $20 urine cup dip-stick test was reliable method of monitoring patient compliance.

349.    Dr. Cho followed this conversation with an email to Dr. Golovac and others in which he repeated the points he had made orally with Dr. Golovac. Dr. Cho reiterated:

(a)    Surgery Partners was routinely over-utilizing confirmation UDT;

(b)    Dr. Cho would contact the Florida Medical Board, CMS, and other national professional societies to refute Surgery Partners' position (as stated by Dr. Golovac) that random drug screening tests (qualitative) are inappropriate for opioid safety;

(c)    Surgery Partners' UDT policy which caused a one-to-two-week delay between sending the urine sample for UDT confirmation testing and issuing an opioid prescription could cause patient harm  because patients suffering from chronic pain would be without treatment while waiting for these expensive quantitative UDT results;

(d)    Surgery Partners' UDT policy will also result in unnecessary emergency room (ER) treatment and withdrawal for patients who run out of pain medication while waiting for quantitative UDT results; and

(e)    Surgery Partners pain specialists serve aged patients suffering from chronic pain, a patient population that is largely compliant with their opioid treatment. These are not patients with a history of drug abuse as is the case in addiction clinics.

350.    Dr. Golovac responded that the UDT policy revisions were intended to ensure physician compliance (while, at the same time, Dr. Golovac represented that Surgery Partners' UDT policy was non-binding). Dr. Golovac made clear that he would be contacting any physician who deviated from Surgery Partners' policy requiring confirmation UDT, on both new patients and as follow-up to patients stratified as red or yellow using Surgery Partners' EMR.

68

351.    Dr. Cho reiterated in his February 1, 2017 email that the medical necessity of all UDT is determined, based on the independent medical judgment of the physician or mid-level provider, after considering the following: 1) prescription history, including Florida's e-force controlled medication prescription record; 2) the patient interview; 3) information received from the patient's primary care provider; 4) the patient's family and social history; 4) the physical examination conducted during the patient visit; and 5) general medication compliance.

352.    Dr. Cho repeated  in his February 1, 2017 email what he had been telling Surgery partners leaders since he arrived at the Merritt Island pain clinic in November of 2015: he preferred to  use screening UDT: "a simple urine dip stick test which cost only $20 and we can get the result in 3 minutes on the same day." Dr. Cho emphasized the safety and cost-effectiveness of this method of qualitative UDT to minimize the risk of opioid abuse.

353.    Dr. Cho, after ignoring the Defendants' ban on simple dip stick (urine cup) drug screening, did not see any indication of illicit drugs or lack of compliance with the prescribed opioid medication in 95% of patients.

354.    Dr. Cho also reiterated to Dr. Golovac on February 1, 2017 that Surgery Partners had opposed physician efforts to use simple dip stick urine tests, forcing pain management specialists to refer patients for qualitative UDT performed by outside labs such as Logan Labs: "But you are against this option…So I choose next least expensive test which is urine screen test as my primary urine test."

355.    Dr. Cho referred to Dr. Golovac's email of January 13, 2017 and reiterated that he did not agree with Surgery Partners' position that neither the less expensive qualitative UDT (which costs approximately $100 to $200) or the $20 drug screening (urine cup dip-stick) was reliable method of monitoring patient compliance.

356.    Finally, Dr. Cho made clear that it was not acceptable for Surgery Partners to repeatedly interfere with and pressure medical providers to change their independent medical judgment regarding the appropriate UDT for patients, particularly when Surgery Partners failed to provide appropriate professional and/or medical sources for their policies.

357.    On February 1, 2017, Dr. Cho made clear that he was concerned with fraud, waste, and abuse: "I do not believe I can justify your revised UDT policy if I am audited by authority in future."

358.    Dr. Golovac's written response, that Dr. Cho could exercise his independent judgment, contradicted what Surgery Partners had told Dr. Cho orally:  their UDT policy was mandatory.

359.    For example, when Dr. Cho challenged the referral relationship between Surgery Partners physicians and Logan Labs, Dr. Golovac replied to Dr. Cho that Surgery Partners' physicians were expected to refer their patients to Logan Labs. Dr. Golovac drew the following analogy for Dr. Cho: if a family owns a gas station, their children must use their own convenience store, not the store located at cross the street.

> **4.     Surgery Partners steered Government healthcare program beneficiaries to Logan Labs for quantitative UDT, even when the physician or mid-level provider ordered or preferred a dip stick test for qualitative UDT or a different UDT laboratory.**

360.    From the time that Dr. Cho started at Surgery Partners' FPI- Merritt Island location, the physicians and mid-level providers were instructed to refer all patients with Government-funded insurance, including Medicare and Tricare, and any PPO that will pay for lab-based UDT to Logan Labs.

361.    In fact, the defendants posted a sign on the wall of the clinic just above the urine specimen collection table room reminding all providers in large bold letters of this requirement:

"WHERE DO YOU SEND THAT UTOX??...ALL PPO's = Logan...Medicare = Logan."

362.    Other physicians across the Surgery Partners' national pain management network also experienced Surgery Partners' pressure to reduce inexpensive urine dip stick tests and steering of UDT to Logan Labs. For example, Dr. Howard, who began practicing in Colorado Springs in 2015 experienced both the over-utilization of UDT and pressure to refer to Logan Labs.

363.    Dr. Howard, like Dr. Cho, preferred using screening drug tests (a/k/a "dipstick tests") when UDT was medically indicated by his examination of the patient.

364.    He observed that Surgery Partners' employees had pre-selected patients for lab-based UDT, and the majority of patients were being steered to lab-based UDT Logan Labs.

365.    When Dr. Howard tried to refer patients who needed lab-based UDT to other labs, personnel at Surgery Partners' Colorado location overrode his orders and changed the referrals to Logan Labs.

**5.     Surgery Partners pressured physicians and mid-level providers to refer patients for UDT services by closely monitoring the patients who were not referred to UDT at each visit.**

366.    During the relevant time period, Surgery Partners carefully tracked each time a pain management provider referred a patient for confirmation UDT, the main source of revenue for Defendant Logan Labs.

