# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* SHELDON CHO, MD and | ) | |
| DAWN BAKER, Relators, | ) | |
| | ) | **SECOND AMENDED *QUI TAM* COMPLAINT** |
| | ) | |
| Plaintiffs | ) | |
| | ) | **Case No.: 8:17-cv-983-T-33AEP** |
| | ) | |
| v. | ) | **HON. VIRGINIA M. HERNANDEZ COVINGTON** |
| | ) | |
| | ) | |
| H.I.G. CAPITAL, LLC and | ) | |
| H.I.G. SURGERY CENTERS, LLC | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED *QUI TAM* COMPLAINT FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL**

SGR/22940192.1

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION AND SUMMARY OF FRAUD ALLEGATIONS............................1

II. JURISDICTION AND VENUE ...............................................................12

III. PROCEDURAL HISTORY......................................................................14

IV. THE PARTIES......................................................................................14

A. Relators Cho and Baker ....................................................................14

Relator Baker's Interactions with Surgery Partners' William Milo.......................15

B. The H.I.G. Defendants and Related Entities...........................................18

1. Surgery Partners, Inc. & Surgery Partners, LLC .....................................18

2. The H.I.G. Defendants and Their Affiliates ............................................19

a) Defendant H.I.G. Capital, LLC ..........................................................19

b) Defendant H.I.G. Surgery Centers, LLC................................................20

c) Bayside Capital, Inc. .......................................................................20

d) The H.I.G. Defendants' Buyout and Management of Surgery  Partners .......................21

e) Surgery Partners Acquisition Company, Inc............................................42

f) Surgery Center Holdings, Inc............................................................43

g) Surgery Center Holdings, LLC ...........................................................43

h) Surgery Partners, Inc. – Surgery Partners' Reorganization ...........................43

i) Surgery Partners' Ancillary Services 2011 – Present: Pain Relief Centers and Logan Labs...........................................................45

3. Surgery Partners' Pain Management Physician Practices Segment...............46

a) Tampa Pain Relief Centers, Inc. ("TPRC") ...........................................47

b) Denver Pain Relief Center, PC...........................................................49

c) Asheville Pain Relief Center, P.C........................................................50

d) Lebanon Pain Relief Center, PC ........................................................51

e) Dallas Pain Relief Center, PC ...........................................................51

f) Georgia Pain Management Physician Practices .......................................52

4. Logan Labs...................................................................................52

a) Surgery Partners Personnel Who Developed and Carried Out the Logan Laboratories Frauds...........................................................55

(1) Michael T. Doyle...........................................................................55

(2) William Milo ................................................................................56

(3)   Christopher Utz (Chris) Toepke ...................................................................57

V.   BACKGROUND ON FEDERAL AND STATE-FUNDED HEALTH
      INSURANCE PROGRAMS ...........................................................................59

A.   Medicare Program: Coverage Only for Medically Necessary Services .........59

B.   Other Federal Healthcare Programs .............................................................62

VI.  APPLICABLE LAW ........................................................................................62

A.   The Federal False Claims Act .......................................................................62

B.   Self-Referral Prohibitions 42 U.S.C. 1395nn (the "Stark Law")...................63

C.   The Federal Anti-Kickback Statute ...............................................................64

VII. DEFENDANTS' SCHEME TO PRESSURE AND INDUCE PHYSICIANS
      ACROSS THE UNITED STATES TO ORDER COSTLY QUANTITATIVE
      URINE DRUG TESTS ....................................................................................67

A.   The Urine Drug Tests at Issue ......................................................................67

The Value of Confirmation Testing – Limited to Unexpected Screening Results..................69

Guidelines on Urine Drug Testing .........................................................................70

B.   The H.I.G. Defendants' Two Primary Schemes to Fraudulently Generate UDT
      Referrals for Logan Labs ..............................................................................73

C.   The Pressure on Physicians and Mid-Level Providers and Manipulation of
      Office Practices and EMR to Generate Referrals to Logan Labs Without
      Regard for Medical Necessity........................................................................74

1.   Surgery Partners' executives improperly interfered with the physicians' and mid-level
     provider's independent medical judgment by pre-selecting patients, including
     Government healthcare program beneficiaries, for expensive quantitative UDT services
     when the patients arrived at the Surgery Partners' practice -- before the patients were
     even seen by their physician or a mid-level provider.......................................74

2.   Surgery Partners fraudulently obtained the consent of patients, including Government
     healthcare program beneficiaries, to UDT by falsely representing that quantitative UDT
     services were required multiple times per year in order to comply with state and/or
     federal laws. ..................................................................................................76

3.   Surgery Partners employed company-wide policies PROHIBITING physicians and
     mid-level providers from using simple screening UDT  methods (i.e., inexpensive and
     effective dip-stick cups) in the office, which caused gross over-utilization of expensive
     quantitative UDT............................................................................................78

Dr. Cho's Resistance to Surgery Partners' UDT Fraud ..........................................80

4.   Surgery Partners steered Government healthcare program beneficiaries to Logan Labs
     for quantitative UDT, even when the physician or mid-level provider ordered or
     preferred a dip stick test for qualitative UDT or a different UDT laboratory................93

SGR/22940192.1

5.  Surgery Partners pressured physicians and mid-level providers to refer patients for UDT services by closely monitoring the patients who were not referred to UDT at each visit..................................................................................................................94

6.  Surgery Partners implemented UDT policies that resulted in the creation of false electronic medical records (EMRs) to support medically unnecessary UDT services. ..98

7.  Surgery Partners' corporate policies and conduct caused Logan Labs to perform excessive, medically unnecessary quantitative UDT on Government healthcare program beneficiaries, then to submit claims for such to Government-funded healthcare programs. .................................................................................................................98

a)  Surgery Partners Pushed for Providers to Order UDTs More Frequently Than Needed ...........................................................................99

b)  Surgery Partners' Subsidiary Logan Labs Uses Excessive Quantitative UDT Panels. ...................................................................100

8.  Defendants fraudulently unbundled the claim for quantitative UDT and billed Government-funded healthcare programs for more than 40 separate "confirmation" tests....................................................................................................................103

9.  Surgery Partners' corporate policy was to pressure physicians and mid-level providers to sign false attestations of medical necessity for quantitative UDT to respond to or avoid denials of Logan Labs UDT claims from Government-funded healthcare programs, including Medicare...............................................................................103

10. Bills for "Confirmation" UDTs that Were Medically Unnecessary and/or Were Not Performed After a Screening UDT.............................................................................105

11. Waiving co-pays and/or failing to collect co-pays related to quantitative UDT performed by Logan Labs from beneficiaries of Government-funded healthcare programs, including TRICARE and Medicare Part C..................................................105

12. Surgery Partners Pressured Its Physicians Nationwide to Refer to Logan Labs...........106

D.  Surgery Partners' Financial Relationships with Physicians Who Order UDT Services From Logan Labs Violate Stark Laws and Anti-Kickback Statutes............................109

E.  Defendants Had Knowledge of the Illicit Nature of the Kickback Scheme .................115

VIII. DEFENDANTS' COMPENSATION ARRANGEMENT VIOLATES THE STARK LAW ...............................................................................................................116

IX.  CAUSES OF ACTION .................................................................................119

COUNT I - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(A), (B).................................................................................................119

COUNT II - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(C) CONSPIRACY.................................................................................121

DEMAND FOR JURY TRIAL ...........................................................................122

iv

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* SHELDON CHO, MD and | ) | |
| DAWN BAKER, Relators, | ) | |
| | ) | **SECOND AMENDED *QUI TAM* COMPLAINT** |
| | ) | |
| Plaintiffs | ) | |
| | ) | **Case No.: 8:17-cv-983-T-33AEP** |
| | ) | |
| v. | ) | **HON. VIRGINIA M. HERNANDEZ COVINGTON** |
| | ) | |
| | ) | |
| H.I.G. CAPITAL, LLC and | ) | |
| H.I.G. SURGERY CENTERS, LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**SECOND AMENDED *QUI TAM* COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL**

I.   **INTRODUCTION AND SUMMARY OF FRAUD ALLEGATIONS**

1.     This *qui tam* action alleges violations of the federal False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), by Defendants H.I.G. Capital, LLC and H.I.G. Surgery Centers, LLC (collectively "H.I.G." or "Defendants") which, from 2009 to 2017, owned, managed, controlled, and/or advised the entities described below as "Surgery Partners." Relators, in prior pleadings, named other individuals and entities as Defendants who acted with H.I.G. (principally Surgery Partners, Inc., its subsidiaries, and certain executives), which were released following a settlement covering those parties' conduct. This pleading addresses only the H.I.G. Defendants' liability for their fraudulent conduct during the time that H.I.G. controlled, managed, and advised Surgery Partners, Inc. and its subsidiaries.

2.     Surgery Partners, Inc., Surgery Center Holdings, Inc., Surgery Partners Holdings,

LLC, and Surgery Center Holdings, LLC (hereinafter "Surgery Partners") own and operate a national network of surgical facilities and ancillary services located in 29 states.  The company's ancillary services include multi-specialty physician practices and laboratory services. Surgery Partners' physician practices include pain management specialists.

3.      H.I.G. operates as a Miami-based private equity firm which engages in management-led buyouts of manufacturing and service companies, including healthcare providers.  H.I.G., through a related investment vehicle it controlled, the H.I.G. Bayside Debt & LBO Fund II, L.P. ("the buyout fund"), effectuated the buyout of Surgery Partners in or about December 2009.  From the time of H.I.G.'s acquisition of Surgery Partners until H.I.G.'s interest in Surgery Partners was sold in 2017, the H.I.G. Defendants actively engaged with Surgery Partners' executives "to build on their market-leading position."

4.      As set out below, from December 2009 until 2017, H.I.G. controlled Surgery Partners' growth strategies, particularly regarding the acquisition or creation of new businesses by virtue of the management agreement with the company (described below) and the H.I.G. entities' managing directors who held leadership positions on Surgery Partners' and its subsidiaries' Boards and in practice had effective control of these entities.

5.      On December 24, 2009, the same day that H.I.G. effectuated the buyout of Surgery Partners, Bayside Capital, Inc. ("Bayside"), a controlled affiliate of H.I.G. Capital, LLC, entered into a Management and Investment Advisory Services Agreement with Surgery Partners ("the H.I.G. Management Agreement").

6.      The H.I.G. Defendants, through the H.I.G. Management Agreement, provided "management, consulting, and financial advisory services" to Surgery Partners and "the business of any companies … formed or acquired" by Surgery Partners.  The H.I.G. Defendants charged Surgery

2

Partners tens of millions of dollars for these advisory, consulting, and management "services" to Surgery Partners and were paid tens of millions of dollars in return.

7.      Pursuant to the H.I.G. Management Agreement, Surgery Partners retained the H.I.G. Defendants specifically to provide "management and financial advisory consultant and advisor to the Company and its subsidiaries, including the business of any companies hereafter formed or acquired by the Company or any such subsidiary."  The services to be provided to Surgery Partners under the H.I.G Management Agreement included "advice and assistance concerning any and all aspects of the operations, planning, financing and budgeting of [Surgery Center Holdings, Inc.] and its subsidiaries." The H.I.G. Defendants did that and more.

8.      During the relevant time period, Surgery Partners paid the H.I.G. Defendants at least $38.7 million in advisory and management fees, which Surgery Partners reported as general and administrative expenses related to Surgery Partners' overall corporate functions.

9.      H.I.G.'s control over Surgery Partners' operations included the planning, financing, and budgeting of Surgery Partners' existing business lines when H.I.G. took control in 2009 as well as the business of companies formed or acquired by Surgery Partners between 2010 and 2017. Beyond the H.I.G. Management Agreement, H.I.G. placed multiple employees and representatives on the Surgery Partners' Board. For example, H.I.G. Managing Partner Christopher Laitala was named to the Surgery Partners' Board of Directors in 2009, in 2015 became Chairman of the Surgery Partners' Board, and later in 2015 was appointed President of Surgery Center Holdings, Inc.

10.     Under H.I.G.'s control, leadership, experience, and direction, Surgery Partners, created a new profit center – urine toxicology testing.  Beginning in 2011, H.I.G. and Surgery Partners formed a new ancillary service provider, Logan Laboratories LLC ("Logan Labs"), in order to exponentially increase their profit margins through urine diagnostic testing. Logan Labs was designed

to perform the lab work for the unnecessary testing (described below) and H.I.G. and Surgery Partners implemented a management scheme to coerce affiliated physicians (via financial means and otherwise) to refer Surgery Partners' patients' urine testing to Logan Labs for tens of millions of dollars in unnecessary and unreimbursable urine drug tests, which were billed to Government healthcare programs.

11.     Based on H.I.G.'s million-dollar management and advisory services, and related control over the formation of new Surgery Partners' business, Logan Labs was founded as a wholly-owned subsidiary of Surgery Partners through which Surgery Partners provided ancillary laboratory services to its affiliated physicians.  Logan Labs became a nationwide provider, specifically and nearly-exclusively, of urine drug testing ("UDT"), also called "urine toxicology" testing services.

12.     Although billed as a "nationwide" provider, since its founding, Logan Labs' business has been dependent upon UDT referrals by Surgery Partners' employed physicians, whose patients are largely beneficiaries of Government–funded healthcare programs, including, but not limited to, Medicare, Medicaid, and TRICARE.

13.     Surgery Partners' market for its primary and ancillary services focused extensively on Medicare patients.  H.I.G. knew that Surgery Partners' existing and new business would be fueled by Government reimbursements for Medicare-aged patients and H.I.G. even referred  to the buyout of Surgery Partners as "Project Greybeard."

14.     In fact, as described herein, the strategy put forth by the H.I.G. Defendants and adopted by Surgery Partners' executives, managers, and advisors in creating Logan Labs was to take advantage of their captive employed physicians and adopt a fraudulent scheme of over-utilizing UDT as a means to generate revenue through self-referrals, largely of Government

SGR/22940192.1

healthcare program beneficiaries.

15.     The H.I.G. Defendants took full credit for Surgery Partners' "success."  H.I.G. Capital's 2017 press release announcing the sale of its Surgery Partners' stake to a Bain & Company fund described Surgery Partners' "aggressive growth plan, expanding its footprint across the country and enhancing its specialty mix and ancillary service offerings, through both organic growth and acquisitions," achieved as a direct result of "***strategic guidance*** and capital support from H.I.G."  (emphasis added).

16.     UDT when used appropriately either detects the presence of drugs (qualitative UDT) or the specific amount of a particular substance in the patient's system (quantitative UDT).

17.     Qualitative UDT can be either point-of-care testing ("POCT"), which is performed in the physician's office, or laboratory-based, meaning it is performed at an outside laboratory.

18.     In-office drug screening (a/k/a POCT) is an easy and cost-efficient method of qualitative UDT because it is performed to detect the presence of drugs while the patient is in the presence of the provider.  The inexpensive urine cup dip stick test, using immunoassay (the same technology used in home pregnancy tests) is the most common form of in-office qualitative UDT.

19.     In order to bill for POCT, a medical facility needs a Clinical Laboratory Improvement Amendments of 1099 ("CLIA") certification or waiver. However, a medical provider can choose to perform POCT without a CLIA waiver – it just cannot bill the Government or private insurers for the test.

20.     Qualitative UDT can also be lab-based, if POCT is not available. However, in either setting, the same immunoassay technology is used ("immunoassay").

21.     Both types of qualitative UDT (in-office and lab-based) are far less expensive than quantitative UDT.

5

22.     Quantitative (also called confirmation or confirmatory) UDT, on the other hand, can be used to determine the specific levels of a variety of prescription or illegal substances present in a patient's body.   Quantitative UDT is only performed in a laboratory using properly calibrated equipment and appropriately qualified laboratory professionals.

23.     Confirmation drug testing is medically appropriate only for specific and limited indications, including to "confirm" unexpected results of in-office drug screening.  Quantitative UDT is not medically necessary for every patient or at every clinic visit.

24.     In the pain management setting, providers may determine that quantitative UDT is medically necessary to confirm a positive qualitative UDT, in other words, to rule out a false positive qualitative UDT.  Quantitative UDT may also be medically necessary in limited circumstances to rule out a false negative UDT.  In summary, quantitative UDT is medically indicated only for a narrow subset of patients.

25.     Quantitative UDT is expensive, resulting in charges by UDT laboratories to Government healthcare programs ranging from hundreds to thousands of dollars per testing episode, depending on the number of separate tests performed and/or billed.

26.     Since its founding, Logan Labs, under H.I.G.'s direction, supervision, and control, has generated most of its revenues from "confirmatory" quantitative UDT.  At the same time, as discussed below, Surgery Partners' management restricted its physicians' use of screening or qualitative tests which "confirmatory" quantitative UDT are supposed to follow.

27.     Whatever drug testing method is used, either urine dip stick (in-office drug screening) or lab-based qualitative UDT or confirmation (quantitative) UDT, it must be medically necessary to legally obtain reimbursement from Government-funded healthcare programs.  In other words, no type of UDT is automatically reimbursable.

SGR/22940192.1

28.     Both pain medicine and addiction specialists prefer random in-office POC drug screening (via a dip stick cup) tests when medically necessary, to ensure patient safety and to determine patient adherence to treatment.

29.     For the vast majority of patients, including those treated for chronic pain management by Surgery Partners-affiliated pain specialists, laboratory-based quantitative UDT is not medically necessary as an initial or follow-up test. Instead, when any UDT is medically necessary, the patient should receive a screening UDT (office-based POC drug testing).  When the dip stick cup results are not the expected results based on the provider's assessment of the patient, or other specific medical indications warrant it, the patient may then be referred to laboratory-based quantitative UDT if needed.

30.     Nonetheless, under the management, control, and direction of the H.I.G. Defendants, Surgery Partners implemented fraudulent schemes to refer patients of Surgery Partners-affiliated physicians to Logan Labs for extensive and expensive confirmatory quantitative UDT. They prohibited the use of office-based UDT without medical or scientific justification, leaving their affiliated physicians with only laboratory-based UDT (either qualitative or quantitative). They monitored their physicians' and mid-level providers' use of "confirmation" UDT and exerted great pressure on physicians to order confirmation UDT for every patient regardless of the patient's clinical presentation.

31.     Under the management, direction, advice, and/or control of the H.I.G. Defendants, Surgery Partners implemented fraudulent schemes to refer patients of their affiliated physicians to their wholly-owned Logan Labs in Tampa, Florida for extensive and expensive confirmatory quantitative UDT (up to 12 testing episodes per year) for each patient, in order to increase revenues generated through Logan Labs.

SGR/22940192.1

32.     This conduct resulted in extreme over utilization of Government-funded healthcare program resources in light of the fact that quantitative UDT is medically necessary for a very narrow subset of the patients who are treated by Surgery Partners' employed physicians and mid-level providers.

33.     In fact, since its founding in late 2011 (*i.e.*, at a time when the H.I.G. Defendants managed, directed, and controlled Surgery Partners), the primary (if not sole) source of referrals to Logan Labs has been the physicians, including pain specialists, who are employed by or affiliated with Surgery Partners' subsidiaries and practice at Surgery Partners' locations throughout the United States.

34.     During the relevant time period (late 2011 to the present), Surgery Partners and the H.I.G. Defendants knowingly (as that term is defined in the FCA): 1) generated, or caused to be generated, false records that were material to a false or fraudulent claim for Logan Labs services; 2) submitted, or caused the submission by Logan Labs of, millions of dollars' worth of false claims to Government-funded programs, including, but not limited to, Medicare, Medicaid, TRICARE, and the Veterans' Administration (VA), for UDT, including confirmatory quantitative UDT, that were not reasonable or necessary;  3) conspired to submit or cause the submission of false claims by Logan Labs to Government-funded healthcare programs; and 4) failed to return, or conspired to fail to return, to Government-funded healthcare programs overpayments received by the Defendants for medically unnecessary UDT.

35.     As illustrated below, this illegal conduct was a carefully orchestrated, corporate-led, and H.I.G.-managed effort to steer lucrative referrals of beneficiaries of Government-funded healthcare programs to Surgery Partners' wholly-owned Logan Labs for lab-based UDT services without regard to medical necessity.  Defendants also interfered with the objective medical decision-

SGR/22940192.1

making process by offering Surgery Partners' employed and affiliated pain management specialists incentive compensation that was based largely on revenues generated through UDT referrals to Logan Labs.

36.     During the relevant time period, the H.I.G. Defendants have knowingly engaged in the following conduct:

(a)     improperly interfered in the medical decision making of their affiliated physicians by pre-selecting patients, including beneficiaries of Government-funded healthcare programs, for expensive lab-based UDT services at the time the patient arrives at the Surgery Partners' practice – before the patients were or are examined by their physician or a mid-level provider;

(b)     fraudulently obtained the consent of patients, including Government healthcare program beneficiaries, to lab-based UDT by falsely representing to patients that frequent quantitative UDT services were required in order to comply with federal laws;

(c)     employed company-wide policies prohibiting physicians and mid-level providers from using simple in-office drug screening (qualitative UDT), *i.e.,* inexpensive and effective dip-stick cups;

(d)     closed the in-office toxicology laboratory at Tampa Pain Relief Centers' Merritt Island location (which had allowed qualitative and quantitative tests to be done in-house) after Surgery Partners' acquired the practice in order to route more toxicology tests (including confirmatory tests) to Logan Labs;

(e)     interfered in the medical decision making of their affiliated physicians after the physician or mid-level provider saw the patient by steering Government healthcare program beneficiaries to Logan Labs after the provider had referred the patient to a different lab for UDT;

SGR/22940192.1

(f)      pressured physicians and mid-level providers to refer patients for lab-based UDT services (particularly, Logan Labs) by closely monitoring when providers did not refer patients for lab-based UDT at each visit;

(g)      implemented UDT policies that resulted in the creation of false electronic medical records ("EMRs") in an effort to support medically unnecessary lab-based UDT services billed by Logan Labs to Government-funded healthcare programs;

(h)       caused Logan Labs to perform excessive, medically unnecessary UDT, which the Defendants billed or caused Logan Labs to bill to Government-funded healthcare programs;

(i)      fraudulently unbundled claims for lab-based quantitative UDT and billed Government-funded healthcare programs for medically unnecessary separate tests;

(j)      falsely identified UDT as "confirmation" testing on claims submitted by or on behalf of Logan Labs to Government-funded healthcare programs when "confirmation" testing was not warranted. For example, when UDT was not indicated by the physician's examination, or no in-office drug screening (qualitative UDT) had been performed, there were no "unexpected" results to "confirm;"

(k)      pressured physicians and mid-level providers to deviate from the standard of care and sign false attestations of medical necessity for lab-based UDT in order for Defendants to either respond to and/or avoid denials of Logan Labs UDT claims by Government-funded healthcare programs, including Medicare;

(l)      waived co-pays and/or failed to collect co-pays from Government-funded healthcare program beneficiaries, including TRICARE beneficiaries, for lab-based UDTs performed by Logan Labs; and

SGR/22940192.1

(m)     failed to return known overpayments when Defendants had full knowledge that they had caused the submission of false claims to Government-funded healthcare programs.

37.     Defendants also violated the federal FCA by causing the submission of false claims for Logan Labs UDT services that were furnished pursuant to prohibited referrals that resulted from Defendants' improper financial relationships with physicians, in violation of the physician self-referral prohibition, 42 U.S.C. 1395nn (the "Stark Law"), and the federal Anti-Kickback Statute, 42 U.S.C. 320a-7b(b).

38.     Through the conduct described herein, Defendants knowingly caused the submission of false claims, created false records material to false claims, and/or conspired to submit false claims for UDT services to Government-funded healthcare programs including Medicare, TRICARE, and the VA.

39.     Knowing that the claims submitted by Logan Labs were false or fraudulent, Defendants failed to return required overpayments and agreed with Surgery Partners' personnel not to do so and are thus also liable under the FCA for failure to pay a known obligation to the Government.

40.     As a result of the Defendants' unlawful conduct, Defendants caused the submission and/or conspired to submit false claims for quantitative UDT to Government-funded healthcare programs.

41.     For each quantitative UDT episode, Defendants' conduct caused the submission of a claim to Government-funded healthcare programs of approximately $2,700 to $4,600, and the fraud involved multiple testing episodes per beneficiary per year.

42.      The value of UDT claims submitted by or on behalf of Logan Labs to Government-funded healthcare programs exceeds $150 million. Government-funded healthcare programs have

reimbursed Logan Labs tens of millions of dollars for these UDT claims on a fee-for-service basis.