367.    Surgery Partners executives created reports to capture this data.  For example, Surgery Partners created and circulated a report called "Confirms Per Patient" for the providers at FPI-Merritt Island (a/k/a Space Coast), FPI-Melbourne, and FPI- Viera. Surgery Partners executives used these reports as one means to pressure providers to refer more patients for confirmation UDT, with a focus on increasing referrals to Logan Labs.

368.    Surgery Partners executives, including Defendant Toepke, would circulate these

reports to providers and to Surgery Partners' medical directors in an effort to increase referrals for confirmation UDT to Logan Labs.

369.    For example, on January 13, 2017, Defendant Toepke wrote to Dr. Golovac, with a carbon copy to Dr. Ashish Udeshi regarding "space coast stats:" "Just looping you into this but there's a real issue with the mid-levels at Space Coast, there's no reason they should be testing this in frequently [sic]. They are putting the practice and their own licenses at risk. I've spoken with Udeshi and he will address this with the mid-levels. We should also talk about documenting our conversations with Cho formally. He is putting the practice at risk by not testing at all. He doesn't need to use Logan but he does need to use someone.... This chart represents confirms per patient seen. Udeshi's numbers in 3Q and 4Q are very reasonable. The rest of the practice seems to be under testing and potentially exposing us to risk."

370.    Mr. Toepke had inserted a copy of a report "Confirms Per Patient" for FPI-Viera, FPI-Melbourne, and FPI –Merritt island (a/k/a Space Coast) providers from October 2015 to December 2016. The table showed that some providers (Drs. Golovac and Gayles) referred nearly every patient for expensive confirmation UDT at some point in the time period. Dr. Udeshi, whose referrals Mr. Toepke said were "reasonable," had referred a period high of 60.6% of his total daily clinic patients for expensive confirmation UDT.

371.    Dr. Golovac forwarded the email to Dr. Cho: "Please look at your stats. This is what I spoke of. From July to December you practically didn't order any confirmations. This can lead to liability." Dr. Cho replied to Dr. Golovac and Mr. Toepke and included the rest of the practitioners. He highlighted that the UTOX statistics were inaccurate because they did not reflect screening UTOX tests.

372.    Dr. Cho also stated that  99% of his new and follow up patients were receiving

screening UTOX tests at least one or two times per year, with few exceptions. Dr. Cho's "screening UTOX" were lab-based qualitative UDT in light of Surgery Partners' prohibition of POC tests. Surgery Partners routed these lab-based qualitative tests to an in-house lab associated with a Tampa Pain Relief Center practice in Tampa, Florida.

373.    In addition, in the same email, Dr. Cho reiterated that his practice of relying on qualitative UDT, rather than confirmation UDT, was within national standards of care.  He invited Mr. Toepke and Dr. Golovac to provide him with references to refute his use of screening tests:

> If you have any official response from the Florida state medical board and/or any pain or addiction specialty society that shows that 'confirmatory" UTOX test must be used as a primary & initial test rather than a "screening" test for patient's safety, please inform me ASAP. I will gladly change my practice to comply with any medical laws or regulations.

374.    In response, Defendant Toepke threatened Dr. Cho: "First off, it is inappropriate of you to cc the entire practice on a response to an email that was sent just to you. That's the 2nd time it has happened – please make it the last." Mr. Toepke also attempted to exert pressure on Dr. Cho in an effort to interfere with is medical decision making:

> Secondly, as you very well know, UDS is not the same as confirmatory testing. Confirms are widely accepted and used because they are more reliable and necessary to protect providers and practices against false negatives and other issues. An independent group of senior and experienced Tampa Pain Relief and SP [Surgery Partners] physicians have come together to author a toxicology policy and have recommended appropriate utilization of confirmatory testing in conjunction with UDS testing. It has been our policy for a long time to utilize confirmatory testing. You do not need to use Logan Labs but you do need to run appropriate confirmatory testing. Stan [Golovac] will follow up with more specific direction.

375.    Dr. Golovac did contact Dr. Cho.  During the telephone call he threatened Dr. Cho several times, repeating "I warn you."

376.    Dr. Cho followed up with an email to Dr. Golovac at 9 PM on January 13, 2017. Dr. Cho reiterated that Dr. Golovac had again tried to pressure him to refer all patients for confirmation testing in the first instance, rather than use screening UDT. Dr. Cho repeated that this practice was illegal. Dr. Cho offered to "contact the Florida State Medical Board" and "Medicare for official clarification."

377.    Dr. Golovac replied that there was "no need to contact the medical board. As you know a qualitative test does not affirm what a quantitative test performs."

**6.     Surgery Partners implemented UDT policies that resulted in the creation of false electronic medical records (EMRs) to support medically unnecessary UDT services.**

378.    As referenced above, Surgery Partners' NEXTGEN EMR software required the physician or mid-level provider to select from several specific reasons why the UDTs were or were not being ordered for every patient.

379.    Dr. Cho highlighted to Dr. Golovac his concerns that Surgery Partners had manipulated the EMR in order to pressure the physician to create a patient record that would support excessive confirmatory UDT.

380.    When combined with Surgery Partners' tracking of referrals and reports detailing patients who did not receive a referral for confirmatory UDT, the EMR documentation requirements constituted another means that Surgery partners employed to pressure physicians to refer patients for unnecessary confirmatory UDT.

381.    The Defendants' manipulation of the EMR, to the extent that physicians ordered UDT in an effort to avoid justifying their failure to refer, constituted conduct that contributed to the creation of a false record that was material to a false claim for medically unnecessary confirmatory UDT.

**7.  Surgery Partners' corporate policies and conduct caused Logan Labs to perform excessive, medically unnecessary quantitative UDT on Government healthcare program beneficiaries, then to submit claims for such to Government-funded healthcare programs.**

382.  Surgery Partners' conduct, as described above, resulted in referrals by Surgery Partners' physicians and mid-level providers, including pain specialists, for medically unnecessary confirmation UDT.