43.     The H.I.G. Defendants, as set out more fully below, were paid millions of dollars to provide management and advisory services and also directed the management of Surgery Partners, including the formation and operation of a new business line, urine toxicology. The fraudulent conduct that formed the very foundation of Surgery Partners' urine toxicology business was the *sine qua non* of Logan Labs' existence.  H.I.G. approved of, was knowledgeable of, and facilitated the fraud.  H.I.G. also reaped the rewards of Surgery Partners' and Logan Labs' profitable illegal scheme.

44.     Qui Tam Relators Sheldon Cho, M.D. and Dawn Baker (hereinafter Dr. Cho and Ms. Baker, and collectively "Relators"), through their legal counsel, Pietragallo Gordon Alfano Bosick & Raspanti, LLP, Smith, Gambrell & Russell, Lowey Dannenberg, P.C. and Morain & Murphy, LLC bring this action on their own behalf, and on behalf of the United States of America against Defendants.

45.     Dr. Cho is a board-certified pain medicine specialist who was hired by Surgery Partners in 2015, and subsequently witnessed the fraudulent efforts to refer patients to Logan Labs for unnecessary and excessive quantitative UDT services.

46.     Ms. Baker is a professional physician recruiter who has placed physicians with Surgery Partners since 2009, and through the course of her interactions with Surgery Partners' executives and administrators and its affiliated physicians, has direct and independent knowledge of Defendants' fraudulent practices nationwide.

## II.     JURISDICTION AND VENUE

47.     This action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*., the physician self-referral prohibition, 34 U.S.C. 1395nn (commonly known as the "Stark Law"), and the federal Anti-Kickback Statute, 42

U.S.C. § 1320a-7b(b).

48.     Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

49.     The Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants have at least minimum contacts with the United States, and can be found in, transact, or have transacted business in the Middle District of Florida.  For example, Logan Labs, which the Defendants owned and operated, is located in Tampa, in the Middle District of Florida.

50.     During the relevant time period, the H.I.G. Defendants, which are headquartered in Miami, through their control of Surgery Partners and Logan Labs, regularly offered and performed healthcare services and submitted or caused the submission of thousands of claims for payment to federal healthcare programs, including, but not limited to, Medicare, TRICARE, and the Veterans' Administration.

51.     Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Middle District of Florida is a district in which the Defendants can be found or transacts business and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

52.     The specific facts, circumstances, and allegations of the Defendants' violations of the federal FCA have not been publicly disclosed in a civil suit, criminal suit, or administrative civil money penalty proceedings in which the Government is already a party.

53.     On April 14, 2020,  H.I.G. Defendants co-conspirators, Logan Laboratories, LLC, Tampa Pain Relief Centers, Inc., and certain individual Defendants named in Relators' *qui tam* complaint, Michael T. Doyle and Christopher Utz Toepke (also co-conspirators), entered into a Settlement Agreement resolving claims under the False Claims Act made against them in this lawsuit

13

and a related lawsuit that was filed in the Eastern District of Pennsylvania, *U.S. ex rel. Ashton, et al. v. Logan Laboratories LLC, et al.*, 16-4583 (E.D. Pa.).  Like the conduct alleged in this Second Amended Complaint, the covered conduct at the heart of that settlement arises from the toxicology fraud scheme perpetuated by Logan Labs and its affiliated companies and executives, including Tampa Pain Relief Centers, the Surgery Partners' subsidiary that operated physician practices which referred patients to Logan Labs.  The H.I.G. Defendants were not parties to this settlement agreement and are specifically excluded from the settlement agreement's releases.

### III.  <u>PROCEDURAL HISTORY</u>

54.     Relators Dr. Cho and Ms. Baker are the original source of all the information upon which this Complaint is based, as that phrase is used in the federal FCA.  There has been no public disclosure of the allegations herein.

55.     To the extent any such disclosure has been made, such disclosure is unknown to Relators and Relators remain "original sources" under 31 U.S.C. § 3730(e)(4).

56.     Relators have direct and independent knowledge of the information on which the allegations herein are based and voluntarily provided this information to the federal Government prior to filing this action.  *See* 31 U.S.C. § 3730(e)(4).

### IV.  <u>THE PARTIES</u>

#### A.     <u>Relators Cho and Baker</u>

57.     Plaintiff/Relator Sheldon Cho, M.D., a board-certified pain medicine specialist, is a resident of the state of Florida and a naturalized citizen of the United States.  He graduated from Seoul National University College of Medicine in 1992 and has been practicing medicine since that time.

58.     Dr. Cho is licensed to practice medicine in the states of California and Florida.

59.     Before he moved to Florida in 2015, Dr. Cho had extensive experience in both pain management and addiction treatment.

60.     Pursuant to a September 16, 2015, employment agreement, Dr. Cho became an employee of Tampa Pain Relief Center, Inc. ("TPRC"), a subsidiary of Surgery Partners.

61.     Pursuant to that agreement, from November 2015 until early 2017, Dr. Cho was in private medical practice at Surgery Partners' Florida Pain Institute ("FPI") – Merritt Island, Florida.

62.     During his time at Surgery Partners, Dr. Cho also performed procedures at Defendants' Space Coast Surgery Center, which is located in the same building as FPI – Merritt Island, Florida.

63.     Space Coast is also the name of the Surgery Partners' region that includes six locations, including FPI – Merritt Island. The other Surgery Partners' pain management practices in the Space Coast Region are: FPI-Palm Bay; FPI-Melbourne (New Haven Ave.); FPI-Melbourne (N. Wickham Rd.); FPI-Viera; and FPI-Titusville.

64.     From time to time, Dr. Cho saw patients at Surgery Partners' FPI locations in addition to Merritt Island, including Viera and Titusville.

65.     Plaintiff/Relator Dawn Baker, a professional physician recruiter, lives in the state of Missouri and is a resident of the United States.  Ms. Baker graduated from Jackson College of Ministries. She has been a professional physician recruiter since 1995. Based in St. Louis, Missouri, Ms. Baker places physicians with healthcare providers throughout the United States.

### Relator Baker's Interactions with Surgery Partners' William Milo

66.     Since 2009, Ms. Baker has worked closely with Surgery Partners to provide physician recruitment services. In that capacity, she has interacted with Surgery Partners'

physician recruitment executives, including William Milo.

67.     Milo served as Surgery Partners' Director of Human Resources from 2007 until mid-2010, and then as Vice President of Operations & Physician Services and Vice President of Administration at Surgery Partners. He also served as Vice President of Logan Labs from its founding in 2011 until sometime before his departure from Surgery Partners in late 2015.

68.     Milo holds a bachelor's degree in marketing from Florida State University, a master's degree in business administration from Hodges University, and a Senior Professional in Human Resource ("SPHR") certification from the Society for Human Resources Management.

69.     Prior to joining Surgery Partners, Milo served as the Associate Administrator of Medical Surgical Specialists, a 70-physician group practice of Health Management Associates ("HMA"), now a part of Community Health Systems ("CHS").  He has no formal medical training or clinical experience.

70.     As Vice President of Operations/Administration, Milo oversaw Surgery Partners' physician services division, including the Pain Relief Centers, as well as the startup of Logan Labs.

71.     During 2011, Milo told Ms. Baker that he approached Surgery Partners' CEO Doyle and proposed to Surgery Partners' leadership that Surgery Partners would benefit from owning its own laboratory. Thereafter, Milo drafted a formal proposal, which Doyle approved.

72.     Doyle's proposal for the formation of Logan Labs required approval by Surgery Partners' leadership, including the H.I.G. Defendants, Surgery Partners' managers, advisors acting pursuant to the H.I.G. Management Agreement, and Surgery Partners' Board of Directors.  As pleaded herein, multiple H.I.G. members served on Surgery Partners' Board, including H.I.G. Managing Partner Laitala, who later also chaired Surgery Partners' Board.

73.     As a result, in the fall of 2011, Surgery Partners' operations included a newly-

formed subsidiary UDT laboratory, Logan Labs.  Milo initiated and then was primarily tasked by Surgery Partners' leadership to implement the startup of Logan Labs.

74.    Milo was intimately involved in creating Logan Labs, including establishing the lab's ability to bill Government healthcare programs for UDT services. In September 2011, when Surgery Partners applied for an NPI for Logan Labs, 1720361173, Milo was identified as the Vice President associated with the application.

75.    When Toepke arrived at Surgery Partners in August 2014 and became Group President, Ancillary Services, Milo's title was changed to Vice President of Operations and Physicians Services. From that time, Milo was no longer directly responsible for Logan Labs' operations.

76.    From 2011 until his departure in December 2015, upon information and belief, Milo was personally involved in implementing Surgery Partners' efforts to generate revenues from Logan Labs, including through referrals of Government healthcare programs beneficiaries by Surgery Partners' physicians, for example those at the Pain Relief Centers, to Logan Labs for UDT services.

77.    At the time of the September 2015 initial public offering ("IPO") of Surgery Partners, Inc., Milo was the beneficial owner of 243,661 shares of common stock. In December of 2015, after the Surgery Partners' initial public offering, Milo left Surgery Partners.  At the time, Surgery Partners paid him millions of dollars for redemption of his Surgery Partners stock.

78.    When Milo left Surgery Partners in December of 2015, Chrissy Infinger, Assistant Vice President ("AVP"), Business Development assumed physician recruitment responsibilities and became Ms. Baker's point of contact going forward.

79.    Over eight years, from 2009 through December of 2016, based on her years of

SGR/22940192.1

experience in the industry, Dawn Baker recruited more than 30 physicians for Surgery Partners practices throughout the country, including: Florida (Orlando, Tampa, Miami metro areas, as well as Jacksonville, Sarasota, Merritt Island, Melbourne, Wellington/West Palm); Colorado (Denver and Colorado Springs); Asheville, North Carolina; and Lebanon, Pennsylvania.

80. Ms. Baker recruited predominantly pain management physicians and orthopedic surgeons for Surgery Partners, but she also recruited some ophthalmologists. Ms. Baker received a flat fee from Surgery Partners for each physician she successfully placed.

B. **The H.I.G. Defendants and Related Entities**

1. **Surgery Partners, Inc. & Surgery Partners, LLC**

81. Surgery Partners, Inc. is a Delaware corporation which is headquartered at 40 Burton Hills Boulevard, Suite 500, Nashville, Tennessee 37215.

82. Surgery Partners, LLC was a Florida limited liability company that was formed in 2004 by a Florida pain specialist. From 2007 until 2014, the principal place of business for Surgery Partners, LLC was 5501 W. Gray Street, Tampa, Florida. Surgery Partners, LLC later became Surgery Partners, Inc.

83. On December 24, 2009, Surgery Partners, LLC, its parent company (Surgery Partners Holdings, LLC), subsidiaries (*e.g.*, Surgery Center Holdings, Inc.), affiliates, and their chain of pain relief clinics were sold, by then-owner Rodolfo Gari, M.D., to the buyout fund for approximately $130 million, which Defendant H.I.G. Capital, LLC controlled. Doyle worked with H.I.G. on the acquisition and continued on as CEO following the buyout. After the transaction closed, H.I.G. both owned and controlled Surgery Partners and its related businesses. Specifically, H.I.G.'s buyout fund and H.I.G. Surgery Centers, LLC jointly owned 100% of the equity in these businesses.

84. Then, in November 2011, Surgery Partners, LLC (owned and operated by H.I.G.)

18

merged with NovaMed, which focused on ophthalmology services. The H.I.G. Defendants, in accordance with the H.I.G. Management Agreement, provided substantial advisory and consulting services attendant to this acquisition (as well Surgery Partners' acquisition of Symbion discussed in greater detail *infra*).  In fact, discussions concerning the NovaMed buyout occurred shortly after H.I.G. completed the Surgery Partners' buyout.

85.     After the 2011 NovaMed merger, Doyle remained as CEO of the merged entity, Surgery Partners, LLC. It was during Doyle's tenure as CEO of both TPRC and Surgery Partners that Logan Labs was formed.

86.     In 2014, Surgery Partners, LLC acquired Nashville-based Symbion Healthcare, a large national multi-specialty provider of ambulatory surgery centers and hospitals, for $792 million.  At the time, Surgery Partners had headquarters in Chicago, Illinois and Tampa, Florida.

87.     Between 2011 and September of 2015, Surgery Partners, LLC operated a number of privately held Delaware corporations and Florida subsidiaries.

88.     In April 2015, after the Symbion merger, but before the IPO, the principal place of business for Surgery Partners, LLC was changed to 40 Burton Hills Blvd., Suite 500, Nashville, Tennessee.

89.     On November 2, 2015, Surgery Partners, LLC filed a registration to use the name of a Delaware corporation, Surgery Partners, Inc., within the state of Florida.

### 2.     The H.I.G. Defendants and Their Affiliates

#### a)     Defendant H.I.G. Capital, LLC

90.     H.I.G. Capital, LLC is a privately-held Florida limited liability company with a principal place of business located at 1450 Brickell Avenue, 31st Floor, Miami, Florida 33131.

91.     H.I.G. Capital, LLC was, as of the 2009 Surgery Partners acquisition, and remains a U.S.-based global investor with private equity, growth equity, real estate, and other miscellaneous holdings in more than 200 companies, including several located in Florida, where the company is headquartered. H.I.G. Capital, LLC currently has approximately $21 billion of equity capital under management.

### b)      Defendant H.I.G. Surgery Centers, LLC

92.     H.I.G. Surgery Centers, LLC, is a Delaware LLC which is, and was at all relevant times, controlled by H.I.G. Capital and Bayside.  Its principal place of business is also 1450 Brickell Avenue, 31st Floor, Miami, Florida 33131.

93.      H.I.G. Surgery Centers, LLC jointly owned the equity in Surgery Partners' various businesses along with the buyout fund.  H.I.G. Surgery Centers, LLC was controlled by the buyout fund (which fund H.I.G. Capital, LLC and Bayside controlled).

### c)      Bayside Capital, Inc.

94.     Bayside is a Florida corporation with a principal place of business located at 1450 Brickell Avenue, 31st Floor, Miami, Florida, 33131, the same principal place of business of H.I.G. Capital, LLC and H.I.G. Surgery Centers, LLC.

95.     Bayside operates under the control and supervision of H.I.G. Capital, LLC, and carries out its business as if it is part of – and, in fact, operates a unified business with – H.I.G. Capital, LLC.

96.     Bayside and H.I.G. Capital, LLC operate as a unified and singular investment advisory business, which is frequently referred to simply as "H.I.G." or "H.I.G. Capital."

97.     H.I.G. Capital and its affiliates (including Bayside) operate as a single business sharing the same office, personnel, and website and jointly marketing their services.  All of these

individuals laboring on behalf of this singular business (including Bayside) hold themselves out to the public as employees of H.I.G. Capital.

98.     Bayside's co-CEOs are Mnaymneh Sami and Anthony Tamer, who also are co-CEOs and managing partners of H.I.G. Capital.  Sami and Tamer were at all times material the sole Directors of Bayside.

99.     Bayside is the nominal signatory to the H.I.G. Management Agreement with Surgery Partners, through which H.I.G. indirectly received compensation for providing its management, advisory, and consulting services to and for Surgery Partners.

100.    H.I.G., directly and through its Bayside business unit, controlled, managed, and advised Surgery Partners.

> **d)    The H.I.G. Defendants' Buyout and Management of Surgery Partners**

101.    In 2009, the H.I.G. Defendants, through the buyout fund, purchased Surgery Partners Holdings, LLC, and its chain of pain relief clinics and affiliated businesses for more than $153 million.  H.I.G.'s Christopher Laitala, M.B.A., Fraser Preston, J.D., M.B.A, and Matthew Lozow, M.B.A., led H.I.G.'s buyout and subsequent management of Surgery Partners.

102.    Both before and after the sale to H.I.G. Capital, Surgery Partners owned and operated its pain management clinics through Defendant Tampa Pain Relief Center, Inc. ("TPRC").

103.    When H.I.G. Capital acquired Surgery Partners in 2009, Doyle, who had been the Chief Operating Officer since 2004, became the Chief Executive Officer of Surgery Partners, LLC and TPRC.

104.    Doyle has been Surgery Partners' CEO for the duration of the H.I.G. Defendants' ownership and/or control of Surgery Partners and its subsidiaries, including Logan Labs.

105. On January 7, 2010, H.I.G. announced its acquisition of Surgery Partners Holdings, LLC. In its press release to the media and investors, H.I.G. Managing Director Christopher Laitala, who would become a Director, Chairman of the Board, and President at Surgery Partners, emphasized H.I.G.'s active role in Surgery Partners' operations and partnership with executives who were already in place (such as co-conspirators Doyle and Milo), stating:

> [w]e are delighted to partner with Mike Doyle and his team. We believe that patient volumes for these types of procedures will continue to shift from hospital settings to outpatient surgery centers due to greater efficiency and ease of use for physicians combined with a lower cost for payors. We believe that the Surgery Partners model of partnering with leading physicians to provide superior patient outcomes will allow the company to continue to grow at an attractive rate. We share management's excitement about the future and look forward to working with them to build their market-leading position.

106. In order to effectuate the 2009 Surgery Partners' buyout, H.I.G. used funds it had raised from its investor-clients which was pooled into the buyout fund. By virtue of its managerial and advisory role to the buyout fund and the buyout fund's large equity stake, the H.I.G. Defendants controlled the Surgery Partners business. Further, H.I.G., through its Bayside business unit, contracted to provide Surgery Center Holdings, Inc. with managerial, consulting, and advisory services.

107. Surgery Partners and its related businesses were, at that time, held by Surgery Partners Holdings, LLC (that entity and/or its assets were purchased by H.I.G.). Surgery Partners Holdings, LLC was simply a holding company that owned all shares in Surgery Partners, LLC and its affiliated and subsidiary businesses. Surgery Center Holdings, Inc. became the successor company to Surgery Partners Holdings, LLC after the H.I.G. buyout was consummated.

108. While the buyout fund is principally owned by H.I.G.'s investor-clients (*e.g.*, institutional investors or high net worth individuals) who are limited partners in the fund, the

SGR/22940192.1

buyout fund was managed and operated by the H.I.G. Defendants.

109.    As stated above, pursuant to the December 2009 H.I.G. Management Agreement, Surgery Partners paid the H.I.G. Defendants, through H.I.G's Bayside unit, a minimum annual cash consulting fee of, initially, $1 million to provide management, consulting, and financial advice  to Surgery Partners, particularly on the business of any companies formed, expanded, or acquired by Surgery Partners after December 2009.

110.    In early May 2011, following the NovaMed merger, Surgery Partners and H.I.G. amended the H.I.G. Management Agreement to increase H.I.G.'s minimum annual management fee to $2 million.

111.    During 2013, in addition to the $2 million minimum fee, Surgery Partners paid the H.I.G. Defendants another $2.7 million for management and advisory services. The H.I.G. Management Agreement was again amended in November 2014 after the Symbion merger to increase the minimum annual management, consulting, and advisory fees paid by Surgery Partners to H.I.G. Defendants from $2 million to $3 million per year.

112.    During 2014, Surgery Partners paid H.I.G. an additional $20.1 million in fees under the Management Agreement.  $17.6 million of those fees related to Surgery Partners' acquisition of Symbion.

113.    During 2015, pursuant to the H.I.G. Management Agreement, Surgery Partners paid H.I.G., through Bayside, a termination fee, as well as a transaction fee of $5.4 million. At the time of Surgery Partners' 2015 IPO, the H.I.G. Management Agreement terminated. However, the H.I.G. Defendants' control over  Surgery Partners' operations continued until 2017 (when H.I.G. sold its majority stake), including through H.I.G.'s managing partners' leadership positions on the Board of Surgery Partners and its subsidiaries.

114.    The H.I.G. Defendants were not mere passive owners, but actively involved in all aspects of Surgery Partners' business, including the provision of

> management, consulting and financial advisory services to the Company and its subsidiaries, which services will include advice and assistance concerning any and all aspects of the operations, planning, financing and budgeting of [Surgery Center Holdings, Inc.] and its subsidiaries and all acquisitions, dispositions and financings undertaken by such entities, as needed from time to time, including advising the Company and its subsidiaries in their relationships with banks and other financial institutions and with accountants, attorneys, financial advisers and other professionals with respect to such services….

115.    The H.I.G. Defendants regularly exercise supervisory control over their portfolio companies through the framework of "management, consulting and financial advisory services" agreements.  For example, VAS Aero Services, LLC, an aviation products company owned by an affiliate of H.I.G. Capital from 2010 to 2015, entered into a management service agreement with H.I.G. Capital in 2010, pursuant to which H.I.G. Capital would provide "management consulting, and financial advisory services" to VAS Aero Services for an annual fee.  In 2019, the District Court of Appeal of Florida upheld a trial court's factual determination that this agreement gave H.I.G. Capital "both a supervisory and financial interest in VAS."  *Volvo Aero Leasing, LLC v. VAS Aero Servs., LLC*, 268 So.3d 785, 788-90 (Fla. 4th DCA 2019).

116.    The H.I.G. Defendants were required, upon request, to provide reports to Surgery Partners regarding the management and financial advisory services they were providing.  Surgery Partners was responsible for paying any expenses incurred by the H.I.G. Defendants related to services provided under the H.I.G. Management Agreement.  Surgery Partners even agreed to indemnify and hold harmless Bayside and its affiliates for conduct arising from or relating to the Management Agreement with certain narrow exceptions (*e.g.*, gross negligence and willful misconduct).

24

117.    Doyle, Surgery Partners' CEO, executed the H.I.G. Management Agreement on behalf of Surgery Partners and its affiliated businesses, including Surgery Partners Holdings, Inc., Surgery Partners, LLC, and Tampa Pain Relief Center, Inc. A critical element of the H.I.G. Defendants' control over Surgery Partners business, the H.I.G. Management Agreement, was executed by Richard Siegel, Esquire, General Counsel and Chief Compliance Officer of Defendant H.I.G. Capital (who also acted as Vice President and General Counsel of Bayside).

118.    As alleged herein, from December 2009 until Surgery Partners' 2015 initial public offering, H.I.G. Capital exerted extensive control over existing and new business. This control extended to H.I.G.'s appointing all members of the Board of Directors of Surgery Partners, Inc., Surgery Partners' Board, including the H.I.G. Defendant representatives on the Board, were charged with serving "as a prudent fiduciary for shareholders" and overseeing the management of Surgery Partners' business operations.

119.    Even after the 2015 IPO, and until 2017 when the H.I.G. Defendants sold their majority interest in Surgery Partners, the H.I.G. Defendants still exerted substantial control over Surgery Partners' operations through their continued control of its Board.

120.    H.I.G. Capital personnel who served on Surgery Partners, Inc.'s Board of Directors included Christopher Laitala, M.B.A., Matthew Lozow, M.B.A., and Fraser Preston, J.D., M.B.A.

121.    H.I.G. Capital's control over Surgery Partners' management and business development is evidenced by the fact that the H.I.G. Defendants installed Laitala as President of Surgery Center Holdings, Inc. starting on December 24, 2009 (the date of H.I.G.'s buyout of Surgery Partners).  At that point, Surgery Center Holdings, Inc. was the primary entity through which Surgery Partners did business, providing H.I.G., through Laitala, with additional insight and control over the Surgery Partners businesses.

122.    Later on, the H.I.G. Defendants installed Laitala as Chairman of the Board.  Mr. Laitala has extensive experience in healthcare investments and had a professional focus not just on buyout transactions themselves but also "post-closing growth strategies" of portfolio companies like Surgery Partners.

123.    Laitala served as the main H.I.G. Capital representative interacting with Surgery Partners' leadership prior to the buyout and he continued to quarterback H.I.G. Capital's control over existing and new business operations at Surgery Partners thereafter.

124.    Between 2009 and 2017, H.I.G.'s Laitala played a key role in managing and advising Surgery Partners. Pursuant to the H.I.G. Management Agreement, he was the primary contact between Surgery Partners and the H.I.G. Defendants for any communications "required or permitted" at: Bayside Capital, Inc. 600 Fifth Avenue 24th Floor New York, New York 10020 Attn:    Chris    Laitala    Telephone:    212-506-0500    Facsimile:    212-506-0559    Email: claitala@higcapital.com.