383.  Logan Labs then performed the medically unnecessary confirmation UDT on urine samples collected from beneficiaries of government-funded healthcare programs.

384.  Surgery Partners then submitted or caused the submission of claims by Defendant Logan Labs to Government-funded healthcare programs (fee-for-service and managed care programs) for the medically unnecessary confirmation UDT.

385.  These claims were false because Surgery Partners interfered with the independent medical judgment of the physicians and mid-level providers in order to increase revenues at Logan Labs.

386.  These claims were also false because executive leadership at Surgery Partners and Logan Labs either knew or showed reckless disregard for the lack of medical necessity of the confirmatory UDT.

**a)  Surgery Partners Pushed for Providers to Order UDTS More Frequently Than Needed**

387.  Most patients in pain management setting do not need regular UDT services. In fact, the government's guidelines suggest one or two random screening UDTs per year.  For low risk patients, one or two random UDTs annually are appropriate.

388.  Despite the fact that Logan Labs is owned by Defendants, it takes one to two weeks from the time the urine sample is collected, sent to Logan Labs, and the confirmation UDT results

are received by the provider.  In contrast, the urine cup dip stick can be performed in the office.

389.    Thus, the inexpensive screening UDT, when appropriate, is the preferred method for ensuring patient safety and providing appropriate care for patients in pain management clinics.

390.    From the time Dr. Cho arrived at Surgery partners, he was aware that screening UDTs were prohibited because Surgery Partners preferred their providers to refer patients for confirmatory UDTs, particularly for government-funded healthcare program beneficiaries, because these confirmatory UDTs were performed by and billed for by Logan Labs.

391.    There was no medical utility for the vast majority of confirmatory UDTs. The vast majority of the Logan Labs reports (95%) showed that the "confirmation testing" was negative for any illicit drugs. In the roughly 5% of confirmation UDT with positive results, the most common illicit drug was marijuana.

392.    Given the pressure to refer patients for lab-based (quantitative) UDT, the Defendants' conduct also caused referrals for unnecessary UDT to other labs, such as LabCorp, where that lab was required by the patient's insurance.

    b)    **Surgery Partners' Subsidiary Logan Labs, Uses Excessive Quantitative UDT Panels.**

393.    Surgery Partners executives and Logan Labs Medical Director provided Dr. Cho with a handout explaining that the number of tests performed for each UDT episode was 44.

394.    Logan Labs generally billed LC-MS/MS test results using individual CPT codes for each drug or drug class it tested.

395.    Logan Labs routinely billed multiple different CPT codes for some drug classes, as reflected in the chart below.

396.    Logan Labs also routinely billed multiple units of the same CPT codes—such as 83925 for opiates—suggesting that it had performed multiple procedures to test for opiates.

397.    For example, during the relevant time period, for a beneficiary of Medicare Part B

of Florida, Defendant Logan Labs charged the Government as follows for confirmatory drug

testing:

| CPT | Test | Logan Labs Charged |
|---|---|---|
| 80324 (3 units) | DRUG SCREEN AMPHETAMINES 1/2 | $56.15 x 3 = $168.45 |
| 80346 (3 units) | BENZODIAZEPINES 1-12 | $56.15 x 3 = $168.45 |
| 80348 (3 units) | DRUG SCREENING BUPRENORPHINE | $56.15 x 3 = $168.45 |
| 80349 (3 units) | CANNABINOIDS NATURAL | $56.15 x 3 = $168.45 |
| 80353 (3 units) | DRUG SCREENING COCAINE | $56.15 x 3 = $168.45 |
| 80354 (3 units) | DRUG SCREENING FENTANYL | $56.15 x 3= $168.45 |
| 80356 (3 units) | HEROIN METABOLITE | $56.15 x 3 = $168.45 |
| 80358 (3 units) | DRUG SCREENING METHADONE | $56.15 x 3 = $168.45 |
| 80359 (3 units) | METHYLENEDIOXYAMPHETAMINES | $56.15 x 3 = $168.45 |
| 80361 (3 units) | OPIATES 1 OR MORE | $56.15 x 3= 168.45 |
| 80362 (3 units) | OPIOIDS & OPIATE ANALOGS 1/2 | $56.15 x 3 = $168.45 |
| 80365 (3 units) | DRUG SCREENING OXYCODONE | $56.15 x 3 =$168.45 |
| 80369 (3 units) | SKELETAL MUSCLE RELAXANT 1/2 | $56.15 x 3 = $168.45 |
| 80372 (3 units) | DRUG SCREENING TAPENTADOL | $56.15 x 3= $168.45 |
| 80373 (3 units) | DRUG SCREENING TRAMADOL | $584.82 |
| 83992 ( 2 units) | ASSAY FOR PHENCYCLIDINE | $84.22 + $84.23= $168.45 |

398.    The number of tests in the panel Defendants established for Logan Labs'

quantitative UDT was excessive. For example, where quantitative UDT was even necessary, pain

management specialists such as Dr. Cho would need results for only illicit medications (PCP,

Cannabinoids, Amphetamines, Methylenedioxy Amphetamines, Cocaine, Methadone, Heroin

metabolite, etc.). There is no medical necessity in testing pain management patients for all 44

medications covered in Logan Labs' routine quantitative DUT panel. Also, confirmation UDT

testing for only one or two selected medications was not offered by Logan Labs, as Dr. Cho

confirmed by discussing the subject with the Logan Labs sales representative.

399.    During the relevant time period (2012 through the present) the defendants submitted,

caused Logan Labs to submit, or conspired to submit Logan Labs claims for confirmation testing to

Government-funded healthcare programs, including Medicare, Medicaid, TRICARE and the VA,

for each drug or class tested – averaging more than 40 procedure codes (many with multiple units) per urine sample - including drugs that patients were not suspected of taking, and for "confirmation" quantitative UDT.

400.    These claims for quantitative "confirmation" testing were also false because the defendants had not performed the "in-office" UDT.  Such in-office "screening tests" were, by-and-large, prohibited at the Surgery Partners' physicians' offices. Instead, Surgery Partners policies were aimed at forcing physicians and mid-level providers to use confirmation (quantitative) UDT as a "screening" test.