125.    When announcing Laitala's May 2017 resignation from Surgery Partners' Board, Surgery Partners noted that he had "served on the Board of Directors of Surgery Center Holdings, Inc. since leading H.I.G. Capital, LLC's investment in December 2009," and that, in addition to serving on the Board and "as chairman of the Board since August 2015," Laitala also served as a member of the Audit Committee of the Surgery Partners' Board until September 2016 and as a member of the Compensation Committee of Surgery Partners' Board. Surgery Partners noted that "Mr. Laitala's resignation is part of a planned transition off of the Board following his resignation from H.I.G. Capital, LLC, the majority stockholder of the Company, and is not due to a disagreement with the Board or management or on any matter relating to the Company's operations, policies or procedures."

126.     However, Surgery Partners' account of Laitala's resignation was contradicted by a shareholder's characterization, included in a filing in Delaware Chancery Court, according to which Laitala "abruptly" resigned to protest the H.I.G.-Bain deal's lack of fairness, less than a week before the Surgery Partners' Board approved the transaction. *Klein v. H.I.G. Capital, LLC*, 2018 WL 6719717, at *2 (Del. Ch. Dec. 19, 2018).

127.     Like Laitala, in May 2017, after H.I.G.'s sale of its Surgery Partners' stock to Bain Capital, Matthew Lozow resigned from Surgery Partners Inc.'s Board of Directors, all committees of that Board, and all Boards of Directors of Surgery Partners' subsidiaries on which he had served. Lozow had served on the Surgery Partners' Board since the Company went public in April 2015. He had also served on Surgery Partners' Compensation Committee since its inception. Bain Capital, pursuant to its rights under the Common Stock Purchase Agreement, requested the resignation of Mr. Lozow, the H.I.G.-affiliated Director on the Board, effective upon the Common Stock Closing.  Surgery Partners announced that "Mr. Lozow's resignation from the Board is not due to a disagreement with the Board or management or on any matter relating to the Company's operations, policies or procedures."

128.     H.I.G.'s senior managing director, Fraser Preston, Esquire, also played a role in managing and advising Surgery Partners after H.I.G.'s takeover in 2009.  Preston served on Surgery Partners' Board from H.I.G.'s acquisition of Surgery Partners in 2009 until July 2012.

129.     Preston, like Laitala and Lozow, was involved in H.I.G.'s efforts to grow Surgery Partners from a small independent ASC operator with operations in Florida, to a company that went public and owned and operated over "180 facilities in 32 states, including surgical facilities and ancillary services comprised of a diagnostic laboratory, multi-specialty physician practices, urgent care facilities, anesthesia services, optical services and specialty pharmacy services."  In

SGR/22940192.1

early 2013, Mr. Preston left Surgery Partners' Board in anticipation of his transfer to the west coast to establish H.I.G.'s presence in that region.

130.    From 2009 through 2017, the H.I.G. Defendants controlled and managed Surgery Partners, Inc. and its affiliated businesses and were focused on maximizing their management and advisory fees, Surgery Partners' revenues, returns for itself, and, of course, returns for their investors.  This financially focused approach put profits before patients as, under H.I.G.'s control and direction, Surgery Partners created and then expanded its illegal toxicology testing scheme (as set out more fully herein).

131.    H.I.G. Capital's 2014 press release announcing Surgery Partners' acquisition of Symbion included quotes from Surgery Partners' CEO Doyle, as well as H.I.G.'s Laitala.  In it, both Doyle and Laitala referred to Surgery Partners' ancillary service lines.  H.I.G.'s Laitala highlighted the importance of Surgery Partners' "outpatient ancillary lines of care, including …diagnostic testing," which "Surgery Partners and Symbion expect …will enhance its ability to offer patients a wide array of these complimentary services."  H.I.G. noted that "Surgery Partners …provides ancillary services to support its physician-partners and improve the quality and growth of its facilities."  Laitala also added that H.I.G. would continue to build on Surgery Partners' momentum and welcomed Symbion's management team to Surgery Partners.

132.    At the same juncture, Surgery Partners, through CEO Mike Doyle, also emphasized H.I.G.'s active management of Surgery Partners and involvement in growing Surgery Partners' business:

> HIG is an experienced healthcare investor with an impressive track record of success in the healthcare industry. We are delighted by the prospect of building our business together with the H.I.G. team. Our partnership with will allow Surgery Partners to continue to provide our physician partners and patients the most efficient, highest quality service in the industry.

28

133.    So extensive was H.I.G.'s control and management of Surgery Partners through the H.I.G. Management Agreement that the minimum annual advisory and management fee was doubled from $1 million to $2 million from 2010 to 2011 (the year when Logan Labs was formed and Surgery Partners merged with NovaMed).  Again, in 2014, the minimum annual management and advisory fee paid by Surgery Partners to the H.I.G. Defendants was raised by $1 million (to $3 million).  In 2013 to 2014 alone, Surgery Partners, Inc. paid H.I.G. Capital's affiliate, Bayside, more than $20 million in additional advisory and management fees.

134.    By virtue of H.I.G.'s total control and supervision of Surgery Partners, H.I.G., an experienced healthcare investor, was involved in key components of Surgery Partners' business, including the fraudulent conduct alleged herein.  H.I.G. was not a passive investor in Surgery Partners.  Rather, the essence of H.I.G.'s involvement was to provide a robust management role, a "partnership" with Surgery Partners' executives, as CEO Doyle called it, in order to grow its portfolio company, while providing millions of dollars' worth of advisory, consulting, and management services.

135.    The creation of Logan Labs was a key pillar of Surgery Partners' business strategy during the years the H.I.G. Defendants controlled existing and  new business lines.  For example, in March 2016 Surgery Partners' CEO Doyle and CFO Teresa Sparks emphasized in a presentation to investors the importance of Logan Labs in Surgery Partners' business. An Executive Summary and Company Timeline featured  just four strategic achievements following the H.I.G. takeover: the 2011 acquisition of NovaMed; the 2013 expansion into DNA testing and pharmacy services; the acquisition of Symbion; and the launch of Surgery Partners' diagnostic laboratory services business, beginning with the formation of Logan Labs in 2011.

136.    Doyle and Sparks explained that Surgery Partners' move into "ancillary" services

like toxicology testing had been aimed at retaining revenue from the referrals of employed physicians' "[s]ervices [that are] otherwise outsourced to unaffiliated third parties."

137.    Further, when Surgery Partners merged with Symbion in 2014, Surgery Partners touted its ability to capture more referrals from affiliated physicians by "deploying" its "ancillary services" to Symbion's physician network as well. In other words, by purchasing Symbion, Surgery Partners would be able to tap into a new captive service of referrals for ancillary services, including Logan Labs:  Symbion's physicians would refer their patients for toxicology tests to be performed at Logan Laboratories.

138.    The H.I.G. Defendants promoted the importance of Surgery Partners' ancillary service offerings to investors, including its toxicology business.

139.    The success of Logan Labs was based almost entirely upon a management scheme to systematically coerce Surgery Partners' physicians to order expensive (and excessive) toxicology tests and financially rewarding them for doing so. Against that backdrop, upper management's duty, including that of H.I.G. and its majority representatives on Surgery Partners' Board, to avoid, detect, or terminate such illegal conduct is apparent.  Instead, the H.I.G. Defendants managed Surgery Partners' operations to profit from this fraudulent scheme.

140.    Even after the Symbion deal, Surgery Partners' strategy was to search for "new locations and markets to continue ancillary implementation."  Surgery Partners' business model depended on expanding its market footprint, not merely in order to capture the revenue associated with a surgical procedure itself, but also to capture revenues from more profitable ancillary services (*e.g.,* toxicology tests).  Seventy-five percent (75%) of the EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) that Surgery Partners could generate from patients (and their insurers) was derived from "ancillary services."

141.    H.I.G. Capital's 2017 press release announcing the sale of its Surgery Partners' stake to Bain Capital described Surgery Partners' "aggressive growth plan, expanding its footprint across the country and enhancing its specialty mix and ancillary service offerings, through both organic growth and acquisitions," achieved as a direct result of "***strategic guidance*** and capital support from H.I.G." (emphasis added).

142.    The actual surgical services component of Surgery Partners' business, because of its associated operational costs, accounted for a smaller share of Surgery Partners' EBITDA. Surgery Partners' revenue strategy in the years since H.I.G. Defendants took over was aimed at capturing the higher-yield earnings from ancillary services, whose lifeline was referrals from  its captive surgery centers and employed physicians and mid-level providers.

143.    This is reflected in Surgery Partners, Inc.'s Form S-1 which was filed attendant to the company's 2015 initial public offering and which was signed by H.I.G. Capital partners Laitala (Bayside's official representative) and Lozow, as well as H.I.G.'s co-conspirator Doyle (in his capacity as CEO and as a Director) and Adam Feinstein C.F.A., formerly the Senior Vice President, Strategy & Corporate Development at LabCorp, both of whom had been appointed by H.I.G. Feinstein was thus experienced in the laboratory industry.  In the Form S-1, the company and its Directors made repeated references to the importance of its toxicology and ancillary offerings.

144.    Surgery Partners' leadership also recognized that H.I.G. provided substantial management and continuing guidance over Surgery Partners' business strategy and that Surgery Partners' executives had "in recent years depended on our relationship with our Sponsor [*i.e.,* H.I.G. Capital], to help guide our business plan."

145.    The Surgery Partners' IPO prospectus, signed by the aforementioned H.I.G.

31

Officers and Directors, makes clear that Surgery Partners' leaders (including H.I.G. representatives) were knowledgeable of the statutes and regulations governing its business. The prospectus made repeated and extensive references to the Anti-Kickback Statute, Stark Law, fraud and abuse laws, and the False Claims Act.

146.     In fact, the Surgery Partners' prospectus refers to its leaders' knowledge of the Stark Law, its application to "clinical laboratory services" (*e.g.,* toxicology services) and the "substantial monetary penalties" that could result from non-compliance.

147.     Surgery Partners' own prospectus shows that Surgery Partners and its Board Members (including H.I.G.) were fully aware of the compliance mandates of the Stark Law, Anti-Kickback Statute, and False Claims Act.

148.     The prospectus indicates that H.I.G. and Surgery Partners' management were aware of the attendant risks associated with Surgery Partners' post-2012 reliance on referrals from employed physicians to Logan Labs and other high-revenue ancillary services, as well as the fact that Surgery Partners' toxicology lab was a major and growing component of the company's business. Surgery Partners' revenue strategy, under H.I.G.'s direction and oversight, involved incentivizing referrals from its employed physicians.

149.     Given those facts, the H.I.G. Defendants and Surgery Partners' other management members would have known or should have known that the new Logan Labs business and pivotal toxicology arrangements with physicians working at Surgery Partners' practices were non-compliant under the AKS, Stark Law, and False Claims Act. Surgery Partners' Logan Labs, an integral component of its business, was created in 2011 during the time that the H.I.G. Defendants' affiliates were paid millions of dollars to provide management and advisory services on all new Surgery Partners businesses, those organically grown (Logan Labs) and those acquired (*i.e.*,

Symbion).

150.    Logan Labs was founded by Surgery Partners and their advisors and managers, the H.I.G. Defendants, to harness medically unnecessary referrals from Surgery Partners' own financially motivated physicians.  Logan Labs was created solely as a vehicle for fraud (and had little if any legitimate purpose).

151.    Surgery Partners' Board of Directors (including H.I.G. Defendants' management on the Board) and the H.I.G.-affiliated managers and advisors, were duty-bound to make themselves aware of the illegality and non-compliance with well-known fraud, waste and abuse laws (*e.g.*, the False Claims Act, Anti-Kickback Statute, and Stark Law) associated with their Logan Labs growth strategy.  Moreover, a substantial portion of Surgery Partners' growth during H.I.G.'s tenure was linked to Logan Labs' toxicology scam and much of that came from Medicare and other Government payors.  H.I.G. personnel, including their Board Representatives, were aware of Surgery Partners' reliance on Medicare and Government payors, making the need to avoid and/or to remedy the company's compliance failures all the more glaring.

152.    Between 2012 and 2017, Logan Laboratories received tens of millions of dollars in reimbursements from Government healthcare programs. Medicare Part B alone paid at least $32 million for claims which the Defendants caused to be submitted for toxicology tests referred to Logan Labs as a result of the fraudulent scheme set forth herein.  In the first four full years that Logan Labs was actively in operation (2012 to 2016), its annual Medicare receipts for toxicology testing ballooned 216.6% from approximately $2,637,363.00 to $8,350,344.00 (an astounding 54% average annual increase).

153.    In other words, Logan Labs' fraudulent toxicology scheme was a profit center for Surgery Partners' executives and their management and advisory partners at H.I.G.  H.I.G. was in

frequent and routine contact with Surgery Partners executives whereby H.I.G. personnel sought and received extensive financial and operational information on Surgery Partners' key profit centers, including Logan Labs and the illegal conduct set out herein; in response, H.I.G. provided management and advisory services related to these profit centers.  As Laitala described H.I.G.'s investment in Surgery Partners, "[i]t's all about free cash flow," and Logan Labs was a major source of "free cash flow" for the larger Surgery Partners business.  Logan Labs'  dependence on UDT referrals for patients covered by Government healthcare programs  highlighted that generating "free cash flow" through Logan Labs involved a disproportionate fraud upon Government payors.

154.    The H.I.G. Defendants, as a private equity firm, were focused on growing Logan Labs to sell it (as a subsidiary of Surgery Partners) to other investors at a later date.  Organic (as opposed to accretive) growth was an important means to achieve such growth and Logan Labs served those ends.

155.    H.I.G. managed Surgery Partners to best grow its revenue, thereby increasing the company's enterprise value, and the related gain to H.I.G. in a subsequent sale.

156.    Surgery Partners, under the H.I.G. Defendants' control and management, shifted its growth strategy from near-exclusive reliance on acquisitions to finding new revenue sources to fuel organic growth.  Beginning in 2011, the H.I.G Defendants led Surgery Partners' development of its first home-grown business with the formation of Logan Labs and its profitable UDT services.  Logan Labs fed H.I.G.-controlled Surgery Partners more revenue and profit from each patient.  As set out *supra* and *infra*, by coercing physicians to order fraudulent toxicology tests, each patient became a larger individual source of revenue, providing a simple means to increase organic growth at an astounding pace.

34

157.    In September 2011, less than two years after the H.I.G. Defendants took over management decisions, particularly regarding new business lines, Surgery Partners' subsidiary Logan Labs was created. Throughout their tenure at Surgery Partners, H.I.G. Defendants managed, advised, and consulted Surgery Partners' executives and the executives managing Logan Labs and physician practices in the creation and operation of this toxicology fraud scheme.

158.    Surgery Partners, under H.I.G.'s control, supervision, and oversight, grew in large part through the Logan Labs' toxicology scheme, allowing Surgery Partners to continue to pay down its substantial debt while increasing its revenue through fraudulent toxicology practices.

159.    As Surgery Partners noted in its 2015 S-1 filing, concerning its "ancillary services" strategy (which substantially relied on its UDT scheme):

> A differentiated aspect of our model is our Ancillary Services strategy supporting our patients and physicians. These services present significant growth opportunities for our Company and are not additive to the cost of care for patients and payors as these services are otherwise provided by unrelated third parties. We believe our Ancillary Services better support our physicians by providing control over the quality of these services and less variation in clinical outcomes.

> The 15 ASCs in our portfolio where we have incorporated multiple Ancillary Services demonstrate the successful execution of our Ancillary Services strategy. In these surgical facilities, we have experienced, from 2011 to 2014, an additional increase to their operating income CAGR of approximately 20% and an enhanced improvement in their operating income margin of approximately 10%. We have been, and plan to, continue deploying our Ancillary Services strategy across the rest of our platform, which we believe will be an important driver of our future growth.

160.    The S-1 misrepresents the clinical value afforded to Surgery Partners' physicians (and their patients) from in-house ancillary offerings (*e.g.,* Logan Labs).  As  set out below, Dr. Cho witnessed that Logan Labs provided grossly deficient UDT results.  The true rationale for the creation of Logan Labs was unrelated to quality patient care, medical necessity, or clinical efficacy.

35

Instead the creation and growth of Logan Labs was aimed at fraudulently generating profits <u>at the expense of</u> sound medicine.

161.    Meanwhile, the S-1's claim that UDT is "not additive" to the costs of care to the patient and payors is false given that Surgery Partners' UDT clinical policies coerced physicians to order more and more UDT (particularly the most expensive quantitative tests) regardless of medical necessity, thereby greatly increasing costs to the healthcare system.  By funneling these urine toxicology tests through Surgery Partners' Logan Labs, the reimbursements from these tests, received largely from federal healthcare programs, increased the net profitability (measured in reference to EBITDA) of the H.I.G. Defendants' portfolio company, Surgery Partners, and directly impacted its value. The H.I.G. Defendants' sold their interest in Surgery Partners for a significant gain in 2017 in a  $503 million deal with a Bain & Company fund.

162.    The fraud here involved patients who partake in Government healthcare programs, including, but not limited to Medicare. *Id.*  During the relevant time period, nearly 40% of Surgery Partners' revenue came from Government payors. Logan Labs was heavily dependent on government payors and Surgery Partners'-affiliated physicians as  referral sources.  For example, an internal Surgery Partners document identifies hundreds of confirmatory UDT referrals to Logan Labs and the related claims submitted to Medicare for Logan Labs testing  formed the plurality of Logan Labs' charges (with TRICARE and CHAMPVA also targeted).  The referral sources were largely, if not entirely, Surgery Partners' physicians who were subject to the same illegal policies and financial incentives set out herein.

163.    By way of example, Surgery Partners' physicians referred the following patients to Logan Labs for unnecessary confirmatory UDT  testing pursuant to these policies and the government healthcare programs set out herein were billed shortly after the date of service:

| Patient Initials | Date of Service | Referring Physician | Payor | Amount Charged |
|---|---|---|---|---|
| C.S. | 9/16/2014 | Dr. John Otero | TRICARE | $1,591.26 |
| K.C. | 9/18/2014 | Dr. Miguel Attias | CHAMPVA | $1,302.66 |
| T.C. | 9/18/2014 | Dr. Todd Traub | Medicare | $1,103.7 |
| Z.V. | 2/10/2015 | Dr. Hector Cases | Medicare | $1,462.00 |

164.    Pertinently, before Logan Laboratories was established in 2011, Surgery Partners had no UDT policy and physicians were not financially rewarded for ordering UDT from any outside lab.  In other words, before H.I.G. took control of Surgery Partners and began providing management and advisory services worth millions of dollars, and before Logan Labs was created, Surgery Partners employed physicians who referred their patients for UDT for largely, if not entirely, bona fide reasons from outside labs or used cheaper means to do so (*i.e.,* dipstick tests) – and even then infrequently.  At that time, Surgery Partners likewise had no profit or profit incentive to be had from sending such toxicology tests to any outside labs.

165.    The creation of Logan Labs alone, which relied on Surgery Partners-affiliated physicians for nearly all of its referrals, would not add to Surgery Partners' profitability if Surgery Partners had operated the lab subsidiary in a legitimate manner. There simply is not the same level of demand for expensive confirmatory or quantitative UDT when providers rely on their own independent medical judgment, typically involving infrequent simple dip stick UDT – which was not even performed at Logan Labs.

166.    Surgery Partners and its managers and advisors, including the H.I.G. Defendants, implemented a corporate scheme to create a growth opportunity through the formation of Logan Labs.  The H.I.G. Defendants were paid precisely to provide management and financial advice and

SGR/22940192.1

consulting services on such new business opportunities.  Surgery Partners' Board, with leaders from the H.I.G. Defendants, would not approve an investment to fund the formation of Logan Labs without the involvement and approval of the H.I.G. Defendants, whose very purpose was to manage Surgery Partners in a manner that maximized financial returns.

167.    As stated above, Logan Labs could only become a generator of substantial revenue for Surgery Partners by instituting the fraudulent scheme employed from 2011 until 2017: to coercively inflate UDT referral volume and then mandate that those improper referrals be sent to Logan Labs.

168.    Moreover, Surgery Partners continued to grow through acquisitions of physician practices and other partners. With each acquisition, Surgery Partners, controlled by the H.I.G. Defendants, then applied its toxicology fraud scheme to each newly acquired partner, creating a stronger UDT revenue stream to Logan Labs.

169.    When Surgery Partners acquired a larger patient census, for example by acquiring a surgery center (or similar entity), that patient pool represented a valuable revenue stream for Surgery Partners' ancillary services, particularly UDT. Logan Labs was thus a key component of the H.I.G.-controlled Surgery Partners' strategy, making Surgery Partners present patient population more valuable while also making Surgery Partners' serial acquisition strategy even more effective.

170.    Surgery Partners' IPO prospectus is replete with numerous attempts to address the legality of Surgery Partners' referral relationships as to a great many aspects of Surgery Partners' core business model.  Yet the prospectus does not mention the legality of Logan Labs' practices. For example, the prospectus represented that Surgery Partners' relationship with physician investors and the fact that they may refer patients to the company's ambulatory surgery centers for

surgeries did not fall within any Anti-Kickback Statute safe harbors but set out various specific steps that Surgery Partners has taken to otherwise comply with the law.  However, the document does not mention the legal issues related to the Logan Labs UDT scheme, much less  address the Anti-Kickback Statute, and False Claims Act implications of the Defendants' operation of that business, which was dependent on tainted referrals for unnecessary testing, as became apparent to the Relators.

171.    In fact, an outside investor in the IPO would have no way of knowing the fraudulent practices that formed the bedrock of Surgery Partners' toxicology business model (which had afflicted the company's toxicology business from its formation).

172.    In a filing meant to, and required to, address all material aspects of Surgery Partners' business, *see generally* 15 U.S.C. § 77k, Surgery Partners and their management partners, the H.I.G. Defendants, who were duty bound to familiarize themselves with – and truthfully represent— key aspects of Surgery Partners' business, *id.*, failed to address the manifest violations of federal healthcare laws resulting from the H.I.G. Defendants' leadership and the company's fraudulent toxicology revenue growth scheme.

173.    Surgery Partners and H.I.G. conceded in their prospectus that they made no attempt to secure an opinion on the legality of their UDT revenue strategy by asking O.I.G. for an advisory opinion:

> The OIG is authorized to issue advisory opinions regarding the interpretation and applicability of the Anti-Kickback Statute, including whether an activity constitutes grounds for the imposition of civil or criminal sanctions. **We have not, however, sought such an opinion regarding any of our arrangements. If it were determined that our activities, or those of our surgical facilities or hospitals, violate the Anti-Kickback Statute, we, our subsidiaries, our officers, our directors and each surgical facility and hospital investor could be subject, individually, to substantial monetary liability, prison sentences and/or exclusion**

**from participation in any healthcare program funded in whole or in part by the U.S. government, including Medicare, Medicaid, TRICARE or state healthcare programs**.

174. Surgery Partners, owned and managed through representatives of the H.I.G. Defendants, could have easily vetted the AKS-implications of its toxicology business with regulators. It recklessly chose not to.

175. On information and belief, H.I.G. and Surgery Partners omitted any substantive discussion of the compliance implications of their ancillary toxicology business (Logan Labs) in their prospectus (or any other similar documents) because they knew that the practices (as set forth herein) violated the Anti-Kickback Statute, Stark Law, and the FCA.

176. Keeping investors (and regulators) in the dark about the nature of the UDT business model would be particularly important in light of similar UDT fraud schemes which had been successfully prosecuted by the federal Government around the time of Surgery Partners' IPO (which cases had been reported in the media).

177. Accordingly, any public discussion of the internal workings of the Logan Labs fraud scheme and regulatory implications of Surgery Partners' UDT business model, formed and implemented under H.I.G. Defendants' leadership and control, would have created investor skepticism and unwanted regulatory attention, putting the IPO and Surgery Partners' profits at risk. Thus, the H.I.G. Defendants and Surgery Partners' executives substantively addressed the compliance implications of the other aspects of Surgery Partners' business but omitted any discussion of the manifest compliance problems plaguing their revenue-generating toxicology lab, the key pillar of their success they flaunted in presentations to investors.

178. The H.I.G. Defendants knowingly and recklessly disregarded their obligations to lead a major healthcare provider in a manner that is compliant from a fraud, waste, and abuse

perspective. These Defendants billed and were paid tens of millions of dollars to provide management and advisory services to a company operating in a highly regulated industry, but they failed to even give lip service to compliance issues. From the time that H.I.G. took control of Surgery Partners in late 2009 until the IPO in 2015, the H.I.G. Defendants and Surgery Partners' management did not even have a compliance program, which was established only in 2015, just in advance of the IPO.