> **8.    Defendants fraudulently unbundled the claim for quantitative UDT and billed government-funded healthcare programs for more than 40 separate "confirmation" tests.**

401.    Logan Labs unbundled the Quantitative UDT – causing excessive bills to government-funded healthcare programs, as well as high patient co-pays.

402.    Even where the confirmatory UDT is necessary, a bundled claim would have resulted in an estimated charge of approximately $600-1200, not the thousands of dollars in claims the defendants submitted to government-funded healthcare programs for a single patient testing episode.

> **9.    Surgery Partners pressured physicians and mid-level providers to sign false attestations of medical necessity for quantitative UDT to respond to or avoid denials of Logan Labs UDT claims from Government-funded healthcare programs, including Medicare.**

403.    Surgery Partners issued completed responses to Medicare Denial of Services Forms to physicians and mid-level providers, including Dr. Cho.  The form stated:

> This letter is written regarding the above-referenced patient for services provided by Logan Laboratories, billed to Medicare for quantitative confirmatory drug testing, which were denied. This letter will serve as my attestation related to the quantitative drug testing results and orders for those tests." The letter included a form for the

provider to provide a reason (s) why "quantitative drug testing is being performed by Logan Laboratories; testing for Amphetamines, Barbiturates, Benzodiazepines, Cocaine Metabolite, Cannabinoid, Ecstasy, EDDP, Opiates, Phencyclidines, Meprobamate, and Methadone."

404.     Surgery partners wanted the providers to provide medical necessity attestations to support Logan Labs' submission of these records to get UDT claims paid by Government-funded healthcare programs such as Medicare.

405.     Dr. Cho had never been requested to provide such documentation before he arrived at Surgery Partners.  While at Surgery Partners, Dr. Cho never received such an attestation request from other labs such as LabCorp or Quest.

406.     Before August 2016, Surgery Partners had Dr. Cho sign many pre-printed medical necessity attestations for Logan Labs. Beginning in August of 2016, Dr. Cho began to refuse to sign these forms.

407.     However, he understands that during the relevant time period, Surgery Partners regularly forwarded these documents to pain specialists and others on behalf of Logan Labs.

408.     Defendants' pressured physicians at Surgery Partners' pain management practices by taking the position that only quantitative testing has value.  Defendants prepared written materials directed at patients that also, falsely, stated that comprehensive, **quantitative** urine testing was required to comply with state laws.

409.     Where the beneficiary is being tested merely to confirm expected abstinence, the quantitative urine test, which reports the amount of a drug detected in urine (drug level), does not provide any additional useful information to a clinician. Also, the measurement numbers in quantitative urine test report does not reflect the patient's medication dose compliance. Which means that the quantitative test does not provide the time ingested, the amount ingested, or the

pharmacological effect.

410.    Various groups, including the American Academy of Pain Medicine and the American Society of Addiction Medicine, recognize that quantitative urine toxicology testing should not generally or regularly be employed.

411.    Each claim that Surgery Partners or Logan Labs submits, or cause to be submitted, to the United States and the plaintiff-states, for urine toxicology testing referred by a Surgery Partners' affiliated physician as a result of pressure by Surgery Partners and/or Defendant Toepke is false under the FCA and/or the analogous state false claims laws.

> **10.    Defendants Billed for "Confirmation" UDTs that Were Medically Unnecessary and/or Were Not Performed After a Screening UDT**

412.    From 2012 to the present, Defendant Logan Labs has billed Government-funded healthcare programs, including Medicare, for more than a hundred million dollars in "confirmation" UDT, using the CPT Codes listed above.

413.    During this time, Surgery Partners did not allow its physicians to regularly use in-office drug screening tests. Thus, Logan Labs had few, if any, referrals by physicians or mid-level providers for true "confirmation" UDTs.

414.    When there has been no screening UDT and the UDT referral to Logan Labs for confirmatory UDT as a first-line test emanates from Surgery Partners' interference in the good medical judgment of physician, the claim for "confirmatory" UDT is false.

> **11.     Defendants waived co-pays and/or failed to collect co-pays related to quantitative UDT performed by Logan Labs from beneficiaries of Government-funded healthcare programs, including TRICARE and Medicare Part C.**

415.     The Defendants regularly waived co-pays for government healthcare program beneficiaries and those covered by private insurance so that they would not complain about the financial impact of medically unnecessary and excessive UDT performed by Logan Labs.

416.     The one exception, as explained to Dr. Cho was if a patient received payment from their insurer directly for Logan Labs' UDT (because Logan Labs was out-of-network), Logan Labs would attempt to collect monies intended by the insurer to be paid to Logan Labs.

417.     In addition, the Surgery Partners' presentation made clear: This was meant to convey to physicians that Logan Labs would not pursue patients for unpaid copays (the patient responsibility portion of the charges). The waiver of copays had been clearly communicated to providers in the past.

418.     During the presentation by Surgery Partners executives and Logan Labs' leadership on July 26, 2016, the Defendants' executives made clear that waiver-of-copays was a company-wide policy. The PowerPoint slide stated: "Logan currently does not utilize a collection agency."

419.     This was meant to communicate to the Surgery Partners physicians in attendance that they should not be concerned with co-pays owed by their patients because Logan Labs would not attempt to collect these fees.

> **12.     Surgery Partners Pressured Its Physicians Nationwide to Refer to Logan Labs.**

420.     From 2009 until December of 2016, Ms. Baker had been engaged with Surgery Partners and its executives, including Defendant Milo, in her capacity as a physician recruiter.

421.    During that time, she recruited physicians, including pain management specialists, for Surgery Partners locations throughout the country.

422.    From mid-2016 into 2017, Ms. Baker had conversations with physicians throughout the country who detailed their concerns about UDT fraud at Surgery Partners practices regarding referrals to Logan Labs.