179.    On information and belief, this compliance program was created as little more than window dressing to assuage potential investors in the IPO that Surgery Partners' business operations were compliant with the law.

180.    The lack of a compliance program at Surgery Partners for most of its existence while under H.I.G. control is particularly remarkable in light of the fact that Surgery Partners' business model relied largely on referrals from its physician partners to the company's wholly owned ancillary service subsidiaries.  Any healthcare business model reliant on such extensive self-referrals requires strict compliance oversight.

181.    Moreover, H.I.G., as a serial investor of billions of dollars in healthcare businesses, and as Surgery Partners' "partner" beginning in 2009, was well aware of all regulatory mandates that govern healthcare providers, including the FCA and the Anti-Kickback Statute.

182.    The H.I.G. Defendants' history also shows that the fraud, waste, and abuse laws and their implications on H.I.G.'s healthcare companies were well known to H.I.G.  For example, Defendant H.I.G. Capital, LLC is also a defendant in  another False Claims Act case arising from its alleged role in a fraud scheme involving its investment and management of a mental health center, which has been pending since 2013, and involves conduct dating back to 2009 (around the same time that they acquired Surgery Partners).  *U.S. ex rel. Martino-Fleming v. S. Bay Mental*

*Health Ctr., Inc.*, CV 15-13065-PBS (D. Mass.) (Commonwealth of Massachusetts intervening). As they did at Surgery Partners, the H.I.G. Defendant in the South Bay Mental Center matter were alleged to have conducted pre-acquisition due diligence, possessed experience in running regulated health care providers, and seeded the Board of the acquired company with an H.I.G. managing director and other principals.

183.    The conduct of another (now former) H.I.G.-managed healthcare company, Allion Healthcare, was implicated in a criminal Medicaid fraud verdict arising from what was described as "one of the biggest drug-diversion crimes in history" and which involved over $100 million in fraudulent claims.[1]

184.    From 2011 through H.I.G.'s sale in 2017, individuals from H.I.G. Capital who served on Surgery Partners' Board and individuals from the H.I.G. Defendants' affiliate, Bayside, were paid nearly $40 million in management and advisory fees for the valuable services they performed to grow Surgery Partners with H.I.G.'s "partners," including CEO Doyle and his team, which included Will Milo.  The H.I.G. Defendants' growth strategy depended in large part on high-revenue ancillary services, particularly Logan Labs, which was a major source of Surgery Partners' growth during H.I.G.'s control over the company. The H.I.G. Defendants knew, approved of, and provided millions of dollars in management and advisory services related to the forming and operating new businesses, including the Logan Labs fraud set out herein.

e)    **Surgery Partners Acquisition Company, Inc.**

185.    In August 2011, one year after H.I.G. Defendants purchased Surgery Partners, Surgery Partners' CEO Doyle formed Surgery Partners Acquisition Company, Inc. ("Surgery

---

[1] "Guilty Verdict is Handed Down in 2012 MOMS Pharmacy Drug-Diversion Case," Pharmaceutical Commerce, Aug. 11, 2016, https://pharmaceuticalcommerce.com/legal-regulatory/guilty-verdict-handed-2012-moms-pharmacy-drug-diversion-case/.

SGR/22940192.1

Partners Acquisition"), a Florida corporation. The address for Surgery Partners Acquisition is the same as Defendants Surgery Partners, LLC and Tampa Pain Relief: 5501 West Gray Street, Tampa, Florida.

186.    Since August 2011, Doyle has been the CEO of Surgery Partners, Surgery Partners Acquisition, and Tampa Pain Relief Center, Inc.

187.    As was the case for Surgery Partners, LLC, in 2015, the principal place of business for Surgery Partners Acquisition was changed to 40 Burton Hills Blvd., Nashville, Tennessee.

**f)    Surgery Center Holdings, Inc.**

188.    As described below, Surgery Partners formed Logan Labs in September 2011, nearly two years after H.I.G. Capital, LLC purchased Surgery Partners and its chain of pain relief clinics (operated through subsidiaries, including Defendant TPRC).

189.    In September 2011, when Surgery Partners' executive William Milo applied for the National Provider Identifier ("NPI") for Logan Labs, the parent organization of Logan Labs was identified as "Surgery Center Holdings, Inc."

**g)    Surgery Center Holdings, LLC**

190.    Just before the September 2015 IPO of Surgery Partners, Inc., Defendant H.I.G. Surgery Centers, LLC, an affiliate of Surgery Partners, held 47,054,245 Class A Units of Surgery Center Holdings, LLC.

191.    At the time of the September 30, 2015 IPO, Defendant H.I.G. Surgery Center Holdings, LLC received 82 %, or 27,780,115 shares of Surgery Partners, Inc.

**h)    Surgery Partners, Inc. – Surgery Partners' Reorganization**

192.    Surgery Partners, Inc. was formed on or about April 2, 2015, as a holding company in order to facilitate an initial public offering (the "IPO") of shares of common stock.

43

193.    Between April 2, 2015 and September 30, 2015, Surgery Partners, Inc. conducted business through Surgery Center Holdings, Inc. and its subsidiaries.

194.    On September 30, 2015, Surgery Partners, Inc. became the direct parent and sole member of Surgery Center Holdings, LLC (the "Reorganization").  In the Reorganization, all of the equity interests held by the pre-IPO owners of Surgery Center Holdings, LLC were contributed to Surgery Partners, Inc. in exchange for shares of common stock of Surgery Partners, Inc. and certain rights to additional payments under a tax receivable agreement.

195.    Between 2011 and September 2015, the Surgery Partners parties, the H.I.G. Capital Defendants, and Doyle and Toepke operated Surgery Partners and its affiliates and physician practice subsidiaries (including its pain management practices), as well as Logan Labs.

196.    Between 2011 and the September 2015 IPO, the H.I.G. Defendants earned nearly $40 million in advisory and management fees for their "partnership" with Surgery Partners' CEO Doyle in growing the company.

197.    On or about October 1, 2015, Surgery Partners, Inc. completed its IPO. Since that time, the Surgery Partners entities operated their Surgery Centers and ancillary services nationwide through a publicly-traded entity, Surgery Partners, Inc.

198.    Surgery Partners, Inc. is a holding company, and its sole material asset is an equity interest in Surgery Center Holdings, LLC.

199.    Surgery Center Holdings, LLC was and is the sole indirect owner of the equity interests of Surgery Center Holdings, Inc. and has no other material assets.

200.    Surgery Partners' operating segments include surgical facility services, ancillary services, and optical services. Through these segments, Surgery Partners provides healthcare services in 29 states.

201.     Surgery Partners' surgical facilities segment owns or operates at least 104 surgical facilities (99 ASCs and five surgical hospitals). Surgery Partners owns these facilities in partnership with physicians and, in some cases, healthcare systems in the markets and communities it serves.

202.     Surgery Partners' surgical facilities include ambulatory surgical centers (ASCs) and surgical hospitals which primarily provide non-emergency surgical procedures across many specialties, including otolaryngology, gastroenterology, general surgery, ophthalmology, orthopedics, cardiology and pain management.

203.     Of the 99 ASCs operated by Surgery Partners, 71 are pain ASCs, providing treatments to patients who suffer from chronic pain, including Government healthcare program beneficiaries.  These treatments include: cervical and lumbar epidural injections; facet joint blocks; Radio Frequency Ablation ("RFA") of the Sacro-Iliac ("SI") Joint; Spinal Cord Stimulator ("SCS") Trial and implantation; etc.

204.     Since 2011 (when Logan Labs was formed), Surgery Partners has owned or operated 71 pain ASCs, 28 within the state of Florida. Surgery Partners operates another 43 pain ASCs in 21 other states: Colorado (1), Georgia (2), North Carolina (2), Pennsylvania (3), Alabama (1), California (5), Delaware (1), Hawaii (1), Illinois (2), Indiana (2), Kansas (1), Louisiana (1), Michigan (1), Mississippi (2), Missouri (4), Montana (1), New Hampshire (1), Ohio (1), Tennessee (7), Texas (2), and Washington (2).

> **i)      Surgery Partners' Ancillary Services 2011 – Present: Pain Relief Centers and Logan Labs**

205.     Surgery Partners provides services that are ancillary to its main ASC business. The company's ancillary services segment includes multi-specialty physician practices, a diagnostic laboratory (Logan Labs), a specialty pharmacy, and urgent care facilities.

45

206.     During H.I.G.'s ownership and related involvement in the management and growth of Surgery Partners, from 2011 to 2017, the company grew to a network of 53 multi-specialty physician practices include pain management, otolaryngology, gastroenterology, general surgery, ophthalmology, orthopedics, and cardiology.

207.     The sources of Surgery Partners' "ancillary service revenues" include, but are not limited to, fees for patient visits to the Surgery Partners' physician practices (*i.e.* E&M services), reimbursements for diagnostic tests ordered by physicians (*i.e.*, UDT), and pharmacy services.

208.     As of September 30, 2016, revenues from Surgery Partners' ancillary services subsidiaries represented 7.5% of all Surgery Partners' revenues. Of the $1.1 billion in Surgery Partners' 2016 revenues, Surgery Partners' ancillary services subsidiaries generated approximately $75 million.

209.     In 2016, the largest contributor to Surgery Partners' ancillary services revenues was Logan Laboratories located in Tampa, Florida.

### 3.     Surgery Partners' Pain Management Physician Practices Segment

210.     Since 2011, Surgery Partners has owned and/or operated at least 40 pain management physician practices in six states (collectively "the Pain Relief Center Defendants"). Surgery Partners owns and/or operates its pain management physician practices through corporate subsidiaries.

211.     While most of the pain management physician practices are located in Florida (30), during the relevant time period, Surgery Partners and the Pain Relief Center Defendants have owned and/or operated 11 pain clinics in other states: Georgia (6), Colorado (2, Denver and Colorado Springs); Asheville, North Carolina (1); Lebanon, Pennsylvania (1), and Chesterfield, Missouri (1).

a)   **Tampa Pain Relief Centers, Inc. ("TPRC")**

212.   Through its subsidiary, Tampa Pain Relief Centers, Inc. ("TPRC"), Surgery Partners operates the vast majority (30) of its pain management physician practices within Florida.

213.   TPRC was formed in 1996 by a Florida-based pain specialist, who expanded the company to include a chain of surgery centers throughout the Tampa Bay area.

214.   From 2004 through 2009, Doyle served as the Chief Operating Officer ("COO") of TPRC.

215.   When H.I.G. Defendants acquired TPRC in 2009, Doyle became the CEO of TPRC, located at 5501 W. Gray St, Tampa, Florida.  He held that position through at least 2014.

216.   In 2015, the address for TPRC was changed to 40 Burton Hills Blvd., Suite 500, Nashville, Tennessee, the headquarters of Surgery Partners.

217.   From at least 2011 and the present, Surgery Partners and the H.I.G. Defendants, through TPRC, operated pain management practices in the state of Florida where pain management specialists referred most, if not all, lab-based UDT to Logan Labs.  These Surgery Partners' pain management practices included, but were not limited to:

(a)   Pain Medicine Institute Bradenton;

(b)   Tampa Pain Relief Brandon (a/k/a Brandon Pain Management, Brandon Pain Medicine, and Pain Medicine Inst. Brandon);

(c)   Tampa Pain Relief Fletcher;

(d)   Tampa Pain Relief Habana;

(e)   Kendall Pain Relief Center;

(f)   Central Florida Pain Centers – Lake Mary (a/k/a Lake Mary Pain Relief Center);

SGR/22940192.1

(g)     Tampa Pain Relief Oldsmar;

(h)     Orlando Pain Relief Center;

(i)     Central Florida Pain Relief Centers – Downtown (Orlando).   (f/k/a Rehabilitation Medical Group, Inc.).  Doyle has been the CEO of Rehabilitation Medical Group since approximately 2011. Rehabilitation Medical Group, Inc. was voluntarily dissolved on December 21, 2016;

(j)     Central Florida Pain Relief Centers – Altamonte Springs;

(k)     Central Florida Pain Relief Centers – Sandlake (f/k/a Florida Spine Sports & Rehab);

(l)     Pinellas Pain Management;

(m)     Sarasota Pain Relief Centers – Lakewood Ranch;

(n)     Sarasota Pain Relief Centers – Bee Ridge;

(o)     Sarasota Pain Relief Centers – Venice;

(p)     Sarasota Pain Relief Centers – Central Sarasota;

(q)     Palm Beach Pain Relief Center – Wellington;

(r)     South Florida Pain Relief Center – Miami;

(s)     Florida Orthopedic Partners – Armenia – Tampa; and

(t)     Space Coast Pain Institute (a/k/a Florida Pain Institute (FPI) - Merritt Island.

Surgery Partners acquired this pain management practice on or about June 2015 from Dr. Golovac and Dr. Gayles.

218.     When Surgery Partners acquired Dr. Golovac's pain management practices, he became Surgery Partners' Medical Director for all Surgery Partners' physician pain management practices, including those in Florida, Colorado, and North Carolina.

48

219.     During the relevant time period, Defendants tracked all referrals by physicians and mid-level providers at these Florida pain management practices to Logan Labs.

220.     Surgery Partners identified TPRC as the referring "practice" for all of these Florida pain management physician practice locations.

221.     TPRC was identified as the "employer" for pain management specialists working at Surgery Partners pain treatment centers throughout the state of Florida.

222.     In November 2015, TPRC identified the following Officers and/or Directors in its Amended Annual Report filed with the Florida Division of Corporations: CEO and President, Michael Doyle; Senior Vice President and Secretary, Jennifer Boyd Baldock; Vice President, John Byron Crysel; Vice President, Anthony Wayne Taparo; Executive Vice President and CFO, Teresa Lynn Sparks; Vice President, George Middleton Goodwin; and Vice President, Christopher Utz Toepke.

223.     Like Doyle and Toepke, Anthony Taparo and George Goodwin held simultaneous positions with both TPRC (the referring entity for the vast majority of referrals to Logan Labs) and Surgery Partners (the owner of Logan Labs).  From the 2014 merger with Symbion, Mr. Taparo has served as President of Surgery Partners' Atlantic Group, as well as the Executive Vice President and CFO of TPRC.  From the 2014 merger with Symbion, Mr. Goodwin served as both President of Surgery Partners' American Group, and Vice President of TPRC.

**b)      Denver Pain Relief Center, PC**

224.     Between 2011 and the present, Surgery Partners, in "partnership" with its H.I.G. owners and advisors, operated two pain management physician practices in the state of Colorado, one in Denver and another in Colorado Springs.

225.     Denver Pain Relief Center, P.C., is a Colorado professional corporation which was

formed on or about August 26, 2011.

226.    Since April 27, 2012, Denver Pain Relief Center, PC ("Denver Pain Relief") has done business as Colorado Springs Pain Relief Center, a physician-owned pain management practice.

227.    Denver Pain Relief Center, P.C. was formed by former Senior Vice President and General Counsel of Surgery Partners, John Lawrence. At the time, Mr. Lawrence was responsible for all legal matters relating to Surgery Partners and its operations, including structuring and negotiating all acquisitions and other transactions.

228.    Since April 2012, Surgery Partners operated and/or referred to the Surgery Partners' pain management practices located in Colorado as Denver Pain Relief Center, PC ("Denver") and Denver Pain Relief Center, PC ("COS"), d/b/a Colorado Springs Pain Relief Center.

229.    Through Denver Pain Relief Center, P.C., Defendants operated these two pain management practices in the state of Colorado where pain management specialists referred most, if not all, lab-based UDT to Logan Labs: Denver Pain Relief Center and Colorado Springs Pain Relief Center.

c)      **Asheville Pain Relief Center, P.C.**

230.    Since approximately July of 2015, Defendants operated one pain management physician practice in the state of North Carolina, Asheville Pain Relief Center, P.C., a North Carolina corporation.

231.    Lesco Lloyd Rogers, MD is identified on filings with the North Carolina Secretary of State as the President and incorporator of Asheville Pain Center, P.C.

232.     During the relevant time period, Defendants' pain management specialists at

50

Asheville Pain Relief Center referred most, if not all, lab-based UDT to Logan Labs.

233.    During the relevant time period, Defendants tracked the referrals from Asheville Pain Relief Center to Logan Labs.  Defendants identified "Asheville Pain Relief Center, PC" as the referring "practice" for all referrals to Logan Labs from this North Carolina pain management physician practice.

### d)    <u>Lebanon Pain Relief Center, PC</u>

234.    Between 2011 and the present, Defendants operated one pain management physician practice in the state of Pennsylvania, Lebanon Pain Relief Center, PC.

235.    During the relevant time period, Defendants tracked the referrals from Surgery Center of Lebanon, LP to Logan Labs.  Defendants identified "Lebanon Pain Relief Center, PC" as the referring "practice" for all referrals from this Pennsylvania pain management physician practice.

236.    During the relevant time period, Defendants' pain management specialists at Lebanon Pain Relief Center referred most, if not all, lab-based UDT to Logan Labs.

### e)    <u>Dallas Pain Relief Center, PC</u>

237.    During the relevant time, Defendants operated one pain management physician practice in the state of Texas, Dallas Pain Relief Center, PC, which was registered with the Texas Secretary of State in May of 2013.

238.    Dallas Pain Relief Center was located at 7709 San Jacinto Place, Plano, Texas.

239.    During the relevant time period, Defendants' pain management specialists at Dallas Pain Relief Center referred most, if not all, lab-based UDT to Logan Labs, and Defendants tracked the referrals from Dallas Pain Relief Center to Logan Labs.

SGR/22940192.1

**f)**     **Georgia Pain Management Physician Practices**

240.    During the relevant time, Defendants operated six pain management physician practice locations in the state of Georgia: Brunswick, Dublin, Savannah, St. Mary's, Vidalia, and Waycross.

241.    The Defendants operated their Georgia practices under the names Coastal Pain Center and/or Consultants in Pain Medicine.

242.    During the relevant time period, Defendants' pain management specialists in Georgia referred most, if not all, lab-based UDT to Logan, and Defendants tracked all of the referrals from Georgia pain specialists to Logan Labs.

**4.**     **Logan Labs**

243.    Logan Labs is a limited-liability corporation, incorporated in the State of Delaware, and headquartered at 5050 West Lemon Street, Tampa, Florida.

244.    Logan Labs was formed on or about September 19, 2011. That same day, the company was registered with the Florida Division of Corporations as a foreign limited liability company. On September 22, 2011, Defendants obtained an NPI for Logan Labs: 1720361173.

245.    Logan Labs is a wholly-owned subsidiary of Surgery Partners. In its registration as a foreign limited liability company, Logan Labs identified its managing members as Michael Doyle, CEO, 5501 West Gray Street, Tampa, Florida 33609, H.I.G.'s "partner" in growing Surgery Partners' business. Logan Labs' business in Florida was identified as "medical laboratory services."

246.    During the relevant time period, Logan Labs was a national provider of diagnostic services, namely urine toxicology testing services.

247.    Patient urine samples must be collected at physician practices, packaged and

52

transported to Logan Labs' facility in Tampa, Florida. Logan Labs has a billing address in Cincinnati, Ohio.

248.    The Logan Labs testing results are not available for one to two weeks after the specimen is collected. Curiously, even though Surgery Partners' wholly-owned subsidiary was providing the laboratory testing and issuing a report, the EMR at Surgery Partners' physician practice was not integrated with the Logan Labs software until around October 2016 (five years after Logan Labs was created). During these five years (2011-2016),  Logan Labs reports had to be printed, and paper copies were transferred to the patient record by scanning them into the EMR to achieve integration.

249.    Physicians at Surgery Partners' practices do not have prompt access to UDT results when samples are sent to Logan Labs. They must wait for Logan Labs' final report and then the extra step of manually adding them to the patient EMR before they could even know the results of Logan Labs' UDT, let alone consider it for patient care.

250.    Defendants, through Logan Labs, submitted, or caused the submission of claims for Logan Labs services to Government-funded healthcare programs.

251.    Defendants knew that, as a condition of payment by Government-funded healthcare programs, the qualitative UDT or quantitative UDT services on the Logan Labs claim must be medically necessary as determined by the unfettered and independent medical judgment of the treating physician.

252.    When Defendants submitted or caused the submission of Logan Labs claims for UDT that resulted from Defendants' policies and procedures requiring referrals of UDT to Logan Labs without regard to medical necessity, and in interference with the independent medical judgment of the treating physician, these claims were false.

SGR/22940192.1

253.    Since its founding in 2011, Logan Labs has derived a significant portion of its revenue from claims for UDT services that the Defendants submitted or caused to be submitted to Government-funded healthcare programs.

254.    Logan Labs was reimbursed by Government-funded healthcare programs on a fee-for-service basis, including, but not limited to: Medicare, Railroad Medicare, Medicaid (including Florida, Colorado, Georgia, North Carolina, and Texas); TRICARE; the Veterans' Administration ("VA"); and CHAMPVA.

255.    For example, between 2012 and June of 2015, Defendants caused Logan Labs to submit in excess of $130 million in claims for quantitative UDT ("confirmation tests") to Medicare, including Medicare Part B of Florida and Railroad Medicare.  Logan Labs received millions of dollars in return.

256.    In addition, Medicare Part B data for 2014 shows that Logan Labs had the highest average Medicare payment per patient for the state of Florida, $1,834, while the average statewide was $237. Logan Labs also billed Medicare for an average of 82 services per patient, where the average for other laboratories in Florida was 19.

257.    During this same time period, Defendants caused Logan Labs to submit in excess of $17 million in claims for quantitative UDT ("confirmation tests") to TRICARE.

258.    In addition, since its founding in 2011, Logan Labs also derived substantial revenues from claims for UDT services billed to private insurers who administer Government healthcare programs, including: Eden Health (Medicare Advantage and Medicaid managed care); United Healthcare ("UHC") Medicare Part C plans; Humana Medicare; AARP Medicare; and CarePlus Medicare plans.

259.    For example, between 2012 and June of 2015, Defendants submitted or caused

SGR/22940192.1

Logan Labs to submit in excess of $41 million in claims to UHC seeking reimbursements for quantitative UDT ("confirmation tests") services provided by Logan Labs to UHC participants in Medicare Part C (Medicare Advantage) Plans, including UHC Evercare and UHC Medicare Complete.

260.　Logan Labs also billed the United States Department of Labor for testing performed relative to the workers compensation program of the Federal Employees' Compensation Act ("FECA").

261.　Defendants also knowingly steered referrals of lab-based UDT by physicians who have a financial relationship with Surgery Partners to Logan Lab. For example, Defendants did not establish the robust sales force needed to market its services to physicians who were not financially related to the Surgery Partners Defendants. On information and belief, at one time, Logan Labs had approximately five sales representatives who marketed to unaffiliated physicians.

262.　During the relevant time period, nearly all of the claims submitted by Logan Labs to Government-funded healthcare programs were for lab-based UDT services referred by physicians working at Surgery Partners' pain management physician practice subsidiaries: Defendant TPRC; Defendant Denver Pain Relief Center, PC; Defendant Lebanon Pain Relief Center, and pain relief subsidiaries located in Georgia, North Carolina and Texas.

### a) Surgery Partners Personnel Who Developed and Carried Out the Logan Laboratories Frauds

#### (1) Michael T. Doyle

263.　Michael T. Doyle ("Doyle") currently resides at 3417 S Beach Drive, Tampa, Florida 33629.

264.　Since 2004, Doyle has served in a leadership position at Surgery Partners and its related entities. Prior to joining Surgery Partners, Doyle served as SVP of Operations for

55

HealthSouth.  Mr. Doyle does not have medical training or experience.

265.    From 2004 through 2009, Doyle was the Chief Operating Officer of Surgery Partners, LLC. From 2010, when Defendants acquired Surgery Partners and began their relationship with Doyle, until 2014, Doyle served as the CEO of Surgery Partners, LLC. Since 2011, Doyle has also served as the CEO of Logan Labs.  He also served on Surgery Partners' Board as a Director.

266.    Doyle had been with Surgery Partners since its beginning and has been touted with "growing the company organically and through acquisitions." Doyle's compensation is based in part on his ability to grow the company "organically."

267.    In approximately 2011, Doyle and William Milo established Surgery Partners' own urine drug testing laboratory (Logan Labs) in order to generate "organic" revenue from Surgery Partners' affiliated physicians, including its employed pain management specialists.  During the development of the Logan Labs revenue stream, Surgery Partners received management and advisory services from its partner H.I.G., and H.I.G. members served on the Surgery Partners' Board that approved the development of the Logan Labs business.