423.    In June of 2016, Ms. Baker also came in contact with a number of Surgery Partners managers and executives. These included Monica Aliberti, Matt Richardson, Adam Steiger, and Chris Toepke.

424.    At the time, Ms. Aliberti was Surgery Partners' Vice President and Director, Physician Practice Operations. In that capacity she had responsibilities for Surgery Partners' Colorado and North Carolina pain management practices. Ms. Aliberti had also worked as a practice administrator at Defendant TPRC in the Tampa/ St. Petersburg area for more than a decade.

425.    Matt Richardson became a Senior Vice President, Physician Practice Operations, in January 2016, after leaving Community Health Systems (CHS).

426.    Adam Steiger was the administrator for Riverside Pain, a private physician group and ASC in Jacksonville, Florida. It was recently acquired by Surgery Partners.

427.    As related above, Chris Toepke was Surgery Partners' President of Ancillary Services.

428.    Both Mr. Steiger and Mr. Richardson have since either been eliminated or have resigned. Adam Steiger left in late January 2017, and Mr. Richardson's last day with Surgery Partners was February 10, 2017.

429. A stated above, during 2016, Ms. Baker's physician recruits began to complain about Surgery Partners' practices.

430. For example, in approximately November of 2016, Dr. Lesco Rogers, a recruit at Surgery Partners' Asheville, North Carolina location, began to relate his concerns about Surgery Partners' corporate UDT policy.

431. He also discussed Surgery Partners' attempts to pressure him to change his UDT practices, and his responses to Surgery Partners' pressures. For example, he received an email from Monica Aliberti stating that she wanted to discuss Dr. Rogers' UTOX policies. Dr. Rogers replied: "Do NOT ever address my policies or how I practice medicine ever again."

432. Dr. Rogers raised his concerns about Surgery Partners' UDT with Ms. Baker again on December 26, 2016. At that time, he provided Ms. Baker with a link to a document to provide to all of the physicians that she had recruited to Surgery Partners, http://dcbalaw.com/wp-content/uploads/2015/11/JOM_11-1-11-Worthy.pdf. The document was titled: "Evaluating motives: Two simple tests to identify and avoid entanglement in legally dubious urine drug testing schemes."

433. Dr. Rogers raised concerns with Ms. Baker that another Surgery Partners physician, Dr. Rasheed Singleton, MD, had become the focus of administrative action by the Colorado medical board related to UDT referrals. During the relevant time period, Dr. Singleton was a pain specialist at Surgery Partners' Denver Pain Relief.

434. In January 2017, Dr. Demaceo Howard from Surgery Partners' Colorado Springs, Colorado facility related his concerns regarding Surgery Partners' UDT policies and practices with Ms. Baker. Dr. Howard was also concerned that Surgery Partners wanted a written explanation for every pain management patient who did not return within 30 days for an office

visit and that Surgery Partners was scheduling patients to return to the office without his approval.

435.    These physicians, like Dr. Cho, had communicated with Dr. Golovac, Surgery Partners' Medical Director, regarding Surgery Partners' UDT policies and practices.

436.    On January 16, 2017, Chris Toepke called Ms. Baker to complain about her contacting Surgery Partners' physicians regarding other recruitment opportunities. He also accused Ms. Baker of criticizing Monica Aliberti, the practice administrator who had tried to pressure Dr. Rogers to change his UDT practices.

437.    Throughout this period, Ms. Baker was also in contact with Dr. Cho, who was becoming increasingly uncomfortable with the harassment he received from Surgery Partners.

438.    In February 2017, Dr. Cho also provided Surgery Partners with notice of his resignation, informing them that he was leaving in May 2017.

439.    After enduring Surgery Partners' harassment, in March of 2017, Dr. Cho was diagnosed with facial cranial nerve palsy (Bell's palsy) on March 21, 2017 which required medical management and 3 to 4 weeks of recovery time. Bells Palsy is frequently triggered by extreme stress.

**D.    Defendants' Financial Relationships with Physicians Who Order UDT Services From Logan Labs Violate Stark Laws and Anti-Kickback Statutes**

440.    Defendants offered all of their pain management specialists and other physicians whom Ms. Baker recruited the same Stark-plagued, kickback arrangement they offered to Dr. Cho.

441.    Patients rely on their healthcare providers to engage in an objective inquiry into whether to order diagnostic testing, including UDT, as well as the nature of such testing (qualitative versus quantitative).

442. Defendants' scheme corrupts the decision-making process of physicians and nurse practitioners. Unbeknownst to the public at large and the patients at issue, Defendants' arrangements, which violate both Stark and AKS prohibitions, interfere with the objective medical decision-making process by providing financial incentives to doctors to refer patients to Logan Labs for expensive and medically unnecessary quantitative UDT.

443. Surgery Partners internal documents reveal that the company has established an "Attractive Physician Compensation Structure" through which "Physicians are rewarded/incentivized to focus on practicing medicine." to include two phases. During Phase 1, physicians receive a base salary plus a productivity bonus (based on the number of surgical codes personally performed by the physician in excess of 240 per quarter). In Phase 2, physicians are eligible for incentive compensation based on "100% cash collections" of Defendants ancillary services, including "UDS high complex lab."

444. Defendants' employment agreements nationwide implement this incentive compensation.

445. Surgery Partners, through its subsidiaries, had financial relationships with physicians who were in a position to refer patients for ancillary services, particularly UDT (urine toxicology) services provided by Logan Labs).

446. During the relevant time period, through employment agreements between Surgery Partners' subsidiaries (including TPRC) and pain management specialists working at Surgery Partners' pain practices throughout the country, the defendants engaged in prohibited physician relationships and offered illegal inducements to referring physicians. In particular, Defendants offered physicians in a position to refer to Logan Labs incentive compensation that

was calculated based in large part on profits generated from Surgery Partners' "ancillary services," including Logan Labs.

447.   For example, Defendants attached as "Exhibit A" to the September 16, 2015 Employment Agreement between TPRC and Dr. Cho a list of Defendant-owned "ancillary services for which Dr. Cho could share in Defendants' profits:" "1. Urine Drug Screening;" 2. MRI/X-Ray; 3. Tens Units; 4. Prosthetics; 5. Physical Therapy; and 6.  Dispensary."