268.    At the time of the Surgery Partners' September 2015 IPO, Michael Doyle owned 9.5% (3,208,389) of the shares of common stock of Surgery Partners, Inc.

### (2)    William Milo

269.    William Milo ("Milo") currently resides at 12622 Stanwyck Circle, Tampa, Florida 33626 and does business at 4730 N Habana Avenue, Suite 204 Tampa, Florida 33614.

270.    As alleged above, from 2007 until mid-2010, Milo served as Surgery Partners' Director of Human Resources. Thereafter he was Surgery Partners' Vice President of Operations & Physician Services, and Vice President of Administration at Surgery Partners. He also served

as Vice President of Logan Labs from 2011 until sometime before his departure in late 2015.

271.    As alleged above, while Vice President of Operations/Administration, Milo oversaw Surgery Partners' physician services division, including the Pain Relief Centers, as well as the startup of Logan Labs.

272.    As also alleged above, Milo was directly involved in establishing Logan Labs, including establishing the lab's ability to bill Government healthcare programs for UDT services. In September 2011, when Surgery Partners applied the NPI for Logan Labs, 1720361173, Defendant Milo was identified as the Vice President associated with the application.

### (3)    Christopher Utz (Chris) Toepke

273.    From August 2014 until he left the company, Christopher Toepke served as Surgery Partners, Inc. Group President, Ancillary Services.  In that capacity, Toepke was responsible for the Surgery Partners' division comprised of the company's non-surgical business lines, including physician services and the company's diagnostic laboratory subsidiary, Logan Labs. Since joining Surgery Partners, Toepke has also served as a Vice President for TPRC.

274.    Toepke was responsible for "setting strategic direction, driving growth both organically and through acquisition, building an organization dedicated to operational excellence and physician and other key stakeholder relationship management."

275.    Like Doyle, Toepke had been focused on generating revenue through "organic" growth, which upon information and belief, includes growing Surgery Partners' revenue through physicians who are employed and/or otherwise affiliated with Surgery Partners.

276.    From his arrival at Surgery Partners and its subsidiaries in August of 2014, Toepke had been an enthusiastic proponent and enforcer of the policies and strategies aimed at causing Surgery Partners' pain management physicians, including Dr. Cho, to refer patients to Logan Labs

without regard for medical necessity.

277.    At the time of the September 2015 IPO for Surgery Partners, Inc., Toepke was the beneficial owner of 67,316 shares of common stock.

278.    In his capacity as Surgery Partners' Vice President, Toepke also spoke at conferences related to ASC management and physician practices.  For example, in February 2017, Toepke was a panelist at the 2017 ASC & Physician Practice Management Symposium held in Miami, Florida. His panel addressed the following topics: "hot specialties, including…pain management;" "Strategies and issues related to expanding platforms and bolt-on acquisitions… The carrot: incentivizing productivity post-transaction through bonus pools, rollover equity and earnouts . . .  The stick: incentivizing productivity post-transaction through clawbacks and holdbacks."

279.    Prior to August 2014, Toepke served as a Business Unit President for One Call Care Management, a leading third-party vendor of specialty medical services to workers' compensation payers. Before that, Toepke was a management consultant with Bain & Company, where he focused on growth strategy, performance improvement and private equity due diligence projects. H.I.G. later sold a majority of its Surgery Partners' equity stake, which was directly held by H.I.G. Surgery Centers, LLC, to a Bain & Company investment fund in 2017.

280.    Toepke did not have any medical or healthcare experience before he was installed as Surgery Partners, Inc. Group President, Ancillary Services.

281.    Toepke lacks medical training and professional experience, including the areas of clinical laboratory services, pain management or addiction treatment.

SGR/22940192.1

## V.    BACKGROUND ON FEDERAL AND STATE-FUNDED HEALTH INSURANCE PROGRAMS

### A.    Medicare Program: Coverage Only for Medically Necessary Services

282.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled.  Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).  Medicare now has four parts: Part A (inpatient hospital treatment); Part B, Part C (managed care plans), and the Part D (prescription drug) Program.

283.    Medicare Parts A and B are often referred to, collectively, as "Original Medicare".

284.    Medicare Part B (Medical Insurance) covers certain medical services, such as clinical laboratory test services, doctors' services and other outpatient care. Part B pays for covered health services and supplies only when they are medically necessary. 42 U.S.C. § 1395k(a)(2)(B).

285.    Surgery Partners' entities, under H.I.G. control and supervision, submitted claims to and received payment from Medicare Part B for the UDT services provided by Surgery Partners' subsidiary, Logan Labs.

286.    Medicare Part C (Medicare Advantage) provides Medicare recipients with additional, private healthcare plans that provide coverage consummate with that provided in Original Medicare (Parts A and B) and may provide additional coverage as well. These private healthcare plans, referred to as Medicare Advantage plans, receive substantial federal funds.  Thus, when providers submit claims to Medicare Advantage or Medicare Part C plans, they are submitting claims to Government-funded healthcare programs.

287.    Defendants and the Surgery Partners' entities also submitted claims to and received payment from Medicare Part C plans (Medicare Advantage) plans for the UDT services provided by

Surgery Partners' subsidiary, Logan Labs.

288.    Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

289.    The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.   Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal Government (particularly CMS).

290.    To participate in the Medicare program as a new enrollee, clinical laboratories such as Logan Labs must submit a Medicare Enrollment Application, CMS Form-855B.  Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

291.    All Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

292.    An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the]supplier to all of the laws, regulations, and program instructions of the Medicare program."

293.    Authorized officials for Logan Labs were required to sign the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

294.    The National Provider Identifier ("NPI") is a standard and unique health identifier for

health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

295.    To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent (known as the 837P form).

296.    Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

297.    Each request for payment or bill submitted for an item or service payable under Medicare Part B must include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

298.    During the relevant time period, Logan Labs performed all of its UDT in its single facility in Florida, and submitted all claims to the Medicare contractor responsible for processing Medicare Part B claims in that state,

299.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are, medically necessary.

300.    Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act, establish that, as a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. § 424.10.  Regardless of the rules governing the particular type of care, in order for the federal Government to cover services under Medicare Part A or Medicare Part B, or for a Medicare Part C plan to provide coverage, all care must

be "medically necessary."

301.     Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area.

302.     Medicare programs, both Part B and Part C plans, provide reimbursement to healthcare providers or urine drug testing ("UDT") services.

303.     However, the Medicare program covers UDT only when medically necessary as determined by the independent medical judgment of the beneficiary's physician.

### B.     Other Federal Healthcare Programs

304.     In addition to Medicare, the federal Government reimburses a portion of the cost of diagnostic services (including urine toxicology testing and the interpretation of those results) under several other federal healthcare programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA, and the Federal Employees Health Benefit Program ("FEHBP").

305.     CHAMPUS/TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces.  CHAMPVA, administered by the United States Department of Veteran Affairs, is a healthcare program for the families of veterans with a 100 percent service-connected disability.  The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and their survivors.

## VI.   APPLICABLE LAW

### A.     The Federal False Claims Act

306.     The federal False Claims Act ("federal FCA") provides, in pertinent part:

(a)      Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for a statutory civil penalty, plus three times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. §3729(a)(1)(A)-(C).

(b)      "[T]he terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require[s] no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

### B.      Self-Referral Prohibitions 42 U.S.C. 1395nn (the "Stark Law")

307.    The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for "designated health services" ("DHS"), including clinical laboratory services, if: 1) such services were referred to the entity by a physician with whom the entity had a financial relationship; and 2) the financial relationship does not fall within a statutory or regulatory exception. 42 U.S.C. §§ 1395nn; 42 C.F.R. §§ 411.351 *et seq.*

308.    Because compliance with the Stark Law is a condition of payment by the Medicare program, an entity may not request or receive payment for any DHS provided in violation of the Stark Law.  *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

309.    Further, federal regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ."  42 C.F.R. § 411.353(d).

SGR/22940192.1

310.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

311.     Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -- (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

312.     Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ." 42 C.F.R. § 411.351.

313.     A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

314.     The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements. The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R.

### C.     The Federal Anti-Kickback Statute

315.     Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.

316.    When an entity pays kickbacks to a provider in order to induce him/her to refer or recommend patients to the entity for goods and/or services, it fundamentally compromises the integrity of the doctor-patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon providers to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program.  As a condition of its reimbursement, Government healthcare programs require that the physicians must render their services without the conflict inherent in receipt of a kickback.

317.    The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

(1)    to refer an individual to a person for the furnishing of any item or service covered under a federal healthcare program; or

(2)    to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(1) and (2).The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).

318.    Violations of the federal Anti-Kickback Statute must be knowing and willful.  42 U.S.C. § 1320a-7b(b)(1).

319.    The federal Anti-Kickback Statute has been interpreted by the federal courts to cover any arrangement involving federal healthcare program funds where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Proof of an explicit *quid pro quo* is not required to show a violation of the Anti-Kickback Statute.

320.    A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under

the federal Anti-Kickback Statute *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal healthcare programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).

321.    Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider from federal healthcare programs for a discretionary period and may impose administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

322.    HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse.  *See* 42 C.F.R. § 1001.952.  However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection.

323.    Compliance with the Anti-Kickback Statute (like the Stark Law) is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the Government.

324.    The Anti-Kickback Statute expressly provides that claims that arise from a kickback scheme are false and violate the False Claims Act.  No further express or implied false statement is required to render such infected claims false, and none can wash the claim clean.

325.    It is the very fact that the healthcare decision-maker has accepted a kickback that *per se* renders not payable the claims for goods or services as to which the kickback was given, not whether the decision-maker would have otherwise selected that good or service.

326.    Moreover, as a prerequisite to participating in and receiving payment for federally-funded healthcare providers, like Surgery Partners and Logan Labs, must certify (expressly or,

through their participation in a federally-funded healthcare program, impliedly) their compliance with the federal Anti-Kickback Statute and Stark Law.

327.     Even in absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, *i.e.,* that it is properly payable. Consequently, if a healthcare provider pays a kickback to induce the referral or recommendation of a patient for inpatient or out-patient services and related goods (or violates the Stark Law), it renders false the submitter's implied or express certification of compliance that the resulting claim meets the requirements of the Anti-Kickback Statute (or Stark Law).

## VII.   DEFENDANTS' SCHEME TO PRESSURE AND INDUCE PHYSICIANS ACROSS THE UNITED STATES TO ORDER COSTLY QUANTITATIVE URINE DRUG TESTS

### A.      The Urine Drug Tests at Issue

328.     Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system. Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte). Different testing methodologies have different capabilities and limitations.

329.     Drug testing is performed in a number of contexts. In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

330.      Urine is the most common medium used for drug testing, and during the relevant period it was nearly the exclusive medium for testing used by Logan Labs.

331.     There are different types of urine drug testing, based in part on the location of the test (in-office or at a laboratory), which have different associated costs.

332.     "Point of care" or "POC" testing—at a physician's office or clinic—is generally

performed by "immunoassay" methodologies. Three types of immunoassays that are in common use:  1) enzyme immunoassay ("EIA"), 2) fluorescence polarization immunoassay ("FPIA") and 3) radioimmunoassay ("RIA"). These three types of immunoassay are based on the same general principle: binding antibodies are used to detect specific drugs or groups of drugs. Immunoassays generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels.

333.    In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips (usually 8 to 12), each of which tests for a specific drug or drug class.

334.    In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

335.    Under CLIA, CMS oversees all laboratory testing services. UDT performed using POC drug test strips and test cups is generally "CLIA-waived." CLIA-waived tests are categorized as simple laboratory examinations and procedures that have an insignificant risk of an erroneous result or pose no risk of harm to the patient if the test is performed incorrectly. 43 C.F.R. § 493.15(b).  To perform CLIA-waived tests, physicians need to enroll in CLIA and obtain a waiver. 42 C.F.R. § 493.35.  To operate a benchtop or desktop analyzer, physician practices are generally required to obtain CLIA certification to perform moderate or high complexity laboratory tests.

336.    There is little difference between office-based POC drug testing and lab-based qualitative UDT except cost.  Lab-based qualitative UDT is more expensive than office-based POCT if more sophisticated technology (FPIA or RIA) is utilized.

337.    As discussed in the next section, since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer

versus POC test cup with embedded test strips). As of January 1, 2011, the Medicare reimbursement for POC tests is determined by the complexity of the test under CLIA (HCPCS billing code "G0434" for CLIA-waived tests and "G0431" for high-complexity analyzer tests).

338.    POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management. Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

339.    Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and/or high-performance liquid chromatography ("HPLC"). These testing methodologies can provide quantitative results, identifying the concentration of a drug or metabolite in a sample. Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes. Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

340.    Logan Labs performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").

341.    Logan Labs' LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine.

## The Value of Confirmation Testing – Limited to Unexpected Screening Results

342.    The clinical value of Logan Labs' "confirmatory" or "quantitative" laboratory testing depends on the physician's independent assessment of his or her patient's medical condition. The clinical utility of a "confirmation" or "quantitation" of UDT screening test results

depends in part on the patient's history of compliance with drug treatment, whether there is any history of drug abuse, their clinical presentation, and whether the UDT screening test result is expected or unexpected.

343.    If a drug screening test is warranted and the results are negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory test for that drug is not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

### Guidelines on Urine Drug Testing

344.    Professional organizations issue guidelines regarding UDT in the clinical setting, including UDT for chronic pain patients prescribed opioids. According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of UDT guidelines in the clinical setting draws on the experience of workplace drug testing, including the 21 Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines"). 73 Fed. Reg. 71858 (Nov. 25, 2008).

345.    Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class." Id. at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is negative[.]" Id. at 71894. Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method. *See id.*

346.    Logan Labs is well aware that professional organizations and national experts have published guidelines regarding the use of UDT in clinical pain management.

347.    As Logan Labs knew, none of these guidelines recommended the routine use of

SGR/22940192.1

quantitative laboratory testing, such as the LC-MS/MS testing that Logan Labs performs, to "confirm" expected negative immunoassay results.

348.   Instead, published guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first, and then only unexpected results in need of further analysis are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

349.   For example, recommendations are made by other authoritative entities, including the ASIPP and SAMSHA.  *See* Manchikanti L, Abdi S, *et al.,* Pain Physician 2012; 15:S67-S116, ISSN 1533-3159, ASIPP Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain; Substance Abuse and Mental Health Services Administration, Clinical Drug Testing in Primary Care, Technical Assistance Publication (TAP) 32, HHS Publication No. (SMA) 12-4668. D. Reimbursements for Laboratory Tests.

350.   Different types of urine drug tests have different costs. Since January 2011, POC test cup tests have been billed to Medicare using HCPCS code G0434 and reimbursed at a fixed rate of approximately $20-25 per patient encounter—regardless of the number of substances tested. Also, since January 2011, POC high-complexity immunoassay tests have been billed to Medicare using HCPCS code G0431 and reimbursed at a fixed rate of approximately $100 per patient encounter—again, regardless of the number of substances tested.

351.   Relators believe that prior to their involvement with Surgery Partners, the vast majority of competent pain management providers affiliated with Surgery Partners who provided care to Government healthcare beneficiaries would have used qualitative UDT (a/k/a drug screening tests) to detect the presence of alcohol or drugs in the beneficiaries' bodies.

352.   The simple and quick urine dip stick test is an example of "qualitative" or "drug

screening" test. It is simple to administer, inexpensive, and the results are available immediately while the patient is still in the provider's office.

353.    When the urine dip stick UDT is used, because the results are available while the patient is still in the office and can be considered for the patient's plan of care, there is no need for a follow-up visit to consider UDT results.

354.    In contrast, quantitative UDT (a/k/a confirmation testing) such as Logan Labs' LC-MS/MS technology requires that the patient's urine sample is referred to an outside lab for testing. It is expensive, and the results are not available during the patient's appointment. When quantitative or confirmation UDT results are received weeks later, the patient must return for a follow-up visit to consider these results in the patient's plan of care (even when quantitative UDT was not medically necessary at the initial visit).

355.    In pain management, when medically necessary, providers first employ drug screening, or qualitative UDT. When medically indicated, after the qualitative (drug screening) UDT, pain management providers may refer patients for medically necessary quantitative (confirmation) UDT.  For example, when the result of the drug screening test is different from what the provider would expect based on the patient's medical history, clinical presentation, or the patient's own statements, the provider may confirm the results of their examination and screening UDT by referring the patient to an outside lab for quantitative UDT.

356.    Although quantitative UDT can be ordered in the first instance in the rare situations that it is medically necessary, pain management specialists do not regularly refer patients for these tests without the benefit of qualitative UDT.  *See, e.g.,* L36393 (Local Coverage Determination).

357.    For example, before November of 2015, when Dr. Cho worked at a California Detox Clinic, his practice involved use of random drug screening tests (dip stick cups) whenever

medically necessary. If the drug screening test results yielded unexpected positive or negative results, and Dr. Cho determined it was medically necessary to order confirmation (qualitative) UDT, he would order only those tests that were medically warranted.

358.    In general, based on Dr. Cho's 20 years of experience in pain management, between 10% and 15% of medically necessary qualitative UDT (drug screening tests) will require a quantitative test to confirm the result of a drug screening UDT (urine cup test) to eliminate the possibility of a false positive or negative result. This statistic varies depending on the age and prevalence of drug abuse among the clinic population.

**B.      The H.I.G. Defendants' Two Primary Schemes to Fraudulently Generate UDT Referrals for Logan Labs**

359.    During 2011, Surgery Partners, under the management, control, supervision, and guidance of H.I.G. Defendants, took on significant debt (in addition to the debt from the 2009 H.I.G. buyout).  Specifically, in May 2011 (the same time that the H.I.G. Defendants raised their minimum fees under the H.I.G. Management Agreement), Surgery Partners borrowed $240 million related to the acquisition of NovaMed. During 2011, Surgery Partners also took out a 5-year, $20.0 million Revolving Loan to use for working capital and general corporate purposes.

360.    Since late 2011, the H.I.G. Defendants and the Surgery Partners' entities created Logan Labs as a means of generating substantial revenues from expensive confirmatory urine drug testing. In order to feed business to Logan labs, they deployed at least two fraudulent schemes aimed at interfering with the independent medical judgment of providers (both physicians and mid-level providers) working at physician practices owned or operated by Surgery Partners in order to generate hundreds of millions of dollars in referrals to Logan Labs, located in Tampa, Florida.

361.    First, Surgery Partners, under H.I.G.'s control and oversight, pressured physicians and manipulated Surgery Partners' physicians' office practices and patient records to create

referrals of medically unnecessary UDT to Logan Labs.

362.   Second, Surgery Partners, under H.I.G.'s control and oversight, offered incentive compensation to Surgery Partners' affiliated physicians, who are in a position to refer to UDT services to Logan Labs, that is based on profits generated by Surgery Partners' ancillary services subsidiaries, including Logan Labs.

**C.   The Pressure on Physicians and Mid-Level Providers and Manipulation of Office Practices and EMR to Generate Referrals to Logan Labs Without Regard for Medical Necessity**

363.   H.I.G. and the Surgery Partners' entities knew that Government-funded healthcare programs, including Medicare, Medicaid, TRICARE, and the VA only cover laboratory testing that is reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, as determined by the patient's provider, based on his or her medical condition. *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A).

364.   The medical necessity for each test for each patient must be individually assessed and documented in the patient's medical record. 42 C.F.R. §§410.32(a), (d)(2).

365.   For years, Surgery Partners has employed various schemes whose purpose was to steer patient referrals for UDT, including Government healthcare program beneficiaries, to Surgery Partners' wholly-owned subsidiary, Logan Labs.

366.   As described below, this scheme was employed at Surgery Partners' practices nationwide.

**1.   Surgery Partners' executives improperly interfered with the physicians' and mid-level provider's independent medical judgment by pre-selecting patients, including Government healthcare program beneficiaries, for expensive quantitative UDT services when the patients arrived at the Surgery Partners' practice -- before the patients were even seen by their physician or a mid-level provider.**

367.   In September of 2015, Relator Dawn Baker recruited Relator Dr. Cho as a pain

specialist for Surgery Partners' FPI - Merritt Island, Florida location, which is part of Surgery Partners' Space Coast region.

368.    When Dr. Cho arrived at Surgery Partners' FPI – Merritt Island two months later, in November of 2015, he came to learn that Surgery Partners' employees obtained urine samples for UDTs from his patients before he either saw the patient or ever ordered any type of UDT.

369.    Dr. Cho also observed that the names of patients whose insurance would cover Logan Labs tests, including beneficiaries of Government healthcare programs, were highlighted in yellow, which meant that they were pre-selected for referral for UDT services.

370.    When he asked for the reason behind this unusual practice, he was informed by Tracy Helfeldt, the Administrator at FPI-Merritt Island, that Surgery Partners' policy was to obtain urine samples from pre-selected patients as soon as they checked in for their appointment.

371.    When Dr. Cho challenged this policy, Ms. Helfeldt responded that Surgery Partners implemented this practice of ordering UDT for pain management patients at each office visit purportedly to comply with Florida law. She remarked that being from California, Dr. Cho was just not familiar with the local laws in Florida.

372.    Dr. Cho also questioned Surgery Partners' executives about the policy of collecting urine samples for UDT even before he had seen the patient or determined that UDT was needed.

373.    For example, after Dr. Cho took it upon himself to review the relevant law and confirmed that it did not require UDT at every patient visit, he complained about this practice to Chris Toepke during July of 2016.

374.    Beginning in November of 2016, the physicians whom Ms. Baker had recruited began to inform her that they had started to have qualms with Surgery Partners' practices company. They discussed with her the circumstances which preceded their later decisions to leave Surgery

75

Partners.  Many of the pain specialists whom she had recruited cited Surgery Partners' scheme to use their physician practices as a conduit for improper UDT referrals to Logan Labs.

375.    Other Surgery Partners' pain specialists across the country who had been recruited by Ms. Baker had also experienced Surgery Partners' policies and procedures aimed at steering UDT referrals to Logan Labs.  For example, in May of 2015, Ms. Baker had recruited pain specialist Demaceo Howard, MD to practice at Surgery Partners' Colorado Springs Pain Relief Center. Dr. Howard has been practicing as a pain specialist in Surgery Partners' Colorado Springs Pain Relief Center since that time.

376.    From the time he began there, Dr. Howard also experienced Surgery Partners' program of obtaining urine samples from his patients before he had seen them. He had concluded that this practice was implemented in order to create referrals of lab-based UDT (expensive quantitative testing) to Logan Labs.

377.    Dr. Howard implemented a number of tactics to avoid medically unnecessary referrals of lab-based UDT to Logan Labs. For example, Dr. Howard attempted to intercept urine samples and discard them so that the patient's urine would not be send for a medically unnecessary analysis.

> **2.    Surgery Partners fraudulently obtained the consent of patients, including Government healthcare program beneficiaries, to UDT by falsely representing that quantitative UDT services were required multiple times per year in order to comply with state and/or federal laws.**

378.    Since at least May 2016, Surgery Partners' Florida Pain Institute (FPI) has used a New Patient Intake Form which includes its "Urine Toxicology Screen Policy."  Surgery Partners' policy purports to "inform patients as to why you have been asked to give a urine specimen and information regarding the billing of the specimen."  Surgery Partners tells patients that changes in Florida law in 2010, specifically 64B8-9.0131, Training Requirements for Physicians Practicing in Pain

Management Clinics (https://www.flrules.org/gateway/ruleno.asp?id=64B8-9.0131) require pain management practices to test patients at least twice per year ("**whether you are being prescribed no medications or multiple medications**") and that "if there are inconsistencies in your results, it is up to the physician/practitioner to retest randomly as needed." (emphasis in original).

379.    Surgery Partners also systemically attempted to shift the responsibility for UDT to the physicians at their pain practices: "In an effort to provide timely service while reducing energy and cost to our patients, the physicians have assumed the responsibility of providing laboratory services for urine confirmations. The physicians have an ownership interest, but understand if you, the patient request to send your lab work to a secondary facility, we will honor that request."

380.    The Urine Toxicology Policy also states: "Florida pain understands that this testing may come as an added expense to you…We will make every effort to keep your expenses down and still maintain our contracts with you [sic] insurance carrier, as to keep claims 'in network,' with your insurance. Therefore, it is important to confirm correct insurance at every visit, to ensure that your claim is filed properly."

381.    This patient notice is a pretext to justify referring Surgery Partners' patients for UDT at every visit and to shift responsibility for Surgery Partners' corporate UDT policies to the physicians and mid-level providers who work at Surgery Partners' pain management practices.