448.   Exhibit A attached to Dr. Cho's agreement was the same as Exhibit A attached to contracts drafted by the defendants when Surgery Partners' subsidiaries entered into employment agreements with other physicians recruited through Ms. Baker.  For example:

(a)   Exhibit A to an August 25, 2011 Employment Agreement between TPRC and a pain specialist included the Defendants' offer to pay incentive compensation based on profits received from "Ancillary Services," including "Lab Services."

(b)   Exhibit A to an December 21, 2011 Employment Agreement between TPRC  and a pain specialist included the Defendants' offer to pay incentive compensation based on profits received from "Ancillary Services," including "Lab Services."

(c)   Exhibit A to a July 26, 2012 Employment Agreement between TPRC and a pain specialist included Defendants' offer to pay incentive compensation based on profits received from "Ancillary Services," including "Lab Services."

(d)   Exhibit A to an April 21, 2014 Employment Agreement between TPRC and a pain specialist included Defendants' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

(e)   Exhibit A to the March 24, 2015 Employment Agreement between TPRC and a pain specialist included Defendants' offer to pay incentive compensation based on profits

received from "Ancillary Services," including, specifically: "Urine Drug Screening."

(f)     Exhibit A to the May 12, 2015 Employment Agreement between TPRC and a pain specialist included Defendants' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

(g)     Exhibit A to the November 16, 2015 Employment Agreement between Denver Pain Relief Center, PC and a pain specialist included Defendants' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

449.     Defendant Logan Labs was created in September of 2011, an NPI was issued in November of 2011, and Logan Labs began providing testing services, including urine toxicology (quantitative UDT) in approximately January or February of 2012.

450.     Upon information and belief, the defendants began offering incentive compensation to physicians in a position to refer to their ancillary services subsidiaries after H.I.G purchased Surgery Partners and TPRC in 2010.

451.     For example, there was no incentive compensation for ancillary services in a September 22, 2009 an employment agreement between Tampa Pain Relief Center and a pain specialist, but the ancillary services incentive compensation was a part of an August 2011 employment agreement between TPRC and a pain specialist.

452.     During the recruitment process, Ms. Baker, representing the physician recruit, dealt primarily with William Milo. As the executive charged with physician relationships, Defendant Milo would have been involved in drafting Surgery Partners' employment agreements. Defendant  Milo was also the architect of the defendants UDT business line, operated through Logan Labs.

87

453.    Defendants changed the Ancillary Services that would determine the employed physicians' incentive compensation from general "lab services' to specifically "urine drug screening" (the primary source of Logan Labs' revenue) sometime between 2012 and 2014.

454.    Defendant Chris Toepke joined Surgery Partners in August of 2014.

455.    Defendants' arrangements to compensate healthcare providers that order UDT from Defendant Logan Labs, as described herein, runs afoul of the Anti-Kickback Statute and analogous state Anti-Kickback laws.

456.    The purpose and intent of Defendants' kickback arrangement, as offered to Surgery Partners' pain management specialist, is to induce healthcare providers to order UDT from Defendant Logan Labs. *See* 42 U.S.C. § 1320a-7b(a).

457.    The fraud has involved patients who partake in government healthcare programs, including, but not limited to, Medicaid and Medicare. *Id.*

458.    The funds provided to the ordering providers are kickbacks and/or bribes and therefore a form of remuneration under the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(b)(1).

459.    The arrangement does not fall into the "safe harbor" provisions set out at 42 C.F.R. § 1001.952.

460.    Given the structure of Defendants' kickback scheme and their focus on providing income to physicians based on referrals for ancillary services, including UDT performed by Logan Labs, one of, and indeed the primary, purpose of this arrangement was and is to induce providers to order UDT from Defendants.

461.    The incentive for a provider to not just order a test from Defendants but also to order an unnecessary test — is palpable and substantial.

462.    Patients are harmed, not simply because they are forced to pay the co-pays

associated with the UDT, but also because their care is delayed while Defendants obtain the UDT results for Logan Labs, which takes one to two weeks.

463.    Accordingly, all claims submitted to government insurers pursuant to referral arrangements prohibited by the Anti-Kickback Statute are "legally false."

464.    One purpose of the Surgery Partners' ancillary services incentive compensation was to induce physicians and mid-level providers to refer patients to Logan Labs.

465.    Surgery Partners issued guidance to the physicians working at their pain medicine practices requiring that patients be referred to quantitative urine toxicology testing at regular intervals, rather than only when deemed medically necessary by the provider.

466.    Surgery Partners' employment agreements provide that after a year, the physicians receive incentive compensation that is based, in part, on profits generated by Surgery Partners' ancillary services, including Logan Labs.

467.    Defendants' scheme of requiring their employed physicians to refer patients to Logan Labs, and also inducing them to refer government-insured patients to Logan for urine toxicology testing services constitutes an illegal kickback in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

468.    Each claim that Surgery Partners or Logan Labs submits, or cause to be submitted, to the United States and the plaintiff-states, for urine toxicology testing referred by a physician who Surgery Partners and/or Logan Labs paid a kickback, is false under the FCA and/or the analogous state false claims laws.

469.    Defendants' violations of the Stark Laws and federal and state AKS were knowing. For example, Defendants provided patients at the Merritt Island location with a notice that physicians had a financial relationship with (an ownership interest in) Surgery Partners'

subsidiary lab.

470.    When Dr. Cho challenged the referral relationship between Surgery Partners physicians and Logan Labs, he received oral directives that Surgery Partners physicians were expected to refer their patients to Logan Labs.

### E.    Defendants Had Knowledge of the Illicit Nature of the Kickback Scheme

471.    At all times relevant, Defendants knew that the compensation arrangements they offered as inducements to referring physicians were kickbacks.

472.    Defendants' executives offered "attractive" compensation packages to physicians across the country, including Dr. Cho, which included incentive bonuses based, in part, on revenues generated by UDT referrals to Logan Labs.