382.    Surgery Partners' notice contained both misrepresentations and false statements. It misrepresented Florida rule 64B8-9.013 in order to justify expensive and unnecessary UDT. There were multiple false statements in the patient notice: 1) there are no in-office laboratories permitted by Surgery Partners (even Dr. Cho's location previously had a lab and Surgery Partners closed it) so that all UDT is sent to outside labs, particularly Logan Labs; 2) Surgery Partners does not "make every effort to keep your expenses down." Instead, Surgery Partners causes their providers to order

expensive quantitative UDT, particularly for Medicare patients, who are sent to Logan Labs; and 3) Surgery Partners' UDT policy requires UDT of every patient – they do not permit providers to use their independent medical judgment to determine type or frequency of UDT.

383.     The mention of the physicians' "ownership interest" in the confirmation testing, upon information and belief, refers to Surgery Partners' ownership interest in Logan Labs, which received the vast majority of UDT referrals from Surgery Partners' physicians and mid-level providers.

3.      **Surgery Partners employed company-wide policies PROHIBITING physicians and mid-level providers UDT from using simple screening UDT methods (i.e., inexpensive and effective dip-stick cups) in the office, <u>which caused gross over-utilization of expensive quantitative UDT.</u>**

384.     When Dr. Cho first arrived at Surgery Partners' FPI - Merritt Island in November of 2015, he presumed that he would follow the good medical judgment that he had formed in more than 20 years as a pain management specialist, as well as his professional experience in addiction treatment.

385.     This means that, only when medically necessary, would he order screening (qualitative) UDT using a simple dip stick cup, while the patient was in the office.

386.     When physicians use simple qualitative UDT, they obtain the test results while the patient is present at the physician's office. If the simple dip stick UDT is negative, there is usually no need to perform additional quantitative UDT (confirmation testing) to confirm an unexpected negative result.

387.     Although quantitative (confirmation) UDT can be ordered without first performing the inexpensive dip stick drug screening, this is very rarely medically necessary.

388.     Dr. Cho also knew that, because it was not necessary to subject patients to quantitative UDT at every clinic visit, Medicare prohibited the routine use of confirmation UDT.

389.     Dr. Cho learned soon after arriving at FPI – Merritt Island that Surgery Partners did

not permit its providers to use inexpensive dip stick tests (a/k/a screening or qualitative UDT) that could be administered while the patient was present at its pain management centers.

390.    Surgery Partners prohibition of qualitative UDTs to be administered while the patient was in their pain clinics resulted in all urine samples being sent to outside referral labs, particularly Logan Labs.  In fact, when Surgery Partners' acquired the Florida Pain Institute's Merritt Island practice, which at that time operated an in-office toxicology laboratory, that laboratory, which had provided physicians with in-house qualitative testing, was shuttered to further coerce physicians to use Logan Labs, including its expensive confirmatory testing services.

391.    There is no medical necessity for an outside lab to perform screening UDT because the utility of these tests is that they are inexpensive, they are administered in the physician's office, and they provide immediate results while the patient is still in the physician's office.

392.    Thus, when a patient's urine sample was collected at Surgery Partners' physician practices, it was referred to outside labs, particularly Logan Labs, for expensive confirmation UDT.

393.    Surgery Partners' practices regarding UDT referrals and testing performed by Logan Labs was approved and permitted to continue by the H.I.G. Defendants, caused false claims to be submitted by Logan Labs submitted to Government-funded healthcare programs, including fee-for service programs (Medicare Part B, Tricare, VA) and managed care plans (including Medicare) were for lab-based "confirmation" quantitative UDT.

394.    One reason that Logan Labs' claims were false was that the referring Surgery Partners' physicians and mid-level providers were prohibited, when medical necessity warranted, from ordering and/or performing the inexpensive screening UDT for the presence of drugs. This caused gross over-utilization of "confirmation" quantitative UDT to be performed by Logan Labs and to be billed to Government-funded healthcare programs.

SGR/22940192.1

395.    Surgery Partners' policies also caused patients to return to the Pain Clinic more frequently than is necessary, causing additional false claims for unnecessary physician services.

396.    Each time Surgery Partners' physicians employed the corporate practice of ordering quantitative UDT before prescribing pain medication, it required the patient to submit to lab-based quantitative UDT, wait for the results to come back from Logan Labs, and return to the office for the pain medication.

## Dr. Cho's Resistance to Surgery Partners' UDT Fraud

397.    Between February and June 2016, Dr. Cho received serious complaints from patients regarding unreasonably expensive UDT bills from labs, ranging $3,200 to $4,600 for each testing episode.

398.    Before this, Dr. Cho had been informed that using quantitative UDT was Surgery Partners' company policy and he had to comply as an employed physician. However, Surgery Partners did not have a written UDT policy.

399.    On July 11, 2016, Surgery Partners' Practice Administrator, Tracy Helfeldt sent an email to the providers at FPI-Merritt Island notifying them of a provider meeting with Surgery Partners corporate leadership on July 26, 2016.

400.    That same day, in response, Dr. Cho wrote an email and "replied all" to the recipients of Ms. Helfeldt's email.  In his communication, Dr. Cho expressed concerns about being required to use Logan Labs, the excessive charges associated with UDT performed by Logan Labs, and the poor quality of the test results coming from Defendant Logan Labs, compared to other lab companies, such as LabCorp or Quest.

401.    In particular, Dr. Cho cited that 20 to 30% of Logan Labs' reports include critically high levels (over the reference limit) of opioids, nearly all of which do not match with the providers'

80

clinical observations. Dr. Cho opined that Logan Labs had "critical problems in calibration or quality control process or they keep using broken equipment without repair."

402.    Dr. Cho also cited increases in Logan Labs' UDT fees from $2,400 to $4,600 "without reason," and unbundling of charges.

403.    The next day, July 12th, Matthew Richardson, Surgery Partners' Senior Vice President of Physicians Services, responded to Dr. Cho. After indicating that he had contacted Logan Labs "to correct [Dr. Cho's] perceptions."  Mr. Richardson admonished Dr. Cho to contact Surgery Partners' executives (Mr. Richardson or Chris Toepke) in the future so that they could "quickly clarify any questions that you may have with Logan and processes that may appear inaccurate. A group email such as this is not the forum for this."

404.    On July 12, 2016, Chris Toepke, Surgery Partners' Group President, Ancillary Services, also wrote in response to Dr. Cho's email of the day before. Toepke opined that the Logan Labs' report layout, not the quality of the equipment, was somehow responsible for inaccuracies in UDT lab results that Dr. Cho raised.

405.    Toepke also employed a tactic that Surgery Partners often uses to shield their fraudulent practices. He wrote to Dr. Cho that he was free to use any lab services and that none of his compensation is tied to Logan Labs.

406.    In reality, this was not the case. Surgery Partners' executives used oral communications to pressure providers; they track physicians' UDT referrals to outside labs; and they manipulated the EMR software used by physicians and mid-level providers to justify referrals for lab-based UDT, particularly to Logan Labs.

407.    On July 13, 2016, Dr. Cho wrote a letter to Dr. Golovac, Surgery Partners' Medical Director, outlining his concerns with the Surgery Partners' UDT policy, and made suggestions to

81

allow practitioners to use an opioid abuse risk tool to determine the medical necessity of UDT for their patients, rather than Surgery Partners' pre-determined number of UDT episodes per patient per year.

408.    Within months of the March 2016 investor presentation highlighting Logan Labs as one of the company's major accomplishments since the H.I.G. Defendants took over, on July 26, 2016, Surgery Partners' corporate leadership held an evening meeting with providers associated with six practices located in Surgery Partners' Space Coast region at a local restaurant. Surgery Partners' executive leaders and Logan Labs' management were in attendance, including, but not limited to: Chris Toepke; Monica Aliberti; Tracy Helfeldt, Practice Administrator; Robert Williams, PhD, Laboratory Director of Logan Labs; and Joseph Sholy, a Surgery Partners Vice President of Operations who helped run Logan Labs (and who previously worked at LabCorp and Quest Diagnostics).  FPI providers in attendance included: Dr. Cho; Dr. Michael Esposito; Dr. Ashish Udeshi; and mid-level providers Beth Holtham, Patricia Dunn, Susan Clark, Michael Thomas, Richard Pectol, and Nicole Malerba.

409.    Just before the meeting, Dr. Cho met separately with Surgery Partners executives, including Chris Toepke, and with Dr. Williams, the Logan Labs Medical Director, and Joseph Sholy. Dr. Cho highlighted the poor quality of Logan Labs' quantitative UDT.  Dr. Cho noted that Logan Labs' reports included false positive results and frequent above-limit measurements just marked "high," rather than providing a specific number (quantification). Dr. Cho also provided examples of two patients whose results were clearly erroneous.

410.    At this July 26, 2016 meeting, Dr. Cho point blank told the Surgery Partners' and Logan Labs' leaders them that they had serious quality control problems. Dr. Cho told the Logan Labs' director: "I believe that either you don't know what you are doing, or all of your machines are

broken."

411.     Later that evening there was a meeting between Surgery Partners' corporate leaders and Surgery Partners' providers.  Chris Toepke, Surgery Partners' Group President, Ancillary Services, attempted to respond to Dr. Cho's emails regarding Surgery Partners' long-standing practices requiring patient referrals for quantitative UDT to Logan Labs.  Toepke claimed that Surgery Partners would not interfere in medical decision making, including UDT, and that physicians had full autonomy to make these decisions.

412.     At the same meeting, Surgery Partners' executives and Logan Labs' managers made a presentation entitled: "Surgery Partners Spacecoast [sic] Providers Meeting, July 2016." The presentation was marked "Not for Distribution."

413.     The presentation covered a number of topics, including: new growth targets by provider; "provider and patient concerns;" "UDS testing and billing discussion;" and "Logan laboratories update."

414.     During the presentation, the participants discussed Surgery Partners' strategies for a number of geographic markets, including pain management practices in Florida, Colorado, North Carolina, and Pennsylvania, and the company's growth in these markets over the past year.

415.     The Surgery Partners' leaders' presentation related to Logan Labs focused largely on the "disadvantages" of immunoassay, the method used for screening or qualitative UDT. At the same time, the discussion stressed the advantages of quantitative UDT.

416.     As alleged above, from 2009 until 2015, while the H.I.G. Defendants provided management oversight, Surgery Partners did not even have a compliance program.

417.     Similarly, although the H.IG. Defendants provided millions of dollars in management and advisory services related to newly-created businesses (such as Logan Labs), they did not ensure

that Surgery Partners developed a written urine drug screen policy for this newly-formed business. In fact, Surgery Partners, with an H.I.G. executive as Chairman of the Board, touted the importance of Logan Labs' revenues to the overall operation of Surgery Partners in March 2016, but did not even issue a formal, written urine drug screen policy until September of 2016.

418.    Instead, from the start of Logan Labs' operations in 2011, under the management and control of the H.I.G. Defendants, until September 2016, Surgery Partners' leaders adopted a corporate policy to perform UDT on every patient, at every visit, without any specific indication of medical necessity.  When multiple physicians (including Dr. Cho) complained and requested appropriate clinical support for the mandatory UDT practice, Dr. Golovac created Surgery Partners' urine drug screen policy under the guise of participation by a medical advisory committee.

419.    H.I.G. did little to ensure compliance at its portfolio company, despite H.I.G.'s ownership and control over the business, knowledge of the strict fraud, waste, and abuse laws that governed the business, and Surgery Partners' reliance on government payors, including Medicare.  At the same time, Surgery Partners made hundreds of millions of dollars per year in revenue (much of it from government payors) during the period of the H.I.G.'s control, and, in turn, paid H.I.G. millions for its management and advisory services,

420.    On July 31, 2016, Dr. Golovac announced that Surgery Partners would be issuing a written UDT policy.  The Surgery Partners' first written UDT policy would include recommendations that for patients in the high-risk group, providers should order 10 to 12 UDTs annually (screen or confirmation or both) and that patients in the low risk group were recommended to receive two to six UDTs per year.

421.    Dr. Cho responded to Dr. Golovac that he had reviewed Surgery Partners' NEXTGEN EMR software, and he was concerned that the EMR software required the provider to select from

84

several specific reasons why the UDTs were or were not being ordered -- without exception. This is another means for Surgery Partners to pressure physicians to order UDT.

422.    Beginning in August 2016, Dr. Cho made a concerted effort to avoid Logan Labs' quantitative UDT, to use screening or qualitative UDT as he deemed necessary.

423.    On September 19, 2016, Matthew Richardson, Surgery Partners' Sr. Vice President, Physician Services, sent an email to Surgery Partners providers and attached the "Urine Drug Testing and Compliance Program that will be adopted by Surgery Partners Effective October 1, 2016." Mr. Richardson represented that the Surgery Partners UDT policy was the:

> product of many hours of work from a representative group of our employed physicians, as well as outside counsel and reflects best practices we've seen in the industry...in line with guidance we have received from various regulatory boards...we will be training on the contents for NextGen users in the upcoming week. The continued key is proper documentation in our EMR, and this document will serve as a guidance tool to assist you in the necessary criteria to order specific tests on behalf of your patients. Our Medical Director, Stanley Golovac MD states the following ...The document attached will stand as a reference as how to stratify and **help us monitor our patients who are either being prescribed or not**, the types of medications that can be habit forming and potentially abused...The document is guidance to better serve as a reference to validate why we prescribe the types of medications that can be potentially abused and/or misused. Each patient will need to undergo a written stratification exam that will categorize them into three categories...We are eager to train and adopt this guidance. Please be looking for the training opportunities from your practice leader the week of September 26th. If you have any questions please reach out to your practice administrator or to Dr. Golovac directly...POD leaders and office managers, please ensure that this is distributed to all providers that you are responsible for.

(emphasis added).

424.    The Executive Summary for Surgery Partners' October 1, 2016 UDT policy states:

> This document provides for the local implementation of a Compliance Plan that will allow the individual physician care team to provide urine toxicology testing within a rational, non-prejudicial and clinically legitimate framework....This is a guideline, and as such, is non-binding

to the clinician and does not replace the conscientious decision-making process of a knowledgeable and dedicated physician who is most familiar with any one patient's particular situation.

425. However, the Surgery Partners' October 1, 2016 UDT policy document reveals that Surgery Partners sought to use this policy to justify over-utilization of UDT, particularly UDT referred to Logan Labs. For example:

(a) Section I.3. Surgery Partners Physicians have determined that patients are frequently unreliable in reporting their medication compliance, history of drug additional and substance abuse, medication over-utilization, use of non-prescribed medications, drug diversion, and/or other aberrant behaviors. This can lead dangerous and uninformed decision-making by the medical staff;

(b) Section I.5. Surgery Partners, Inc., and their subsidiary companies are located in states in which a high incidence of illicit drug use has been observed. These guidelines are designed to help our physicians make geographically and medically appropriate decisions when prescribing controlled substances, in order to reduce or eliminate possible abusive, addictive and dangerous prescribing outcomes;

(c) Section I.8. Surgery Partners Physicians has encountered innumerable otherwise "legitimate-appearing" patients who have been identified through urine toxicology as using illicit or non-prescribed controlled substances....it is critical to immediately catch and correct these behaviors and have the opportunity to counsel and/or discontinue controlled substance prescriptions before the behavior escalates to a full-blown abusive, addictive or lethal situation;

(d) Section II.2. Direct to Quantitative Testing. It may be reasonable and necessary to proceed directly to quantitative testing without qualitative testing in the circumstances described in section II(1)(b)(i)(-(iv) above;

(e)      Section III.1. Risk Assessment, Risk Classification and Testing Frequency Recommendations.  Qualitative urine drug testing with quantitative confirmation **will be performed** on patients prior to the initial issuance of a controlled substance prescription, **and then at an overall frequency of one (1) to twelve (12) times per year** as determined by the patient's risk level classification.   Any additional testing **beyond the recommended frequencies** included in this protocol must be justified by the clinician in the patient's medical record. (Emphasis added);

(f)      Testing Procedures & Frequency Recommendations 1. A prescribing provider may collect a patient urine/oral specimen in the office and send the specimen to a certified laboratory.... 3. Surgery Partners Physicians shall ensure that it maintains chain-of-custody of the urine or oral fluid specimen once received from the patient up until the specimen testing is completed by the in-office laboratory or shipped to an off-site laboratory for testing. The frequency of UDT will depend upon the patient's risk classification... 1. Red Patients.  ...Red patients generally undergo qualitative immunoassay drug testing with quantitative confirmation testing one to three times every three months.  2. Yellow Patients are tested at random intervals approximately one to two times every six months.  3. Green Patients. .... done at random intervals approximately one to two times every twelve months;

(g)      Section IV. 1. Due to the perception of runaway testing, payers have progressively emphasized and required full comprehensive documentation of the clinical situation and the circumstances which require urine toxicology testing… blanket statements such as 'per LCD' or **'per our Corporate Protocol'** are not adequate to justify the clinical need for testing. … Although PANELS are allowable for IA testing, LCMS testing requires selection of a specific and risk-adjusted PROFILE.  The practitioner will select an LCMS PROFILE that fits the risk level of the patient, which will then be further customized to the patient based on the prescribed medications, and

SGR/22940192.1

furthermore customized based on the unexpected positive and negative results of the presumptive IA testing. … If the prescribing provider so believes s/he should document that the "testing is medically necessary for the safe prescribing and/or treatment of the patient…". (emphasis added); and

(h)     1.g. The medical record should indicate "This clinical document cannot by itself provide a comprehensive overview of the testing protocol; therefore, we include by reference the Surgery Partners Urine Drug Testing and Compliance Program; Recommendations for Physicians dated 10/1/2016."

426.     Around this time, Surgery Partners' management, working with its partners and advisors at the H.I.G. Defendants, continued to subject providers, including Dr. Cho, to significant pressure to order expensive UDT. The company email system was changed from "floridapaininstitute.net" to "surgerypartners.com," and many emails detailing pressure to order UDT exerted on Dr. Cho by Surgery Partners' executives and managers were deleted or no longer available to Dr. Cho.

427.     In late 2016, several physicians discussed their concerns regarding Surgery Partners' UDT policies and practices with Ms. Baker.  In addition to Dr. Cho, Ms. Baker spoke with Dr. Howard from Surgery Partners' Colorado Springs location.

428.     In addition, in late 2016, Dr. Le, a physician practicing at Surgery Partners' Palm Beach Pain Relief Center – Wellington, discussed with Ms. Baker that he had considered leaving Surgery Partners.  Also, Dr. Robert Kent, who had practiced at Surgery Partners' Central Florida Pain Relief Centers – Downtown (Orlando), f/k/a Rehabilitation Medical Group, Inc. and Central Florida Pain Relief Centers – Altamonte Springs resigned.

429.     In January of 2017, Surgery Partners issued a revised UDT policy which required that its affiliated physicians order a very expensive (approximately $3,000) confirmation (quantitative)

88

UDT for every new patient and for every patient that receives a change in medication, including dose adjustment. Surgery Partners directed their pain specialists that no new prescriptions could be issued until the results of the "confirmation" testing were received. (This typically took one to two weeks). Surgery Partners issued this directive, again, under the guise of monitoring medication compliance.

430.     Dr. Golovac, Surgery Partners' Chief Medical Officer, insisted in an email of January 13, 2017 that the confirmation UDT (which costs thousands of dollars) was medically necessary for every patient seen at the clinic to ensure opioid safety.

431.     During the months leading to H.I.G.'s August 2017 sale of its remaining interest in Surgery Partners, the company's UDT policy was again changed.  On January 30, 2017, Surgery Partners, through Dr. Golovac, issued "Revised: Urine Drug Testing and Compliance Program: Recommendations for Physicians," with an effective date of January 23, 2017.  On information and belief, each formal UDT policy as devised by Surgery Partners' corporate executives, would also be presented to and approved by Surgery Partners' Board of Directors, including the H.I.G. Defendants' managing partner members. These revisions included:

(a)     Section I.10 of the revised policy stated: "patients requiring opioids, benzodiazepines, sleep inducing medicines and TCA's are of higher risk." Surgery Partners requires "with few exceptions, qualitative urine drug testing with quantitative confirmation" on patients before "the initial issuance of a controlled substance prescription. Thereafter, qualitative and/or quantitative testing will be performed at an overall frequency of one (1) to twelve (12) times per year as determined by the patient's risk level classification. Any additional testing beyond the recommended frequencies included in this protocol must be justified by the clinician in the patient's medical record, such as the use of opioids, benzodiazepines, TCA's and sleep-inducing medicines;"

(b)     "With very few exceptions that must be well documented, every new

consulted patient should undergo a preliminary screening of a UDT (qualitative and quantitative analysis) to establish baseline metrics and ensure both the prescribing physician and/or extender, understands what our patients may be taking for other medical reasons and not as well as to check for the presence of illicit drugs;"

(c)     Patients will be stratified into three risk categories (red being high, yellow being moderate and green being low). Patients stratified into the "RED" category should be tested 1 -3 times every 3 months (depending on clinical assessments and patient specific circumstances), Patients in the "Yellow" category should be tested every 1-3 times every 6 months. Patients in the "green" category should be tested 1-2 times per year;

(d)     Any patient with a medication (family) change, will also require a follow up UDT (qualitative and quantitative) on the next office visit to determine if the level in the urine is consistent with the "new" medication;

(e)     "In addition to the areas mentioned above, it is the responsibility of each of us to fully read and understand what the policy intent is and the importance of why it is administered. Should anyone have any questions or concerns please do not hesitate to contact me personally thru email or my personal cell (321) 403-1893."

432.   Surgery Partners manipulated the patient risk classification tool in the EMR software so that more patients would be stratified into the high risk (RED) group, in an effort to justify more frequent UDT.

433.   On February 1, 2017, Dr. Cho had a conversation with Dr. Golovac. Dr. Cho again stated that he did not agree with Surgery Partners' position that neither the less expensive lab-based qualitative UDT (which costs approximately $200) or the $20 urine cup dip-stick test were reliable methods of monitoring patient compliance.

434.    Dr. Cho followed this conversation with an email to Dr. Golovac and others in which he repeated the points he had made orally with Dr. Golovac. Dr. Cho reiterated:

(a)    Surgery Partners was routinely over-utilizing confirmation UDT;

(b)    Dr. Cho would contact the Florida Medical Board, CMS, and other national professional societies to refute Surgery Partners' position (as stated by Dr. Golovac) that random drug screening tests (qualitative) are inappropriate for opioid safety;

(c)    Surgery Partners' UDT policy which caused a one-to-two-week delay between sending the urine sample for UDT confirmation testing and issuing an opioid prescription could cause patient harm  because patients suffering from chronic pain would be without treatment while waiting for these expensive quantitative UDT results;

(d)    Surgery Partners' UDT policy will also result in unnecessary emergency room (ER) treatment and withdrawal for patients who run out of pain medication while waiting for quantitative UDT results; and

(e)    Surgery Partners' pain specialists serve aged patients suffering from chronic pain, a patient population that is largely compliant with their opioid treatment. These are not patients with a history of drug abuse as is the case in addiction clinics.

435.    Dr. Golovac responded that the UDT policy revisions were intended to ensure physician compliance (while, at the same time, Dr. Golovac represented that Surgery Partners' UDT policy was non-binding). Dr. Golovac made clear that he would be contacting any physician who deviated from Surgery Partners' policy requiring confirmation UDT, on both new patients and as follow-up to patients stratified as red or yellow using Surgery Partners' EMR.

436.    Dr. Cho reiterated in his February 1, 2017 email that the medical necessity of  all UDT is determined, based on the independent medical judgment of the physician or mid-level

provider, after considering the following: 1) prescription history, including Florida's e-force controlled medication prescription record; 2) the patient interview; 3) information received from the patient's primary care provider; 4) the patient's family and social history; 4) the physical examination conducted during the patient visit; and 5) general medication compliance.

437.    Dr. Cho repeated  in his February 1, 2017 email what he had been telling Surgery Partners leaders since he arrived at the Merritt Island pain clinic in November of 2015: he preferred to  use screening UDT: "a simple urine dip stick test which cost only $20 and we can get the result in 3 minutes on the same day." Dr. Cho emphasized the safety and cost-effectiveness of this method of qualitative UDT to minimize the risk of opioid abuse.

438.    Dr. Cho, after ignoring Surgery Partners' ban on simple dip stick (urine cup) drug screening, did not see any indication of illicit drugs or lack of compliance with the prescribed opioid medication in 95% of patients.