473.    At all times relevant to this Complaint, Defendants knew that their Incentive Compensation clauses were a sham used as a cover for offering illegal inducements to referring physicians.

474.    Defendants further knew that it violated the federal Anti-Kickback Statute and analogous state Anti-Kickback laws to require their providers to refer their patients to Defendants' subsidiary, Logan Labs, for UDT services.

475.    These actions have damaged the public and the government payors at issue in this Complaint by inducing UDT services referrals to Defendants.

476.    Defendants have also caused these government payors to reimburse Defendants for many UDT services that were not medically necessary. Providers may have ordered the UDT (or an excessive UDT) in order to reap the financial benefits offered by Defendants.

## VIII.  DEFENDANTS' COMPENSATION ARRANGEMENT VIOLATES THE STARK LAW

477.    The Surgery Partners defendants offered incentive compensation to physicians in a position to refer patients to their wholly-owned subsidiary, Logan Labs. Defendants communicated to physicians that their incentive compensation would be based on profits generated through Logan Lab.

478.    The financial relationship does not meet the in-office ancillary services exception because the laboratory services (UDT) are shipped from Surgery Partners' pain practices all over the country to Logan Labs in Tampa, Florida.

479.    Defendants' "ancillary services" incentive compensation also violates the federal AKS and analogous statutes enacted by the Plaintiff States.

480.    Dr. Cho has raised his concerns regarding violations of the Stark Laws with Surgery Partners executives on several occasions.

481.    Dr. Cho advised Surgery Partners, via email in July of 2016 that he would not order Logan Labs UDT for his patients because he was concerned that the practice was illegal:

482.    He also instructed Surgery Partners executives that if he had received compensation that was based on Logan Labs referrals, these amounts should be deducted from future pay until they were returned.

483.    Dr. Cho also refused to accept any compensation based in part on revenues from Surgery Partners' ancillary services subsidiaries to which he could refer, including Logan Labs.

484.    In his February 1, 2017 email, Dr. Cho again raised his concerns about the improper financial relationship between Surgery partners and physicians with respect to Logan Lab referrals:

Also the Logan Lab is owned 100% by my employer, Surgery

91

> Partners, so there is "Conflict of Interest" issue, even if I do not get
> any financial compensation from the Logan Lab. All MAs and PAs
> are instructed to use Logan Lab if patient's insurance plan is
> Medicare or any PPO plan at this time.

485.    Relators do not know of any physicians who are unaffiliated with Surgery
Partners who regularly refer their patients to Logan Labs for UDT.

486.    At all times relevant to this Complaint, Defendants knew that their ancillary
services incentive compensation agreements constituted an unlawful inducement in violation of
the federal Stark laws.

487.    Defendants acted knowingly or with reckless disregard in violation of the federal
FCA and analogous state FCAs. For example, Defendant Surgery Partners implemented a
compliance program only after the company became publicly traded in 2015. Before that, there
was no formal compliance program, just a "commitment to integrity that has existed at Surgery
Partners since inception." Dr. Cho received Surgery Partners' compliance education on April 4,
2017.

488.    However, Surgery Partners' compliance program, as reflected in its Compliance
Orientation materials, shows that Surgery Partners Board of Directors and senior management
were aware of the following: 1) Kickbacks or compensation of any kind intended to induce
referrals are prohibited by law; 2) Contract payments and other benefits paid to clinicians and
referral sources must be for actual services at fair market value; 3) Surgery Partners is subject to
False Claims Act liability for false claims, including claims not supported by the patient's
medical record; 4) Surgery Partners should not submit claims for reimbursement which are
"false, fraudulent, inaccurate, or fictitious;" 5) Surgery Partners must promptly refund any
money received which the company knows is not due to them.

489.    In addition, Surgery Partners knowingly harassed Dr. Cho and others in violation

of their corporate "Policy of non-retaliation/non-retribution for reporting violations of laws, standards, policies, etc."

## IX.   **CAUSES OF ACTION**

### COUNT I - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(A), (B)

490.    Relators incorporate the averments of paragraphs 1 through 489 as if set forth in full herein.

491.    Claims submitted by Defendants nationwide to federally - or state-funded health care programs, including Medicare and Medicaid, related to professional services that were not medically necessary or were not provided constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

492.    Claims submitted by the Defendants that violated the federal Anti-Kickback Statute constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

493.    The claims knowingly made by Defendants nationwide to federally- or state-funded health care programs related to false records of UDT that were not medically necessary constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

494.    The false records or statements were the patient records and bills which (a) misrepresented that quantitative UDT was medically necessary and/or (b) certifications and representations of full compliance with all federal and state laws, including, but not limited to, the federal Anti-Kickback Statute and Stark Laws.

495.    All of Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

496.    Each of the Defendants is jointly and severally liable for the damages resulting from the conduct described in this Complaint.

**WHEREFORE**, Relators request the following relief:

A.    Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus the maximum civil penalty allowed by law for each violation of the federal False Claims Act;

B.    Twenty-five percent (25%) of the proceeds of this action if the United States elects to intervene, and thirty percent (30%) if it does not;

C.    Their attorneys' fees, litigation and investigation costs, and expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT II - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(C) CONSPIRACY

497.    Relators incorporate the averments of paragraphs 1 through 496 as if set forth in full herein.

498.    Defendants, in their agreements with healthcare providers to order unnecessary UDT in exchange for illicit remuneration, engaged in a concerted effort to carry out Defendants fraudulent scheme to bill for UDT that were not medically necessary, conspired to defraud the federal government by submitting false or fraudulent claims (including those related to unnecessary services, as well as those claims related to referrals tainted by violations of the federal Anti-Kickback Statute and the Stark Laws) which were paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

**WHEREFORE**, Relators request the following relief:

A.    Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus the maximum civil penalty allowed by law for each violation of the federal False Claims Act;

B.    Twenty-five percent (25%) of the proceeds of this

action if the United States elects to intervene, and thirty percent (30%) if it does not;

C.    Their attorneys' fees, litigation and investigation costs, and expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT III - FLORIDA FALSE CLAIMS ACT
### Fla. Stat. §§ 68.081, *et seq.*

499.    Relators incorporate Paragraphs 1 through 498 as though fully set forth herein.

500.    The allegations in this count are made upon information and belief.

501.    This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. § 68.082(2).

502.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

503.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Florida State Government to approve or pay such false and fraudulent claims.