439.    Dr. Cho also reiterated to Dr. Golovac on February 1, 2017, that Surgery Partners had opposed physician efforts to use simple dip stick urine tests, forcing pain management specialists to refer patients for qualitative UDT performed by outside labs such as Logan Labs: "But you are against this option…So I choose next least expensive test which is urine screen test as my primary urine test."

440.    Dr. Cho referred to Dr. Golovac's email of January 13, 2017 and reiterated that he did not agree with Surgery Partners' position that neither the less expensive qualitative UDT (which costs approximately $100 to $200) or the $20 drug screening (urine cup dip-stick) was reliable method of monitoring patient compliance.

441.    Finally, Dr. Cho made clear that it was not acceptable for Surgery Partners to repeatedly interfere with and pressure medical providers to change their independent medical judgment regarding the appropriate UDT for patients, particularly when Surgery Partners failed to

provide appropriate professional and/or medical sources for their policies.

442.    On February 1, 2017, Dr. Cho made clear that he was concerned with fraud, waste, and abuse: "I do not believe I can justify your revised UDT policy if I am audited by authority in future."

443.    Dr. Golovac's written response, that Dr. Cho could exercise his independent judgment, contradicted what Surgery Partners had told Dr. Cho orally: their UDT policy was mandatory.

444.    For example, when Dr. Cho challenged the referral relationship between Surgery Partners' physicians and Logan Labs, Dr. Golovac, Surgery Partners' Chief Medical Officer, replied to Dr. Cho that Surgery Partners' physicians were expected to refer their patients to Logan Labs.  Dr. Golovac drew the following analogy for Dr. Cho: if a family owns a gas station, their children must use their own convenience store, not the store located at cross the street.

**4.      Surgery Partners steered Government healthcare program beneficiaries to Logan Labs for quantitative UDT, even when the physician or mid-level provider ordered or preferred a dip stick test for qualitative UDT or a different UDT laboratory.**

445.    From the time that Dr. Cho started at Surgery Partners' FPI- Merritt Island location, the existing corporate UDT practice at Surgery Partners required that the physicians and mid-level providers to refer all patients with Government-funded insurance, including Medicare and Tricare, and any PPO that will pay for lab-based UDT to Logan Labs.

446.    In fact, Surgery Partners had posted a sign on the wall of the clinic just above the urine specimen collection table room reminding all providers in large bold letters of this requirement: "WHERE DO YOU SEND THAT UTOX??...ALL PPO's = Logan…Medicare = Logan."

447.    Other physicians across the Surgery Partners' national pain management network also experienced Surgery Partners' pressure to reduce inexpensive urine dip stick tests and steering of

UDT to Logan Labs. For example, Dr. Howard, who began practicing in Colorado Springs in 2015 experienced both the over-utilization of UDT and pressure to refer to Logan Labs.

448.    Dr. Howard, like Dr. Cho and consistent with sound and reasonable medical practice, preferred using screening drug tests (a/k/a "dipstick tests") when UDT was medically indicated by his examination of the patient.

449.    He observed that Surgery Partners' employees had pre-selected patients for lab-based UDT regardless of medical necessity, and the majority of these patients were being steered to lab-based UDT at Logan Labs.

450.    When Dr. Howard tried to refer patients, who needed lab-based UDT to other labs, personnel at Surgery Partners' Colorado location overrode his orders and changed the referrals to Logan Labs.

451.    Surgery Partners' practices were implemented company-wide, a reflection of the direct involvement, knowledge, or at a minimum, recklessness by the H.I.G. Defendants during the time they acted as partners, management consultants or advisors to Surgery Partners' executives. In light of the keen focus on Logan Labs as one of four accomplishments during the H.I.G. Defendants' control over the company, Surgery Partners' million-dollar management advisors knew or should have known about the practices employed across the many states where Surgery Partners operated to feed lucrative referrals to ensure the successes of Logan Labs.

>    **5.    Surgery Partners pressured physicians and mid-level providers to refer patients for UDT services by closely monitoring the patients who were not referred to UDT at each visit.**

452.    During the relevant time period, Surgery Partners carefully tracked each time a pain management provider referred a patient for confirmation UDT, the main source of revenue for Logan Labs.

453.    Surgery Partners' executives created corporate reports to capture this data.  For example, numerous emails sent by Logan Laboratories' Director of Business Development Heather Isaac to the Surgery Partners/Logan Laboratories Sales team in the spring and summer of 2016 address physician referral data.  On May 25, 2016, Isaac forwarded that week's referral data to the Sales team and added that she had "received several emails from Corporate this morning asking why certain physicians are down week over week."  As described above, the "Corporate" leadership of Surgery Partners included H.I.G. Capital personnel such as Christopher Laitala, Matthew Lozow and Fraser Preston.

454.    On August 17, 2016, Isaac once again contacted the Sales team to inform them that "Chris [Toepke] has asked to be kept immediately informed if anyone is down for other than PTO. He said he will make himself available to insert himself into any account where volumes are down, and we are not seeing the appropriate rebound within a few days of addressing it."

455.    Similarly, Surgery Partners created and circulated a report called "Confirms Per Patient" for the providers at FPI-Merritt Island (a/k/a Space Coast), FPI-Melbourne, and FPI-Viera. Surgery Partners' executives used these reports as one means to pressure providers to refer more patients for confirmation UDT, with a focus on increasing referrals to Logan Labs.

456.    Surgery Partners' executives, including Toepke, would circulate these reports to providers and to Surgery Partners' medical directors in an effort to increase referrals for confirmation UDT to Logan Labs.

457.    For example, on January 13, 2017, Toepke wrote to Dr. Golovac, Surgery Partners' Chief Medical Officer, with a carbon copy  to Dr. Ashish Udeshi regarding "space coast stats:"  "Just looping you into this but there's a real issue with the mid-levels at Space Coast, there's no reason they should be testing this in frequently [sic]. They are putting the practice and their own licenses at risk.

SGR/22940192.1

I've spoken with Udeshi and he will address this with the mid-levels. We should also talk about documenting our conversations with Cho formally. He is putting the practice at risk by not testing at all. He doesn't need to use Logan but he does need to use someone…. This chart represents confirms per patient seen. Udeshi's numbers in 3Q and 4Q are very reasonable. The rest of the practice seems to be under testing and potentially exposing us to risk."

458.    Toepke had inserted a copy of a report "Confirms Per Patient" for FPI-Viera, FPI-Melbourne, and FPI –Merritt island (a/k/a Space Coast) providers from October 2015 to December 2016.  The table showed that some providers (Drs. Golovac and Gayles) referred nearly every patient for expensive confirmation UDT at some point in the time period.  Dr. Udeshi, whose referrals Mr. Toepke said were "reasonable," had referred a period high of 60.6% of his total daily clinic patients for expensive confirmation UDT.

459.    Dr. Golovac forwarded the email to Dr. Cho: "Please look at your stats. This is what I spoke of. From July to December you practically didn't order any confirmations. This can lead to liability." Dr. Cho replied to Dr. Golovac and Toepke and included the rest of the practitioners. He highlighted that the UTOX statistics were inaccurate because they did not reflect screening UTOX tests.

460.    Dr. Cho also stated that 99% of his new and follow up patients were receiving screening UTOX tests at least one or two times per year, with few exceptions. Dr. Cho's "screening UTOX" were lab-based qualitative UDT in light of Surgery Partners' prohibition of POC tests. Surgery Partners routed these lab-based qualitative tests to an in-house lab associated with a Tampa Pain Relief Center practice in Tampa, Florida.

461.    In addition, in the same email, Dr. Cho reiterated that his practice of relying on qualitative UDT, rather than confirmation UDT, was within national standards of care.  He invited

Mr. Toepke and Dr. Golovac to provide him with references to refute his use of screening tests:

> If you have any official response from the Florida state medical board and/or any pain or addiction specialty society that shows that 'confirmatory" UTOX test must be used as a primary & initial test rather than a "screening" test for patient's safety, please inform me ASAP. I will gladly change my practice to comply with any medical laws or regulations.

462.    In response, Toepke threatened Dr. Cho: "First off, it is inappropriate of you to cc the entire practice on a response to an email that was sent just to you. That's the 2nd time it has happened – please make it the last."  Mr. Toepke also attempted to exert pressure on Dr. Cho in an effort to interfere with is medical decision making:

> Secondly, as you very well know, UDS is not the same as confirmatory testing. Confirms are widely accepted and used because they are more reliable and necessary to protect providers and practices against false negatives and other issues. An independent group of senior and experienced Tampa Pain Relief and SP [Surgery Partners] physicians have come together to author a toxicology policy and have recommended appropriate utilization of confirmatory testing in conjunction with UDS testing. It has been our policy for a long time to utilize confirmatory testing. You do not need to use Logan Labs but you do need to run appropriate confirmatory testing. Stan [Golovac] will follow up with more specific direction.

463.    Dr. Golovac contacted Dr. Cho.  During the telephone call he threatened Dr. Cho several times, repeating "I warn you."

464.    Dr. Cho followed up with an email to Dr. Golovac at 9 PM on January 13, 2017.  Dr. Cho reiterated that Dr. Golovac had again tried to pressure him to refer all patients for confirmation testing in the first instance, rather than use screening UDT.  Dr. Cho repeated that this practice was illegal.  Dr. Cho offered to "contact the Florida State Medical Board" and "Medicare for official clarification."

465.    Dr. Golovac replied that there was "no need to contact the medical board. As you know a qualitative test does not affirm what a quantitative test performs."

**6.      Surgery Partners implemented UDT policies that resulted in the creation of false electronic medical records (EMRs) to support <u>medically unnecessary UDT services</u>.**

466.    As referenced above, Surgery Partners' NEXTGEN EMR software required the physician or mid-level provider to select from several specific reasons why the UDTs were or were not being ordered for every patient.

467.    Dr. Cho highlighted to Dr. Golovac his concerns that Surgery Partners had manipulated the EMR in order to pressure the physician to create a patient record that would support excessive confirmatory UDT.

468.    When combined with Surgery Partners' tracking of referrals and reports detailing patients who did not receive a referral for confirmatory UDT, the EMR documentation requirements constituted another means that Surgery Partners employed to pressure physicians to refer patients for unnecessary confirmatory UDT.

469.    The manipulation of the EMR, to the extent that physicians ordered UDT in an effort to avoid justifying their failure to refer, constituted conduct that contributed to the creation of a false record that was material to a false claim for medically unnecessary confirmatory UDT.

**7.      Surgery Partners' corporate policies and conduct caused Logan Labs to perform excessive, medically unnecessary quantitative UDT on Government healthcare program beneficiaries, then to submit claims <u>for such to Government-funded healthcare programs.</u>**

470.    Surgery Partners' conduct, as described above, resulted in referrals by Surgery Partners' physicians and mid-level providers, including pain specialists, for medically unnecessary confirmation UDT.  This occurred while the company received advisory services from H.I.G. and its managers.

471.    Logan Labs then performed the medically unnecessary confirmation UDT on urine samples collected from beneficiaries of Government-funded healthcare programs.

472.     Surgery Partners then submitted or caused the submission of claims by Logan Labs to Government-funded healthcare programs (fee-for-service and managed care programs) for the medically unnecessary confirmation UDT.

473.      These claims were false because Surgery Partners interfered with the independent medical judgment of the physicians and mid-level providers in order to increase revenues at Logan Labs.

474.     These claims were also false because executive leadership at Surgery Partners and Logan Labs either knew or showed reckless disregard for the lack of medical necessity of the confirmatory UDT.

### a)     Surgery Partners Pushed for Providers to Order UDTs More Frequently Than Needed

475.     Most patients in pain management setting do not need regular UDT services. In fact, the Government's guidelines suggest one or two random screening UDTs per year.  For low risk patients, one or two random UDTs annually are appropriate.

476.     Despite the fact that Logan Labs was, during the relevant time period, owned and controlled by Surgery Partners, it took one to two weeks from the time the urine sample is collected, sent to Logan Labs, and the confirmation UDT results are received by the provider.  In contrast, the urine cup dip stick can be performed in the office.

477.     Thus, the inexpensive screening UDT, when appropriate, is the preferred method for ensuring patient safety and providing appropriate care for patients in pain management clinics.

478.     The owners, executives, managers, and advisors knew or should have known that screening UDTs were not being used because the company was out buying them.

479.     From the time Dr. Cho arrived at Surgery Partners, he was aware that screening UDTs were prohibited because Surgery Partners preferred their providers to refer patients for confirmatory

99

UDTs, particularly for Government-funded healthcare program beneficiaries, because these confirmatory UDTs were performed by and billed for by Logan Labs.

480.    There was no medical utility for the vast majority of confirmatory UDTs. The vast majority of the Logan Labs reports (95%) showed that the "confirmation testing" was negative for any illicit drugs. In the roughly 5% of confirmation UDT with positive results, the most common illicit drug was marijuana.

481.    Given the pressure to refer patients for lab-based (quantitative) UDT, the Defendants' conduct also caused referrals for unnecessary UDT to other labs, such as LabCorp, where that lab was required by the patient's insurance.

       **b)**    **Surgery Partners' Subsidiary Logan Labs Uses Excessive Quantitative UDT Panels.**

482.    Surgery Partners' executives and Logan Labs Medical Director provided Dr. Cho with a handout explaining that the number of tests performed for each UDT episode was 44.

483.    Logan Labs generally billed LC-MS/MS test results using individual CPT codes for each drug or drug class it tested.

484.    Logan Labs routinely billed multiple different CPT codes for some drug classes, as reflected in the chart below.

485.    Logan Labs also routinely billed multiple units of the same CPT codes—such as 83925 for opiates—suggesting that it had performed multiple procedures to test for opiates.

486.    For example, during the relevant time period, for a beneficiary of Medicare Part B of Florida, Logan Labs charged the Government as follows for confirmatory drug testing:

SGR/22940192.1

| CPT | Test | Logan Labs Charged |
|---|---|---|
| 80324 (3 units) | DRUG SCREEN AMPHETAMINES 1/2 | $56.15 x 3 = $168.45 |
| 80346 (3 units) | BENZODIAZEPINES1-12 | $56.15 x 3 = $168.45 |
| 80348 (3 units) | DRUG SCREENING BUPRENORPHINE | $56.15 x 3 = $168.45 |
| 80349 (3 units) | CANNABINOIDS NATURAL | $56.15 x 3 = $168.45 |
| 80353 (3 units) | DRUG SCREENING COCAINE | $56.15 x 3 = $168.45 |
| 80354 (3 units) | DRUG SCREENING FENTANYL | $56.15 x 3= $168.45 |
| 80356 (3 units) | HEROIN METABOLITE | $56.15 x 3 = $168.45 |
| 80358 (3 units) | DRUG SCREENING METHADONE | $56.15 x 3 = $168.45 |
| 80359 (3 units) | METHYLENEDIOXYAMPHETAMINES | $56.15 x 3 = $168.45 |
| 80361 (3 units) | OPIATES 1 OR MORE | $56.15 x 3= 168.45 |
| 80362 (3 units) | OPIOIDS & OPIATE ANALOGS 1/2 | $56.15 x 3 = $168.45 |
| 80365 (3 units) | DRUG SCREENING OXYCODONE | $56.15 x 3 =$168.45 |
| 80369 (3 units) | SKELETAL MUSCLE RELAXANT 1/2 | $56.15 x 3 = $168.45 |
| 80372 (3 units) | DRUG SCREENING TAPENTADOL | $56.15 x 3= $168.45 |
| 80373 (3 units) | DRUG SCREENING TRAMADOL | $584.82 |
| 83992 (2 units) | ASSAY FOR PHENCYCLIDINE | $84.22 + $84.23= $168.45 |

487.    Logan Labs and Surgery Partners' executives, managers, and advisors knew or should have known the tests performed by Logan Labs and what they charged payors, including Government healthcare programs.

488.    The number of tests in the panel Defendants established for Logan Labs' quantitative UDT was excessive. For example, where quantitative UDT was even necessary, pain management specialists such as Dr. Cho would need results for only illicit medications (PCP, cannabinoids, amphetamines, methylenedioxy amphetamines, cocaine, methadone, heroin metabolite, etc.).  There is no medical necessity in testing pain management patients for all 44 medications covered in Logan Labs' routine quantitative UDT panel. Also, confirmation UDT testing for only one or two selected medications was not offered by Logan Labs, as Dr. Cho confirmed by discussing the subject with the Logan Labs' sales representative.

489.    By its very nature, a quantitative test is used in a *confirmatory* manner.  The test seeks to confirm (when needed) the presence of a drug that shows up positive on a screening test

and which was typically not expected to show up positive on that screening test.  For example, a physician may have qualms with prescribing a patient tramadol if the patient's drug screen shows that he is otherwise using opioids or other drugs.  Yet, if a given drug comes up negative on a screening test there would (absent exceptional circumstances) be no reason to perform a confirmatory test for the drug.

490.    By way of example, Surgery Partners' Medicare patients tended to be of advanced age and exhibited no predilection for drug abuse.  These individuals would not be expected to use PCP, cocaine, or various other drugs that Surgery Partners used quantitative and qualitative tests to measure or screen.  Yet, Surgery Partners' fraudulent policies and practices coerced physicians to order UDT, including expensive confirmatory tests, for such patients despite the lack of medical necessity.

491.    During the relevant time period (2012 through 2017) while the H.I.G. Defendants controlled and managed Surgery Partners and provided management and advisory services to Surgery Partners worth tens of millions of dollars (including services related to new lines of business such as Logan Labs) the Defendants submitted, caused Logan Labs to submit, or conspired with Surgery Partners' executives to submit Logan Labs' claims for confirmation testing to Government-funded healthcare programs, including Medicare, TRICARE and the VA, for each drug or class tested – averaging more than 40 procedure codes (many with multiple units) per urine sample - including drugs that patients were not suspected of taking, and for "confirmation" quantitative UDT.

492.    These claims for quantitative "confirmation" testing were also false because Surgery Partners' corporate policy would not allow providers to perform the "in-office" UDT.  Such in-office "screening tests" were, by-and-large, prohibited at the Surgery Partners' physicians' offices. Instead, Surgery Partners' policies were aimed at forcing physicians and mid-level providers to use expensive

SGR/22940192.1

"confirmation" (quantitative) UDT at Logan Labs as a "screening" test.

> **8.    Defendants fraudulently unbundled the claim for quantitative UDT and billed Government-funded healthcare programs for more than 40 separate "confirmation" tests.**

493.    Logan Labs unbundled the quantitative UDT – causing excessive bills to Government-funded healthcare programs, as well as high patient co-pays.

494.    Even where the confirmatory UDT is necessary, a bundled claim would have resulted in an estimated charge of approximately $600-1200, not the thousands of dollars in claims the Defendants submitted to Government-funded healthcare programs for a single patient testing episode.

> **9.    Surgery Partners' corporate policy was to pressure physicians and mid-level providers to sign false attestations of medical necessity for quantitative UDT to respond to or avoid denials of Logan Labs UDT claims from Government-funded healthcare programs, including Medicare.**

495.    Surgery Partners' executives, managers, and advisors created form responses to Medicare Denial of Services Forms to physicians and mid-level providers, including Dr. Cho.  The form stated:

> This letter is written regarding the above-referenced patient for services provided by Logan Laboratories, billed to Medicare for quantitative confirmatory drug testing, which were denied. This letter will serve as my attestation related to the quantitative drug testing results and orders for those tests." The letter included a form for the provider to provide a reason (s) why "quantitative drug testing is being performed by Logan Laboratories; testing for Amphetamines, Barbiturates, Benzodiazepines, Cocaine Metabolite, Cannabinoid, Ecstasy, EDDP, Opiates, Phencyclidines, Meprobamate, and Methadone."

496.    Surgery Partners wanted the providers to provide medical necessity attestations to support Logan Labs' resubmission of these records to Government healthcare programs, including Medicare, to get UDT claims paid by Government-funded healthcare programs such as Medicare.

497.    Dr. Cho had never been requested to provide such documentation before he arrived at

Surgery Partners.  While at Surgery Partners, Dr. Cho never received such an attestation request from other labs such as LabCorp or Quest.

498.     Before August 2016, Surgery Partners had Dr. Cho sign many pre-printed medical necessity attestations for Logan Labs. Beginning in August of 2016, Dr. Cho began to refuse to sign these forms.

499.     However, he understands that during the relevant time period, Surgery Partners' corporate practice and policy was to regularly forward these documents to pain specialists and others on behalf of Logan Labs.

500.     Defendants' corporate practice and policies resulted in pressured physicians at Surgery Partners' pain management practices to take the position that only quantitative testing has value.  Surgery Partners' corporate managers, executives, and advisors prepared written materials directed at patients that also, falsely, stated that comprehensive, **<u>quantitative</u>** urine testing was required to comply with state laws.

501.     Where the beneficiary is being tested merely to confirm expected abstinence, the quantitative urine test, which reports the amount of a drug detected in urine (drug level), does not provide any additional useful information to a clinician. Also, the measurement numbers in quantitative urine test report does not reflect the patient's medication dose compliance. Which means that the quantitative test does not provide the time ingested, the amount ingested, or the pharmacological effect.

502.     Various groups, including the American Academy of Pain Medicine and the American Society of Addiction Medicine, recognize that quantitative urine toxicology testing should not generally or regularly be employed.  *See also, e.g.,* LCD L36393 (First Coast Service Options, Inc. Medicare Local Coverage Determination for UDT).

SGR/22940192.1

503. Each claim that Surgery Partners or Logan Labs submits or cause to be submitted as a result of the conduct of its corporate managers, executives, and advisors, including the H.I.G. Defendants, to the United States and the plaintiff-states, for urine toxicology testing referred by a Surgery Partners' affiliated physician as a result of pressure by Surgery Partners and/or Defendant Toepke is false under the FCA.

**10.    Bills for "Confirmation" UDTs that Were Medically Unnecessary and/or Were Not Performed After a Screening UDT**

504. During the relevant time, from 2012 until 2017, Logan Labs has billed multiple Government-funded healthcare programs, including Medicare, for more than a hundred million dollars in "confirmation" UDT, using the CPT Codes listed above and received millions in return.

505. During this time, Surgery Partners, under the management or advice of H.I.G., did not allow its physicians to regularly use in-office drug screening tests. Thus, Logan Labs had few, if any, referrals by physicians or mid-level providers for true "confirmation" UDTs.

506. When there has been no screening UDT and the UDT referral to Logan Labs for confirmatory UDT as a first-line test emanates from Surgery Partners' interference in the good medical judgment of physician, the claim for "confirmatory" UDT is false.

**11.    Waiving co-pays and/or failing to collect co-pays related to quantitative UDT performed by Logan Labs from beneficiaries of Government-funded healthcare programs, including TRICARE and Medicare Part C.**

507. Surgery Partners and Logan Labs regularly waived co-pays for Government healthcare program beneficiaries and those covered by private insurance so that they would not complain about the financial impact of medically unnecessary and excessive UDT performed by Logan Labs. This waiver of co-pays was a corporate practice adopted under the direction of Surgery Partners' managers, executives, during a time when the H.I.G. Defendants were paid

105

millions of dollars to provide management and consulting expertise on the creation of new businesses, including Logan Labs.

508.    The one exception, as explained to Dr. Cho was if a patient received payment from their insurer directly for Logan Labs' UDT (because Logan Labs was out-of-network), Logan Labs would attempt to collect monies intended by the insurer to be paid to Logan Labs.

509.    In addition, the Surgery Partners' corporate documents, including their July 2016 presentation, made clear: This was meant to convey to physicians that Logan Labs would not pursue patients for unpaid copays (the patient responsibility portion of the charges). The waiver of copays had been clearly communicated to providers in the past.

510.    During the presentation by Surgery Partners' executives and Logan Labs' leadership on July 26, 2016, Surgery Partners' executives, managers, and advisors made clear that waiver-of-copays was a company-wide policy. The PowerPoint slide stated: "Logan currently does not utilize a collection agency."

511.    This was meant to communicate to the Surgery Partners' physicians in attendance that they should not be concerned with co-pays owed by their patients because Logan Labs would not attempt to collect these fees.

        **12.    Surgery Partners Pressured Its Physicians Nationwide to Refer to Logan Labs**

512.    From 2009 until December of 2016, Ms. Baker had been engaged with Surgery Partners and its executives, including Milo, in her capacity as a physician recruiter.