504.    By virtue of the conduct described herein, Defendants conspired to violate the Florida False Claims Act.

505.    By virtue of the acts described above, Defendants have violated and continues to violate Florida law prohibiting the payment or receipt of bribes or kickbacks, namely Fla. Stat. § 456.054 and Fla. Stat. § 409.920.

506.    The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues

to pay the claims that would not be paid but for Defendants' illegal inducements.

507.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments of Florida state funds.

508.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

509.    The State of Florida is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

> A.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Fla. Stat. § 68.082(2)(a), (b), (c), and (g).
>
> B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Florida elects to intervene, and 30% if it does not;
>
> C.    Relators' attorneys' fees, litigation and investigation costs, the costs of the audit, and other related expenses; and
>
> D.    Such other relief as the Court deems just and appropriate.

### COUNT IV - COLORADO FALSE CLAIMS ACT
### Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*

510.    Relators incorporate Paragraphs 1 through 509 as though fully set forth herein.

511.    The allegations in this count are made upon information and belief.

512.    This is a claim for treble damages and penalties under the Colorado False Claims Act.

513.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Colorado for payment or approval.

514.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the state of Colorado to approve or pay such false and fraudulent claims.

515.    By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Colorado False Claims Act.

516.    The State of Colorado, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

517.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Colorado.

518.    By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

519.    The State of Colorado is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

> A.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*;

B.      Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Colorado elects to intervene, and thirty percent (30%) if it does not;

C.      Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.      Such other relief as the Court deems just and appropriate.

## COUNT V - GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. §§ 49-4-168, *et seq.*

520.    Relators re-allege Paragraphs 1 through 519 as though fully set forth herein.

521.    This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

522.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Georgia State Government for payment or approval.

523.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Georgia State Government to approve or pay such false and fraudulent claims.

524.    By virtue of the acts described above, Defendants conspired to violate the Georgia State False Medicaid Claims Act.

525.    By virtue of the acts described above, Defendants have violated Georgia's Patient Self-Referral Act, Ga. Code Ann. § 43-1B-4(7).

526.    The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

527.    Defendants knowingly submitted and/or caused to be made or used false records

or false statements in order to avoid or to decrease their respective obligations to return overpayments of state funds to the Georgia State Government.

528. By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged in a substantial amount to be determined at trial.

529. The State of Georgia is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by the Defendants.

> **WHEREFORE**, Relators request the following relief:
>
> A.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Ga. Code Ann. § 49-4-168.1 (a)(1), (2), (3), and (7).
>
> B.     Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Georgia elects to intervene, and 30% if it does not;
>
> C.     Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and
>
> D.     Such other relief as the Court deems just and appropriate.

## COUNT VI- NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Gen. Stat. § 1-605, *et seq.*

530. Relators incorporate Paragraphs 1 through 529 as though fully set forth herein.

531. The allegations in this count are made upon information and belief.

532. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

533. By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims to the State of North Carolina for payment or approval.

534.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the State of North Carolina to approve or pay such false and fraudulent claims.

535.    By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the North Carolina False Claims Act.

536.    By virtue of the acts described above, Defendants violated N.C. Gen. Stat. § 90-401, which bars providing healthcare providers compensation for the referral of patients.

537.    The State of North Carolina, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

538.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of North Carolina.

539.    By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

540.    The State of North Carolina is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

WHEREFORE, Relators request the following relief:

A.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus the maximum civil penalty

allowed by law for each violation of N.C. Gen. Stat. § 1-607.

B.      Twenty five percent (25%) of the proceeds of this action to the Relator if the State of North Carolina elects to intervene, and thirty percent (30%) if it does not;

C.      Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.      Such other relief as the Court deems just and appropriate.

## COUNT VII - TEXAS MEDICAID FRAUD PREVENTION ACT
### Tex. Hum. Res. Code §§ 36.001, *et seq.*

541.    Relators re-allege Paragraphs 1 through 540 as though fully set forth herein.

542.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

543.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

544.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Texas State Government to approve or pay such false and fraudulent claims.

545.    By virtue of the conduct described herein, the Defendants conspired to violate the Texas Medicaid Fraud Prevention Act.

546.    By virtue of the acts described above, Defendants have violated and continue to violate Texas law prohibiting the payment or receipt of bribes or kickbacks, namely Tex. Occ. Code Ann. § 102.001.

547.    The Texas State Government, unaware of the falsity of the records, statements

and claims made, used, presented or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

548.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments of Texas state funds.

549.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

550.    The State of Texas is entitled to a civil penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Tex. Hum. Res. Code Ann. § 36.002(1), (4), (9), (12);

B.    Twenty-five percent (25%) of the proceeds of this action to the Relators if the State of Texas elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.    Such other relief as the Court deems just and appropriate.

102

## DEMAND FOR JURY TRIAL

Relators request a trial by jury on all claims so triable.

**SMITH, GAMBRELL & RUSSELL**


_/s/ Alan S. Wachs_
ALAN S. WACHS, ESQUIRE
Florida Bar No. 980160
50 North Laura Street, Suite 2600
Jacksonville, FL 32202
(904) 598-6124
(904) 598-6224 (facsimile)
awachs@sgrlaw.com

and

**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**

MARC S. RASPANTI, ESQUIRE
PAMELA COYLE BRECHT, ESQUIRE
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 320-6200
(215) 754-5191 (facsimile)
msr@pietragallo.com
pcb@pietragallo.com
*Pro Hac Vice*


**Attorneys for Relators/Plaintiffs**


Date: ___January 15, 2019_____

#4721039/1

103