513.    Ms. Baker learned that Milo had presented the proposal for Logan Labs to Surgery Partners' managers and executives, including CEO Doyle (who also served on Surgery Partners' Board). At the time, the Surgery Partners' Board of Directors, including H.I.G.'s officers and executives, as well as H.I.G.'s advisors, had approved the business plan for Logan Labs and the

106

use of Surgery Partners' employed physicians as a captive (and nearly exclusive) source of referrals.

514.    During that time, she recruited physicians, including pain management specialists, for Surgery Partners' locations throughout the country.

515.    From mid-2016 into 2017, Ms. Baker had conversations with physicians throughout the country who detailed their concerns about UDT fraud at Surgery Partners' practices regarding referrals to Logan Labs.

516.    In June of 2016, Ms. Baker also came in contact with a number of Surgery Partners' managers and executives. These included Vice President of Physician Practice Operations Monica Aliberti, Senior Vice President of Physician Practice Operations Matt Richardson, Senior Vice President of Physician Services Adam Steiger, and Group President of Ancillary Services Chris Toepke.

517.    At the time, Ms. Aliberti was Surgery Partners' Vice President and Director, Physician Practice Operations. In that capacity she had responsibilities for Surgery Partners' Colorado and North Carolina pain management practices. Ms. Aliberti had also worked as a practice administrator at Defendant TPRC in the Tampa/St. Petersburg area for more than a decade.

518.    Matt Richardson became a Senior Vice President, Physician Practice Operations, in January 2016, after leaving Community Health Systems ("CHS").

519.    Adam Steiger was the administrator for Riverside Spine & Pain Physicians, a private physician group and ASC in Jacksonville, Florida.  The practice was acquired by Surgery Partners in 2016.

520.    As related above, Chris Toepke was Surgery Partners' President of Ancillary Services.

SGR/22940192.1

521.    Both Mr. Steiger and Mr. Richardson have since either been eliminated or have resigned.  Adam Steiger left in late January 2017, and Mr. Richardson's last day with Surgery Partners was February 10, 2017.

522.    A stated above, during 2016, Ms. Baker's physician recruits began to complain about Surgery Partners' practices.

523.    For example, in approximately November of 2016, Dr. Lesco Rogers, a recruit at Surgery Partners' Asheville, North Carolina location, began to relate his concerns about Surgery Partners' corporate UDT policy.

524.    He also discussed Surgery Partners' attempts to pressure him to change his UDT practices, and his responses to Surgery Partners' pressures. For example, he received an email from Monica Aliberti stating that she wanted to discuss Dr. Rogers' UTOX policies.  Dr. Rogers replied: "Do NOT ever address my policies or how I practice medicine ever again."

525.    Dr. Rogers raised his concerns about Surgery Partners' UDT with Ms. Baker again on December 26, 2016. At that time, he provided Ms. Baker with a link to a document to provide to all of the physicians that she had recruited to Surgery Partners, http://dcbalaw.com/wp-content/uploads/2015/11/JOM_11-1-11-Worthy.pdf.  The document was titled: "Evaluating motives: Two simple tests to identify and avoid entanglement in legally dubious urine drug testing schemes."

526.    Dr. Rogers raised concerns with Ms. Baker that another Surgery Partners' physician, Dr. Rasheed Singleton, MD, had become the focus of administrative action by the Colorado medical board related to UDT referrals. During the relevant time period, Dr. Singleton was a pain specialist at Surgery Partners' Denver Pain Relief.

527.    In January 2017, Dr. Demaceo Howard from Surgery Partners' Colorado Springs,

SGR/22940192.1

Colorado facility related his concerns regarding Surgery Partners' UDT policies and practices with Ms. Baker. Dr. Howard was also concerned that Surgery Partners wanted a written explanation for every pain management patient who did not return within 30 days for an office visit and that Surgery Partners was scheduling patients to return to the office without his approval.

528.     These physicians, like Dr. Cho, had communicated with Dr. Golovac, Surgery Partners' Medical Director, regarding Surgery Partners' UDT policies and practices.

529.     On January 16, 2017, Chris Toepke called Ms. Baker to complain about her contacting Surgery Partners' physicians regarding other recruitment opportunities. He also accused Ms. Baker of criticizing Monica Aliberti, the practice administrator who had tried to pressure Dr. Rogers to change his UDT practices.

530.     Throughout this period, Ms. Baker was also in contact with Dr. Cho, who was becoming increasingly uncomfortable with the harassment he received from Surgery Partners.

531.     In February 2017, Dr. Cho also provided Surgery Partners with notice of his resignation, informing them that he was leaving in May 2017.

532.     After enduring Surgery Partners' harassment, in March of 2017, Dr. Cho was diagnosed with facial cranial nerve palsy (Bell's palsy) on March 21, 2017 which required medical management and 3 to 4 weeks of recovery time. Bell's palsy is frequently triggered by extreme stress.

**D.     Surgery Partners' Financial Relationships with Physicians Who Order UDT Services From Logan Labs Violate Stark Laws and Anti-Kickback Statutes**

533.     Surgery Partners offered all of their pain management specialists and other physicians whom Ms. Baker recruited the same Stark-plagued, kickback arrangement they offered to Dr. Cho.

534.     Patients rely on their healthcare providers to engage in an objective inquiry into

whether to order diagnostic testing, including UDT, as well as the nature of such testing (qualitative versus quantitative).

535.    This scheme corrupts the decision-making process of physicians and nurse practitioners. Unbeknownst to the public at large and the patients at issue, Defendants' arrangements, which violate both Stark and AKS prohibitions, interfere with the objective medical decision-making process by providing financial incentives to doctors to refer patients to Logan Labs for expensive and medically unnecessary quantitative UDT.

536.    Surgery Partners' internal documents reveal that during the relevant time period, the company established an "Attractive Physician Compensation Structure" through which "[p]hysicians are rewarded/incentivized to focus on practicing medicine" to include two phases. During Phase 1, physicians receive a base salary plus a productivity bonus (based on the number of surgical codes personally performed by the physician in excess of 240 per quarter). In Phase 2, physicians are eligible for incentive compensation based on "100% cash collections" of the ancillary services, including "UDS high complex lab" tests.

537.    Surgery Partners' employment agreements nationwide implement this incentive compensation such a compensation program was formulated and adopted by its corporate executives, managers, and advisors.

538.    Surgery Partners, through its subsidiaries, had financial relationships with physicians who were in a position to refer patients for ancillary services, particularly UDT (urine toxicology) services provided by Logan Labs).

539.    During the relevant time period, through employment agreements between Surgery Partners' subsidiaries (including TPRC) and pain management specialists working at Surgery Partners' pain practices throughout the country, the Defendants engaged in prohibited physician

110

relationships and offered illegal inducements to referring physicians.   In particular, Surgery Partners offered physicians in a position to refer to Logan Labs incentive compensation that was calculated based in large part on profits generated from Surgery Partners' "ancillary services," including Logan Labs.

540.   For example, Surgery Partners attached as "Exhibit A" to the September 16, 2015 Employment Agreement between TPRC and Dr. Cho a list of Surgery Partners-owned "ancillary services for which Dr. Cho could share in the businesses' profits:" "1. Urine Drug Screening;" 2. MRI/X-Ray; 3. Tens Units; 4. Prosthetics; 5. Physical Therapy; and 6.  Dispensary."

541.   Exhibit A attached to Dr. Cho's agreement was the same as Exhibit A attached to contracts drafted by the Defendants when Surgery Partners' subsidiaries entered into employment agreements with other physicians recruited through Ms. Baker.  These agreements span the time since H.I.G.'s acquisition of Surgery Partners and partnership and collaboration with Surgery Partners' executives, and during the time that H.I.G. made millions of dollars in advisory and management fees as business professionals.  For example:

(a)   Exhibit A to an August 25, 2011 Employment Agreement between TPRC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including "Lab Services."

(b)   Exhibit A to a December 21, 2011 Employment Agreement between TPRC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including "Lab Services."

(c)   Exhibit A to a July 26, 2012 Employment Agreement between TPRC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including "Lab Services."

(d)     Exhibit A to an April 21, 2014 Employment Agreement between TPRC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

(e)     Exhibit A to the March 24, 2015 Employment Agreement between TPRC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

(f)     Exhibit A to the May 12, 2015 Employment Agreement between TPRC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

(g)     Exhibit A to the November 16, 2015 Employment Agreement between Denver Pain Relief Center, PC and a pain specialist included Surgery Partners' offer to pay incentive compensation based on profits received from "Ancillary Services," including, specifically: "Urine Drug Screening."

542.    Logan Labs was created in September of 2011, an NPI was issued in November of 2011, and Logan Labs began providing testing services, including urine toxicology (quantitative UDT) in approximately January or February of 2012.

543.    Surgery Partners began offering incentive compensation to physicians in a position to refer to their ancillary services subsidiaries after H.I.G. purchased Surgery Partners and TPRC in 2009 and with H.I.G.'s approval.

544.    For example, there was no incentive compensation for ancillary services in a September 22, 2009, employment agreement between Tampa Pain Relief Center and a pain specialist, but the ancillary services incentive compensation was part of an August 2011 employment agreement between TPRC and a pain specialist.

112

545.     H.I.G. Capital personnel, including Christopher Laitala and Matthew Lozow, were personally involved in initiating and designing Surgery Partners' incentive compensation system. Following its IPO in 2015, Surgery Partners named Laitala and Lozow to the Compensation Committee, which was charged with "[r]eview[ing] the Company's incentive compensation arrangements…and evaluat[ing] compensation policies and practices that could mitigate any [] risk." On information and belief, the 2015 creation of the Compensation Committee, pursuant to NASDAQ listing rules, only formalized the preexisting corporate arrangement, in which Laitala, Lozow, and other H.I.G. Capital personnel dictated the compensation policy for the then-private Surgery Partners.

546.     During the recruitment process, Ms. Baker, representing the physician recruit, dealt primarily with William Milo. As the executive charged with physician relationships, Milo would have been involved with other Surgery Partners' executives and advisors in drafting Surgery Partners' employment agreements. Milo was also the architect of the UDT business line, operated through Logan Labs.

547.     The Ancillary Services that would determine the employed physicians' incentive compensation were changed between 2012 and 2014 from general "lab services' to specifically "urine drug screening" (the primary source of Logan Labs' revenue) after its founding in 2011.

548.     Toepke joined Surgery Partners in August of 2014.

549.     The arrangements to compensate healthcare providers that order UDT from Logan Labs, as described herein, runs afoul of the Anti-Kickback Statute.

550.     The purpose and intent of Defendants' kickback arrangement, as offered to Surgery Partners' pain management specialists, is to induce healthcare providers to order UDT from Logan Labs.  *See* 42 U.S.C. § 1320a-7b(a).

113

551.    The funds provided to the ordering providers are kickbacks and/or bribes and therefore a form of remuneration under the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(b)(1).

552.    The arrangement does not fall into the "safe harbor" provisions set out at 42 C.F.R. § 1001.952.

553.    Given the structure of the kickback scheme and Surgery Partners' focus on providing income to physicians based on referrals for ancillary services, including UDT performed by Logan Labs, one of, and indeed the primary, purpose of this arrangement was and is to induce providers to order UDT from Logan Labs.

554.    The incentive for a provider to not just order a test from Logan Labs but also to order an unnecessary test - is palpable and substantial.  Defendants were aware of the impropriety of the arrangement given that its very nature was the provision of financial compensation for a referral and such arrangement lacked any indicia of legitimacy.

555.    Patients are harmed, not simply because they are forced to pay the co-pays associated with the UDT, but also because their care is delayed while Defendants obtain the UDT results for Logan Labs, which takes one to two weeks.

556.    Accordingly, all claims submitted to government insurers pursuant to referral arrangements prohibited by the Anti-Kickback Statute are "legally false."

557.    One purpose of the Surgery Partners' company-wide ancillary services incentive compensation was to induce physicians and mid-level providers to refer patients to Logan Labs.

558.    Surgery Partners issued guidance to the physicians working at their pain medicine practices requiring that patients be referred to quantitative urine toxicology testing at regular intervals, rather than only when deemed medically necessary by the provider.  Such guidance would have been issued under the direction of the company's corporate executives, managers, and advisors.

114

559.     Surgery Partners' employment agreements provide that after a year, the physicians receive incentive compensation that is based, in part, on profits generated by Surgery Partners' ancillary services, including Logan Labs.

560.     The scheme of requiring their employed physicians to refer patients to Logan Labs, and also inducing them to refer Government-insured patients to Logan Labs for urine toxicology testing services constitutes an illegal kickback in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

561.     Each claim that Defendants cause to be submitted, to the United States, for urine toxicology testing referred by a physician who Surgery Partners and/or Logan Labs paid a kickback, is false under the FCA.

562.     Defendants' violations of the Stark Laws and federal AKS were knowing and reckless. For example, as noted above, Surgery Partners' SEC filings made repeated references to Surgery Partners' executives', managers', and advisors' knowledge of the financial interests at stake and the Anti-Kickback Statute, Stark Law, and False Claims Act implications of the tainted financial relationships that undergirded Surgery Partners' business model and the self-referral implications of its toxicology arrangements.

563.     When Dr. Cho challenged the referral relationship between Surgery Partners' physicians and Logan Labs, he received oral directives from Surgery Partners' executives that Surgery Partners' physicians were expected to refer their patients to Logan Labs.

### E.     Defendants Had Knowledge of the Illicit Nature of the Kickback Scheme

564.     At all times relevant, Defendants knew that the compensation arrangements they offered as inducements to referring physicians were kickbacks.

565.     Surgery Partners' executives, under the direction of their H.I.G. partners and

advisors, offered "attractive" compensation packages to physicians across the country, including Dr. Cho, which included incentive bonuses based, in part, on revenues generated by UDT referrals to Logan Labs.

566.   At all times relevant to this Complaint, Defendants knew that the Incentive Compensation clauses were a sham used as a cover for offering illegal inducements to referring physicians.

567.   Defendants further knew that it violated the federal Anti-Kickback Statute to require their providers to refer their patients to Surgery Partners' subsidiary, Logan Labs, for UDT services.

568.   These actions have damaged the public and the Government payors at issue in this Complaint by inducing UDT services referrals to Surgery Partners and its affiliated entities.

569.   Defendants have also caused these Government payors to reimburse Defendants for many UDT services that were not medically necessary or improperly billed (*e.g.*, unbundled). Providers may have ordered the UDT (or an excessive UDT) in order to reap the financial benefits offered by Defendants and in order to comply with Surgery Partners' corporate guidelines to overutilize Logan Labs' tests.  Defendants were also aware that the standing orders and similar directives to order needless tests, bill them improperly, and refer them to Logan Labs violated federal law. The essence of a legitimate medical claim is medical necessity and an accurate claim.

## VIII.   DEFENDANTS' COMPENSATION ARRANGEMENT VIOLATES THE STARK LAW

570.   Surgery Partners offered incentive compensation to physicians in a position to refer patients to their wholly-owned subsidiary, Logan Labs. Surgery Partners communicated to physicians that their incentive compensation would be based on profits generated through Logan Labs.

SGR/22940192.1

571.    The financial relationship does not meet the in-office ancillary services exception at least because the laboratory services (UDT) are shipped from Surgery Partners' pain practices all over the country to Logan Labs in Tampa, Florida.

572.    Defendants' "ancillary services" incentive compensation also violates the federal AKS.

573.    During the relevant time period, Dr. Cho raised his concerns regarding violations of the Stark Laws with Surgery Partners executives on several occasions, as well as with Logan Labs' leaders.

574.    Dr. Cho advised Surgery Partners, via email in July of 2016, that he would not order Logan Labs UDT for his patients because he was concerned that the practice was illegal.

575.    He also instructed Surgery Partners' executives that if he had received compensation that was based on Logan Labs' referrals, these amounts should be deducted from future pay until they were returned.

576.    Dr. Cho also refused to accept any compensation based in part on revenues from Surgery Partners' ancillary services subsidiaries to which he could refer, including Logan Labs.

577.    In his February 1, 2017 email, Dr. Cho again raised his concerns about the improper financial relationship between Surgery Partners and physicians with respect to Logan Labs' referrals:

> Also, the Logan Lab is owned 100% by my employer, Surgery Partners, so there is "Conflict of Interest" issue, even if I do not get any financial compensation from the Logan Lab. All MAs and PAs are instructed to use Logan Lab if patient's insurance plan is Medicare or any PPO plan at this time.

578.    Surgery Partners had a duty of reporting Dr. Cho's compliance concerns to Surgery Partners' leadership and its Board of Directors.

SGR/22940192.1

579.    Relators do not know of any physicians who are unaffiliated with Surgery Partners who regularly refer their patients to Logan Labs for UDT.

580.    Even without Dr. Cho's written corporate concerns, at all times relevant to this Complaint, Defendants knew that their ancillary services incentive compensation agreements constituted an unlawful inducement in violation of the federal Stark Laws.

581.    The H.I.G. Defendants and their executive "partners" at Surgery Partners acted knowingly or with reckless disregard in violation of the federal FCA.  For example, Surgery Partners, under H.I.G.'s management, advice, and direction, implemented a compliance program only after the company became publicly traded in 2015.

582.    Before that, there was no formal compliance program, just a "commitment to integrity that has existed at Surgery Partners since inception." Dr. Cho received Surgery Partners' compliance education on April 4, 2017.

583.    However, Surgery Partners' putative compliance program, as reflected in its Compliance Orientation materials, shows that Surgery Partners' Board of Directors and senior management were aware of the following: 1) Kickbacks or compensation of any kind intended to induce referrals are prohibited by law; 2) Contract payments and other benefits paid to clinicians and referral sources must be for actual services at fair market value; 3) Surgery Partners is subject to False Claims Act liability for false claims, including claims not supported by the patient's medical record; 4) Surgery Partners should not submit claims for reimbursement which are "false, fraudulent, inaccurate, or fictitious;" 5) Surgery Partners must promptly refund any money received which the company knows is not due to them.

584.    Further, the company's IPO prospectus referred to the Stark Law implications of its toxicology business yet failed to actually explain how the company's dubious arrangements

could be deemed legal.

585.    In addition, Surgery Partners' leadership, at the highest levels, knowingly harassed Dr. Cho and others in violation of their corporate "Policy of non-retaliation/non-retribution for reporting violations of laws, standards, policies, etc."

586.    Lastly, the violations set out herein are material to federal payors.  Government payors, like commercial insurers, only pay for medically necessary and accurately described, documented, and billed services and will, as those involved in the healthcare industry well know, deny payment for claims that fail to comply with those standards.  Meanwhile, claims made in violation of the AKS and Stark Law are routinely denied by government payors (and AKS violations may give rise to criminal liability).  The AKS and Stark Law, after all, aim to put an end to impermissible referral arrangements which pervert sound medical judgment.  Government payors have an entrenched interest in avoiding providing any financial support of such practices. The significant government settlement with H.I.G.'s executive "partners" at Surgery Partners and with the corporate defendants (Tampa Pain Relief Centers and Logan Labs) emphasizes the materiality of the illegal conduct set forth herein.

## IX.    CAUSES OF ACTION

### COUNT I - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A), (B)

587.    Relators incorporate the averments of paragraphs 1 through 586 as if set forth in full herein.

588.    Claims caused to be submitted, by Defendants nationwide to federally - funded health care programs, including Medicare, related to professional services that were not medically necessary or were not provided constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

589.    Claims caused to be submitted, by the Defendants that violated the federal Anti-Kickback Statute constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

590.    The claims knowingly made by Defendants nationwide, or caused to be made, to federally - funded health care programs related to false records of UDT that were not medically necessary constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

591.    The false records or statements were the patient records and bills which (a) misrepresented that quantitative UDT was medically necessary and/or (b) certifications and representations of full compliance with all federal laws, including, but not limited to, the federal Anti-Kickback Statute and Stark Laws.

592.    All of Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

593.    Each of the Defendants is jointly and severally liable for the damages resulting from the conduct described in this Complaint.

**WHEREFORE**, Relators request the following relief:

A.    Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus the maximum civil penalty allowed by law for each violation of the federal False Claims Act;

B.    Twenty-five percent (25%) of the proceeds of this action if the United States elects to intervene, and thirty percent (30%) if it does not;

C.    Their attorneys' fees, litigation and investigation costs, and expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT II - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(C) CONSPIRACY

594.    Relators incorporate the averments of paragraphs 1 through 593 as if set forth in full herein.

595.    The Surgery Partners' entities, in their agreements with healthcare providers to order unnecessary UDT in exchange for illicit remuneration, and as to the H.I.G. entities, through their management, direction, advisory services, and partnership agreements with Surgery Partners' executives and Surgery Partners itself,  engaged in, approved, and agreed to engage in, a concerted effort to carry out the fraudulent scheme to bill for UDT that were not medically necessary, conspired to defraud the federal government by submitting false or fraudulent claims (including those related to unnecessary services, as well as those claims related to referrals tainted by violations of the federal Anti-Kickback Statute and the Stark Laws) which were paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

**WHEREFORE**, Relators request the following relief:

A.    Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus the maximum civil penalty allowed by law for each violation of the federal False Claims Act;

B.    Twenty-five percent (25%) of the proceeds of this action if the United States elects to intervene, and thirty percent (30%) if it does not;

C.    Their attorneys' fees, litigation and investigation costs, and expenses; and

D.    Such other relief as the Court deems just and appropriate.

SGR/22940192.1

## DEMAND FOR JURY TRIAL

Relators request a trial by jury on all claims so triable.


SMITH, GAMBRELL & RUSSELL, LLP

*/s/ Joseph C. Crawford*
ALAN S. WACHS
Florida Bar No. 980160
awachs@sgrlaw.com
tgreene@sgrlaw.com
dhsmith@sgrlaw.com
JOSEPH C. CRAWFORD
Florida Bar No. 124653
jcrawford@sgrlaw.com
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
(904) 598-6110 (Telephone)
(904) 598-6300 (Facsimile)

And

MARC S. RASPANTI
*(Admitted Pro Hac Vice)*
msr@pietragallo.com
PAMELA COYLE BRECHT
*(Admitted Pro Hac Vice)*
pcb@pietragallo.com
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 988-1433 (Telephone)
(215) 754-5191 (Facsimile)

And

PETER D. ST. PHILLIP, JR.
*(Admitted Pro Hac Vice)*
pstphillip@lowey.com
URIEL RABINOVITZ
*(Admitted Pro Hac Vice)*
urabinovitz@lowey.com
LOWEY DANNENBERG, P.C.

SGR/22940192.1

44 South Broadway, Suite 1100
White Plains, New York 10601
(914) 997-0500 (Telephone)
(914) 997-0035 (Facsimile)

And

CHARLES KOPEL
*(Admitted Pro Hac Vice)*
ckopel@lowey.com
LOWEY DANNENBERG, P.C.
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
(215) 399-4770 (Telephone)
(610) 862-9777 (Facsimile)

And

JOHN GREGORY MURPHY
*(Admitted Pro Hac Vice)*
greg@mandmlawfirm.com
3045 Fritchie Drive
MORAIN & MURPHY, LLC
Baton Rouge, Louisiana 70809
(225) 266-7172 (Telephone)
(225) 926-1202 (Facsimile)

*Counsel for Relators*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day June, 2020 that a true and correct copy of the

foregoing was furnished via the CM/ECF system upon:

Arthur Lee Bentley, III, Esq.
Giovanni P. Giarratana, Esq.
Bradley Arant Boult Cummings LLP
100 N. Tampa Street, Suite 2200
Tampa, Florida 33602
lbentley@bradley.com
ggiarratana@bradley.com

Laura G. Hoey, Esq.
Jeffrey J. Bushofsky, Esq.
Ropes & Gray, LLP

Jake M. Shields, Esq.
United States Department of Justice
Civil Division, Fraud Section
175 N Street NE
Washington, D.C. 20530
jake.m.shields@usdoj.gov

Kyle Scott Cohen, Esq.
Assistant United States Attorney
United States Attorney's Office
2110 First Street, Ste. 3-137

123

191 North Upper Wacker Dr., 32nd Floor N
Chicago, Illinois 60606
laura.hoey@ropesgray.com
jeffrey.bushofsky@ropesgray.com

Kathryn M. Roulett, Esq.
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
kathryn.roulett@ropesgray.com

*Counsel for Defendants H.I.G. Capital, LLC
and H.I.G. Surgery Centers, LLC*

Fort Myers, FL 33901
kyle.cohen@usdoj.gov

*Attorneys for United States of America*

/s/ Joseph C. Crawford
Attorney

SGR/22940192.1