UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
*ex rel.* SHELDON CHO, M.D.,
and DAWN BAKER, Relators,

    Plaintiffs,

v.                                Case No. 8:17-cv-983-T-33AEP

H.I.G. CAPITAL, LLC, and
H.I.G. SURGERY CENTERS, LLC,

    Defendants.
_____/

**ORDER**

This cause comes before the Court pursuant to the Motion to Dismiss the Relators' Second Amended Complaint filed by Defendants H.I.G. Capital, LLC and H.I.G. Surgery Centers, LLC (Doc. # 91), filed on July 13, 2020. Plaintiff-Relators Sheldon Cho, M.D., and Dawn Baker filed a response on August 3, 2020. (Doc. # 97). On August 7, 2020, HIG filed a reply. (Doc. # 98). For the reasons explained below, the Motion is granted, and this case is dismissed without prejudice.

I.    **Background**

    A.    **Factual Allegations**

        1.    **H.I.G. acquires Surgery Partners**

According to the operative complaint, H.I.G. is a private-equity firm that engages in buyouts of various

companies. (Doc. # 85 at ¶¶ 3, 91-93). In December 2009, H.I.G. bought out Surgery Partners,[1] a national network of surgical facilities and ancillary services, including pain management services. (Id. at ¶¶ 2-3, 101). On the same day as the buyout, Bayside Capital, Inc. – a "controlled affiliate of H.I.G. Capital, LLC" – entered into a Management and Investment Advisory Services Agreement with Surgery Partners (hereafter, the "HIG Management Agreement"). (Id. at ¶¶ 5, 94-100). The second amended complaint claims that Bayside is operated and controlled by H.I.G. Capital, and that H.I.G. "directly and through its Bayside business unit, controlled, managed, and advised Surgery Partners." (Id. at ¶¶ 95, 100).

Pursuant to the HIG Management Agreement, H.I.G. provided "management, consulting, and financial advisory services" to Surgery Partners and any companies or businesses formed or acquired by Surgery Partners. (Id. at ¶ 6). The agreement stated that H.I.G. would provide Surgery Partners with "advice and assistance concerning any and all aspects of the operations, planning, financing and budgeting" of the companies. (Id. at ¶ 7). Relators allege that Surgery Partners

---

[1] The term "Surgery Partners," as used in the second amended complaint, encompasses Surgery Partners, Inc., Surgery Center Holdings, Inc., Surgery Partners Holding, LLC, and Surgery Center Holding, LLC. (Doc. # 85 at ¶ 2).

paid H.I.G. $38.7 million for these services from 2009 to 2017. (Id. at ¶ 8).

Following the acquisition, H.I.G. also placed "multiple" representatives on the Surgery Partners' Board of Directors. (Id. at ¶ 9). "For example, H.I.G. Managing Partner Christopher Laitala was named to the Surgery Partners Board of Directors in 2009," became Chairman in 2015, and was also appointed president of Surgery Center Holdings, Inc. (Id. at ¶¶ 10, 121). Specifically, H.I.G. had three individuals on the Surgery Partners Board: Laitala, Matthew Lozow, and Fraser Preston. (Id. at ¶ 120).

According to Relators, "[b]y virtue of its managerial and advisory role to the buyout fund and the buyout fund's large equity stake, the H.I.G. Defendants controlled the Surgery Partners business. Further, H.I.G., through its Bayside business unit, contracted to provide Surgery Center Holdings, Inc. with managerial, consulting, and advisory services." (Id. at ¶ 106). Thus, H.I.G. provided a "robust management role," working in "partnership" with Surgery Partners' executives. (Id. at ¶ 134).

### 2. H.I.G. and Surgery Partners form Logan Labs

The operative complaint alleges that "[u]nder H.I.G.'s control, leadership, experience, and direction, Surgery

3

Partners created a new profit center – urine toxicology testing." (Id. at ¶ 10). Specifically, beginning in 2011, H.I.G. and Surgery Partners formed a new business, Logan Laboratories LLC ("Logan Labs"). (Id. at ¶¶ 10, 157). Logan Labs was a wholly owned subsidiary of Surgery Partners, and Surgery Partners used it to provide ancillary laboratory services to its physicians. (Id. at ¶ 11).

Logan Labs became "a nationwide provider . . . of urine drug testing ('UDT'), also called 'urine toxicology' testing services." (Id.). Logan Labs was dependent on UDT referrals from Surgery Partners' physicians, "whose patients are largely beneficiaries of Government-funded healthcare programs, including, but not limited to, Medicare, Medicaid, and TRICARE." (Id. at ¶ 12).

### a.   Urine Drug Testing (UDT)

There are two types of UDT: qualitative and quantitative. (Id. at ¶ 16). Qualitative UDT can be performed either via point-of-care testing, which means it is performed in a doctor's office, or it can be sent to an outside laboratory. (Id. at ¶ 17). Point-of-care testing is an "easy and cost-efficient" way to perform UDT, and both types of qualitative UDT are "far less expensive" than quantitative UDT. (Id. at ¶¶ 18, 21). This is because quantitative UDT can

4

only be performed "in a laboratory using properly calibrated equipment and appropriately qualified laboratory professionals." (Id. at ¶ 22). Relators state that quantitative UDT is not appropriate or medically necessary for every patient or every clinic visit; in fact, it is medically necessary "only for a narrow subset of patients." (Id. at ¶¶ 23-24).

### b.  Logan Labs' use of UDT

According to Relators, Logan Labs generated most of its revenues from "confirmatory" quantitative UDT. (Id. at ¶ 26). "[U]nder the management, control, and direction of the H.I.G. Defendants, Surgery Partners implemented fraudulent schemes to refer patients of Surgery Partners-affiliated physicians to Logan Labs for extensive and expensive confirmatory quantitative UDT. They prohibited the use of office-based UDT without medical or scientific justification, leaving their affiliated physicians with only laboratory-based UDT (either qualitative or quantitative). They monitored their physicians' and mid-level providers' use of 'confirmation' UDT and exerted great pressure on physicians to order confirmation UDT for every patient regardless of the patient's clinical presentation." (Id. at ¶ 30). Thus, Relators allege that Surgery Partners and H.I.G. submitted,

5

or caused to be submitted, "millions of dollars' worth of false claims to Government-funded programs . . . for UDT, including confirmatory quantitative UDT, that were not reasonable or necessary." (Id. at ¶ 34).

As Relators tell it, "the strategy put forth by the H.I.G. Defendants and adopted by Surgery Partners . . . in creating Logan Labs was to take advantage of their captive employed physicians and adopt a fraudulent scheme of over-utilizing UDT as a means to generate revenue . . . largely of Government healthcare program beneficiaries." (Id. at ¶ 14). To this end, Relators allege that H.I.G. and Surgery Partners drove up quantitative UDT in numerous ways:

1) Surgery Partners' executives allegedly pre-selected patients, including Government healthcare program beneficiaries, for the expensive UDT service and obtained urine samples from these patients before the patients were even seen by a medical provider. (Id. at ¶¶ 367-77).

2) Surgery Partners fraudulently obtained patients' consents to urine toxicology screening by falsely representing that quantitative UDT services were required multiple times per year to comply with state and/or federal laws. (Id. at ¶¶ 378-83).

3) Surgery Partners implemented policies prohibiting physicians from using simple, and less expensive, UDT screening methods in the office. (Id. at ¶¶ 384-96).

4) Surgery Partners had a company-wide practice or policy to send all patients with Government-provided insurance or any private insurance plan

6

that would pay for lab-based UDT to Logan Labs, even if the physician preferred a "dip stick test" or a different laboratory. (Id. at ¶¶ 445-51).

5) Surgery Partners pressured medical providers to refer patients for UDT services by closely monitoring the patients who were not referred for UDT at each visit. (Id. at ¶¶ 452-65). To that end, Surgery Partners would track doctors' UDT referral numbers and would pressure doctors whose referral numbers were low to bring them up. (Id.).

6) Surgery Partners implemented UDT policies that resulted in the creation of false electronic medical records to support medically unnecessary UDT services. (Id. at ¶¶ 466-69).

7) On top of the push for physicians to order more UDTs than medically indicated, Logan Labs would routinely bill multiple different billing codes, performing a more thorough analysis than was necessary. (Id. at ¶¶ 475-88).

8) Logan Labs "unbundled" the quantitative UDT bills, resulting in increased and unduly inflated bills. (Id. at ¶¶ 493-94).

9) Surgery Partners' adopted a corporate policy to pressure medical providers to sign false attestations of medical necessity for quantitative UDT. (Id. at ¶¶ 495-500). This was significant because Government healthcare programs, like Medicare, required that the testing be medically necessary to qualify for reimbursement. (Id. at ¶¶ 299-303, 496).

10) While Logan Labs billed Medicare for millions of dollars' worth of "confirmation" UDT, in reality Surgery Partners' physicians did very little "confirmatory" testing because quantitative UDT was the only testing ordered. (Id. at ¶¶ 504-06).

11) Surgery Partners and Logan Labs regularly waived co-pays for Government healthcare beneficiaries so that they would not complain about the expense of

UDT. (Id. at ¶ 507).

Finally, Relators allege that Surgery Partners tied physician compensation to UDT referrals. Specifically, Surgery Partners had an "Attractive Physician Compensation Structure," which was a two-tiered compensation structure. (Id. at ¶ 536). Tier One was the base salary, while Tier Two provided incentive compensation based on 100% cash collection of ancillary services, including "UDS high complex" lab tests. (Id.). Relators allege that H.I.G. personnel, including Laitala and Lozow, "were personally involved in initiating and designing Surgery Partners' incentive compensation system." (Id. at ¶ 545). Laitala was named to the compensation committee, which reviewed and evaluated company compensation practices. (Id.). Thus, Relators allege that these arrangements violated the Stark Law and the Anti-Kickback Statute. (Id. at ¶¶ 550-63, 570-86).

Based on these allegations, Relators bring two causes of action: (1) violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) and (B), and (2) conspiracy to violate the FCA, in violation of 31 U.S.C. § 3729(a)(1)(C). (Id. at 119-21).

**B.  Procedural History**

Relators initiated this *qui tam* FCA lawsuit against

dozens of defendants on April 25, 2017, based on the UDT fraudulent scheme described above. (Doc. # 1). Relators amended their complaint once as a matter of right on January 15, 2019. (Doc. # 20). On January 21, 2020, the United States and the various states on whose behalf Relators purported to bring claims filed their notices of intent. (Doc. ## 32-33).

In its notice, the United States notified the Court of its decision to intervene in this action for the purpose of settlement as to most of the named defendants (the "Settling Defendants"). The United States also notified the Court that it was not intervening at that time with respect to the H.I.G. Defendants, although its investigation into those Defendants was ongoing. (Doc. # 33).

Accordingly, on January 23, 2020, the Court lifted the seal on the complaint, the amended complaint, and the Court's order, and it also directed that Relators serve all defendants other than the Settling Defendants in accordance with Federal Rule of Civil Procedure 4. (Doc. # 34).

In April 2020, Logan Labs, Tampa Pain Relief Centers, Inc. and certain individual Defendants – all of whom were named in Relators' original complaint – entered into a Settlement Agreement with the United States, the Relators in this case, and the Relators in another matter, the Ashton

case, which will be discussed in further detail below. See (Doc. # 85 at ¶ 53). Those Defendants agreed to pay $41 million to settle the claims at issue in this case and in the Ashton matter. See Dep't of Justice, Office of Public Affairs press release, available at https://www.justice.gov/opa/pr/reference-laboratory-pain-clinic-and-two-individuals-agree-pay-41-million-resolve-allegations.

On May 22, 2020, Relators and the United States filed a joint notice of voluntary dismissal where some defendants were dismissed with prejudice and others without prejudice. (Doc. # 61). After ascertaining that all affected governmental entities assented to the dismissal, this Court dismissed all claims against those named Defendants on June 8, 2020. (Doc. # 77). Pursuant to the Joint Notice of Dismissal, and in accordance with the Settlement Agreement, the following claims were not dismissed: (1) Relators' and Relators' counsel's claims for reasonable costs and attorneys' fees under 31 U.S.C. § 3730(d); and (2) those claims that the Relators and the United States assert against Defendants H.I.G. Capital, LLC, and H.I.G. Surgery Centers, LLC, that are outside the scope of the releases contained in the Settlement Agreement. (Id.).

On August 7, 2020, while this Motion was still pending, the United States notified the Court that it would not be intervening in this matter against Defendants H.I.G. Capital, LLC, and H.I.G. Surgery Centers, LLC, the Defendants who brought the instant Motion to Dismiss. (Doc. # 98).

Through the Court's June 8, 2020, Order, other stipulations of dismissal, and Relators' second amended complaint, the case has now been winnowed down to the two federal FCA claims described above against these two H.I.G. Defendants. (Doc. ## 53, 77, 85).

The H.I.G. Defendants filed their Motion to Dismiss on July 13, 2020. (Doc. # 91). The Motion has been fully briefed (Doc. ## 97, 98) and is now ripe for review.

## II. **Legal Standard**

When a claim arises under the FCA, "Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1051 (11th Cir. 2015). Rule 9(b) imposes a heightened pleading standard for allegations of fraud, requiring a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the FCA context, "the relator has to allege facts as to time, place, and substance of the defendant's alleged

fraud, particularly, the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Urquilla-Diaz, 780 F.3d at 1051 (internal quotation marks and citations omitted).

On a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Furthermore, "[t]he scope of review must be limited to the four corners of the complaint." St. George v. Pinellas Cty., 285 F.3d 1334, 1337

12

(11th Cir. 2002).

## III. **Analysis**

H.I.G. raises four arguments in support of dismissal. First, it argues that the second amended complaint brings claims that have already been released by the Government and Relators in the April 2020 Settlement Agreement. Second, H.I.G. claims that the FCA's first-to-file rule bars the Relators' complaint. Third, it argues that the second amended complaint fails to state a plausible claim against H.I.G. because it does not sufficiently allege that H.I.G. knowingly caused the submission of false claims. Finally, according to H.I.G., the allegations in the second amended complaint do not meet the requirements of Rule 9(b) and rely instead on "conclusory statements and innuendo." (Doc. # 91 at 2).

Because the Court agrees with H.I.G. that Relators' claims are barred by the FCA's first-to-file rule, it will not address any of H.I.G.'s other arguments.

### A.   **First-to-File Rule under the FCA**

The FCA's first-to-file rule provides that "[w]hen a person brings an action . . . no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). The first-to-file rule reflects the understanding

that a corresponding government-initiated action would have involved only a single suit. Makro Capital of Am., Inc. v. UBS AG, 543 F.3d 1254, 1260 (11th Cir. 2008).

This means that "once one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct would be barred." Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 567 (11th Cir. 1994). It abates only "pending" related actions "while the earlier suit remains undecided but ceases to bar that suit once it is dismissed." Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 575 U.S. 650, 135 S. Ct. 1970, 1979 (2015) (holding that a *qui tam* suit under the FCA ceases to be "pending" once it is dismissed). Accordingly, a dismissal based solely on the first-to-file bar should be without prejudice. United States ex rel. Bernier v. Infilaw Corp., 347 F. Supp. 3d 1075, 1081 (M.D. Fla. 2018).

The issues for determination, then, are two-fold: (1) whether the earlier-filed action was "pending" when the later action was brought; and (2) whether the two actions are "related." See 31 U.S.C. § 3730(b)(5).

### 1. Whether the earlier-filed action was "pending"

H.I.G. argues that the first-to-file bar applies here due to the earlier-filed case of United States ex rel. Ashton

14

v. Logan Laboratories, LLC, et al., Case No. 16-4583 (E.D. Pa. 2016). (Doc. # 91 at 11-16). In that case, three plaintiff-relators brought FCA claims against Logan Labs and Surgery Partners, Inc. on behalf of the United States and numerous states. (Ashton, Doc. # 1). The Ashton complaint was filed on August 22, 2016. (Id.). The Ashton complaint was, like the complaint here, based on Surgery Partners' and Logan Labs' fraudulent UDT practices. (Id.). On April 15, 2020, the United States intervened in that case for the purpose of settlement and the court dismissed the case on June 2, 2020, pursuant to a joint stipulation of dismissal. (Ashton, Doc. ## 25, 27, 28).

By way of reminder, Dr. Cho and Baker filed their initial complaint in this matter on April 25, 2017. (Doc. # 1). Thus, at the time the original complaint was filed, Ashton was still pending. Relators argue, however, that when they filed their second amended complaint – which focuses on the allegations against H.I.G. – on June 29, 2020, the Ashton case had since been dismissed. (Doc. # 97 at 18-19). The question thus becomes – does amendment of a complaint cure or change the first-to-file analysis?

As the parties agree, "whether amendment of a *qui tam* complaint following dismissal of a first-filed suit protects

the action from the first-to-file bar is the subject of a Circuit split, and the Eleventh Circuit has not addressed the issue." (Doc. # 97 at 18); see also (Doc. # 91 at 15-16, 15 n.7).

Indeed, the Circuits that have addressed this question are split. The Courts of Appeals for the Second Circuit and the District of Columbia have held that the pertinent date to be considered is when the original complaint was filed in the second action. See United States ex rel. Wood v. Allergan, Inc., 899 F.3d 163, 171-72 (2d Cir. 2018) (rejecting as "inconsistent with the language of the statute" the argument that a violation of the first-to-file bar can be cured by filing an amended pleading after the first action is dismissed); United States ex rel. Shea v. Cellco P'ship, 863 F.3d 923, 929 (D.C. Cir. 2017) ("Shea infringed the first-to-file bar by bringing a related action while [the] first-filed case remained pending. Although [the first-filed] suit is no longer pending, a supplemental **complaint** cannot change when Shea brought [the] second **action** for purposes of the statutory bar. . . . [I]n short, Shea's action was incurably flawed from the moment he filed it."). The First Circuit, however, has taken a different view. See United States ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 6 (1st Cir.

16

2015) ("Developments occurring after the filing of the second amended complaint . . . have dissolved the jurisdictional bar that the court below found dispositive. . . . [T]his case is analogous to the cases in which a jurisdictional prerequisite (such as an exhaustion requirement) is satisfied only after suit is commenced. Under the circumstances, it would be a pointless formality to let the dismissal of the second amended complaint stand — and doing so would needlessly expose the relator to the vagaries of filing a new action.").[2]

After careful consideration, this Court agrees with the reasoning of the Second and D.C. Circuits. See United States v. Albertsons LLC, No. SA-15-CV-957-XR, 2018 WL 6609571, at *3 (W.D. Tex. Dec. 17, 2018)("This Court finds the reasoning in Shea and Wood persuasive and holds that Relator's action — doomed at the time of filing because of the prior-filed [] action — cannot be cured by Relator's amended complaint.").

First, as the Wood court pointed out, allowing an amended complaint to defeat the first-to-file bar runs counter to the

---

[2] The Fourth Circuit has held that the first-to-file bar requires dismissal of a later-filed action even if the first-filed action is dismissed while the later-filed action is still pending; it has not decided whether amending or supplementing a complaint after dismissal of the first-filed action allows the later-filed action to proceed. United States ex rel. Carter v. Halliburton Co., 866 F.3d 199, 212 (4th Cir. 2017).

plain terms of the statute:

> [Section 3730(b)(5)] bars a person from bringing -
> - not continuing to prosecute - a related action
> during the pendency of an FCA case, and it makes no
> provision for a stay of proceedings until the
> prior-filed action is resolved. The first-to-file
> bar is thus clear: an action cannot be brought while
> a first-filed action is pending. . . . Further,
> under a plain-language reading, "amending or
> supplementing a complaint does not **bring** a new
> action, it only **brings** a new complaint into an
> action that is already pending. . . . The statutory
> command is not ambiguous: a claim is barred by the
> first-to-file bar if at the time the lawsuit was
> **brought** a related action was pending.

Wood, 899 F.3d at 172.

Second, as explained in Shea, accepting the argument put

forth by the Relators would "give rise to anomalous outcomes."

863 F.3d at 930. For example, "if a relator brings suit while

a related action is pending, her ability to proceed with her

action upon the first-filed suit's completion could depend on

the pure happenstance of whether the district court reached

her case while the first-filed suit remained pending." Id.

The court elaborated with a hypothetical:

> [I]magine a situation in which relators A, B, and
> C each file a qui tam action alleging the same
> fraud. Relator A reaches the courthouse first and
> his action therefore goes forward. Relator B
> reaches the courthouse second, but the district
> court determines his suit is blocked by the first-
> to-file bar and thus dismisses it per the ordinary
> course. Relator C files last, and shortly
> thereafter, the first-filed action is dismissed.
> But suppose relator C filed her suit so late in the

> game that the district court fails to dismiss her
> action before dismissing the first-filed suit.
> Under Shea's proposed rule, relator C would receive
> a windfall: she, unlike relator B, could simply
> amend her existing complaint and thereby secure
> herself pole position in the first-to-file queue.
> Relator C would jump past relator B for the
> opportunity to proceed with her suit (and to share
> in the government's reward).

Id. (citations omitted). The D.C. Circuit surmised that

"Congress presumably would not have intended a relator's fate

to depend on chance considerations such as the extent of a

particular court's backlog and the timeliness of a particular

court's entry of a dismissal." Id.; see also Wood, 899 F.3d

at 174 (noting that if "the primary, if not sole purpose of

the first-to-file rule is to help the Government uncover and

fight fraud, it is unlikely that Congress intended to do so

in an inefficient manner prone to anomalous outcomes")

(quotations omitted)).

Thus, because Ashton was pending at the time Relators

filed their original complaint in 2017, the first-to-file bar

will apply if the Ashton case is "related." The Court now

turns to that inquiry.

### 2.    Whether the earlier-filed action is "related"

Because the Ashton complaint is publicly available on

the federal courts' PACER website, and as a court document

its contents cannot reasonably be in doubt, this Court is

permitted to take judicial notice of it. "Courts may take judicial notice of public records, such as a pleading filed in another court, because such documents are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" Navarro v. City of Riviera Beach, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999)). "However, judicial notice may be taken only to establish what those documents contain, not the veracity of their contents." Id. (citing Bryant, 187 F.3d at 1278). Accordingly, in order to determine whether the two actions are sufficiently "related" to trigger the FCA's first-to-file bar, this Court will take judicial notice of the allegations in the Ashton complaint, though it passes no judgment on the veracity of those allegations.

"Assessing relatedness is not rocket science; doing so requires comparing the complaints side-by-side to see whether the claims [in the second action] incorporate the same material elements of fraud as the earlier action, even if the allegations incorporate additional or somewhat different facts or information." Infilaw, 347 F. Supp. 3d at 1083 (internal quotation marks omitted). "Rather, the whole point of the first-to-file bar is to see whether the later filed

complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint." Id. (alterations and quotation marks omitted).[3]

For this analysis, this Court will consider only the original complaints in each case. Infilaw, 347 F. Supp. 3d at 1083 ("[T]he relevant complaints are the **originals** – time is of the essence with FCA actions and only the true 'whistleblower' should be rewarded, not copycats."); United States ex rel. Urquilla-Diaz v. Kaplan Univ., No. 09-20756-CIV, 2016 WL 3909521, at *5 (S.D. Fla. Mar. 24, 2016) ("Thus, to determine whether Diaz and Gatsiopoulos are 'related,' the Court must consider only the allegations in the original Gatsiopoulos complaint and the allegations in the original Diaz complaint; later amendments of either complaint are irrelevant to the analysis.").

---

[3] In Infilaw, a court within this District explained that there is currently a split of authority as to whether the first-to-file rule is a jurisdictional bar or should be considered under the rubric of Rule 12(b)(6). Id. at 1081-83. After scrutinizing the case law, the Infilaw court determined that "[w]ithout a clear path from the U.S. Court of Appeals for the Eleventh Circuit, the Court tags along with the Second and D.C. Circuits, who have the better reading of the first-to-file bar as part of the 12(b)(6) inquiry, not 12(b)(1)." Id. at 1082-83. This Court agrees with the reasoning of Infilaw although, for purposes of this Order, whether the bar is jurisdictional or arises under Rule 12(b)(6) is of little moment.

Relators argue that they "allege a scheme materially different than the one in Ashton." (Doc. # 97 at 16). For one thing, Relators point out that the H.I.G. Defendants were not named as defendants in Ashton, and allegations about H.I.G.'s alleged role in the scheme are entirely absent from the Ashton pleading, "either by name or by allusion." (Id.).

Once again, in the absence of Eleventh Circuit case law on this issue, the Court turns to other jurisdictions for guidance. To determine whether the first-to-file bar applies, seven circuit courts of appeals have adopted the "same material elements" test. See United States v. Berkeley Heartlab, Inc., 225 F. Supp. 3d 487, 507 (D.S.C. 2016). Under this test, a later-filed action is not based on the facts of a pending action when it identifies a new defendant who is not a subsidiary or corporate affiliate of an already-named defendant. See In re Nat. Gas Royalties Qui Tam Litig. (CO2 Appeals), 566 F.3d 956, 962 (10th Cir. 2009) ("The identity of a defendant constitutes a material element of a fraud claim [but] [c]ases involving parents, subsidiaries, and other corporate affiliates might . . . require deviations from the general requirement that claims must share common defendants in order to trigger the first-to-file bar."); see also United States ex rel. Hampton v. Columbia/HCA Healthcare Corp., 318

F.3d 214, 218-19 (D.C. Cir. 2003)(holding that later-filed complaint's allegations against a specific subsidiary were already encompassed in allegations in first-filed complaint against the parent corporation).

In addition to their corporate relationship, this Court must also look at the scope of the allegations contained in the first- and later-filed complaints. Courts have held that allegations of a greater, more expansive, or nationwide fraud naturally include lesser, local, or subsidiary frauds; whereas lesser frauds may not always include the greater. See United States ex rel. Heath v. AT&T, Inc., 791 F.3d 112, 121-22 (D.C. Cir. 2015) (holding first-to-file bar did not apply when the earlier action alerted the government only to "a limited scheme by Wisconsin Bell to defraud [a program] within Wisconsin" that was accomplished through affirmative misrepresentations by Wisconsin Bell employees and the later-filed action alleged "a different and more far-reaching scheme to defraud the federal government through service contracts entered into across the Nation"); see also United States ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1209 (D.C. Cir. 2011) (first-to-file rule applied when the first complaint alleged that "corporate policies" perpetuated a "nationwide scheme attributable not only to the subsidiary,

23

but also to [the parent company]," and the second complaint simply asserted the same fraudulent practices in another subsidiary); United States ex rel. Chovanec v. Apria Healthcare Group, Inc., 606 F.3d 361 (7th Cir. 2010) (holding that earlier-filed suit alleged facts of a top-down fraud emanating from national headquarters and, thus, encompassed the fraud at a single office that was alleged in the later-filed complaint). As a district court in the Southern District of Florida has explained it, "[i]n the context of a parent and subsidiaries or related corporations, to determine whether suits are related for purposes of the first-to-file bar, a court must determine whether the earlier-filed suit alleges a fraud at local, individual offices or, instead, alleges a cohesive scheme orchestrated by national management." Urquilla-Diaz, 2016 WL 3909521, at *4. For example, in the Urquilla-Diaz case, the court held that where the earlier-filed complaint's scope was limited to a single school in Pennsylvania but the later-filed complaint encompassed a similar scheme at all of Kaplan University's seventy-nine schools and its online program, "the claims in the two complaints are not related." Id.

Here, it is undisputed that the H.I.G. Defendants were not named in the Ashton complaint. However, in the original

24

complaint in this case, they were named as the corporate parents of Surgery Partners and Logan Labs, the main entities behind the fraud. (Doc. # 1 at ¶¶ 81-93). Thus, the H.I.G. Defendants are the corporate affiliates of the defendants named in the Ashton action. See Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1280 n.4 (10th Cir. 2004) (finding that the first-to-file rule applied where a relator named as defendants some "affiliated" entities that were not listed as defendants in the prior pending lawsuit).

What's more, read in its entirety, the Ashton complaint alleged a broad, nationwide scheme on the part of Logan Labs and Surgery Partners to defraud Medicare and other Government programs by submitting medically unnecessary and inflated claims for UDT. For example, the Ashton complaint alleged that Surgery Partners operated in 28 states and, indeed, the Ashton relators brought the complaint on behalf of 28 individual states, in addition to the United States. (Ashton, Doc. # 1 at 1, ¶ 14). The Ashton relators alleged that Logan Labs knowingly submitted millions of dollars' worth of false claims to Medicare for UDT that were neither reasonable nor necessary, and that, from 2013 until 2016, Logan Labs received almost 200,000 urine specimens and that 50% of those were billed to Government programs, "for a total of an estimate

$200 to $400 million." (Id. at ¶¶ 7, 99).

And comparing the complaints side-by-side, the Ashton complaint and the original complaint here both allege several of the same key factors underlying the UDT scheme: (1) Surgery Partners caused or manipulated its physicians to routinely order UDT for patients without regard for individual patient needs, in violation of the Medicare requirement that providers seek reimbursement only for "reasonable and necessary" services; (2) Surgery Partners paid illegal kickbacks or offered other incentives to its physicians to induce them to refer high numbers of UDT to Logan Labs; (3) once received, Logan Labs would run excessive UDT panels; and (4) all of which resulted in millions of dollars' worth of false claims being presented to Medicare, Medicaid, and other Government programs. Compare (Doc. # 1 at ¶¶ 19-22, 24-25, 31, 272-73, 279, 288, 292-93, 301-03, 349, 353, 386-91, 433-39, 449) with (Ashton, Doc. # 1 at ¶¶ 2, 8, 87-89, 95-97, 104-07, 110-15, 136).

In sum, a comparison of the original Ashton and Cho complaints reveals that they allege the same essential facts regarding the UDT fraud against the Government committed by Surgery Partners and Logan Labs. While Cho's complaint contains slightly different details, both complaints allege

26

that Surgery Partners and Logan Labs violated the FCA by implementing a broad policy of requiring expensive and medically unnecessary UDT for a large number of patients for whom the testing was not necessary and then reaping millions of dollars in profits by submitting these claims to Government programs for payment. Both complaints allege that Surgery Partners and Logan Labs violated the Stark Law, and the Anti-Kickback Statute by providing kickbacks, additional compensation, and other perks to medical professionals as an inducement to order as much UDT as possible.

The Court thus disagrees with Relators that the "primary allegation levelled by Relators in their first Complaint here – the institution of Surgery Partners' kickback compensation structure – is also absent from Ashton." (Doc. # 97 at 16). A fair reading of the initial complaint in this case demonstrates that, while the kickback scheme is certainly an integral part of Relators' original complaint, it is not the "primary allegation." Moreover, the Ashton relators also alleged that "Surgery Partners provided illegal kickbacks to physicians in order to increase laboratory tests to Logan [Labs]" and that this alleged kickback scheme violated the Stark Law and the Anti-Kickback Statute. (Ashton, Doc. # 1 at ¶¶ 95-99). That Cho's complaint contained additional details

27

about the structure of those kickbacks does not defeat the first-to-file bar. See United States ex rel. Lujan v. Hughes Aircraft Co., 243 F.3d 1181, 1189 (9th Cir. 2001) (holding that Section 3730(b)(5) "bars later-filed actions alleging the same material elements of fraud described in an earlier suit, regardless of whether the allegations incorporate somewhat different details").

Relators argue that their initial complaint described a scheme different from the one alleged in Ashton because, for example, (1) the Ashton complaint "focused on the fraudulent impact of standing order forms and standard testing panels," whereas they alleged that the Defendants "used fraudulent intake forms to obtain patient consent for testing," and (2) these Relators alleged a scheme that was "top-down and designed to meet the corporate-wide objective of shifting Surgery Centers' profit center to 'ancillary services.'" (Doc. # 97 at 17-18). The first example is easily discarded. Complaints need not allege identical facts – the relevant question is, instead, whether they allege the same "essential claim" or "material elements." See Grynberg, 390 F.3d at 1279-80. The precise way in which Surgery Partners implemented its objective of sending nearly all patient specimens for UDT, regardless of medical necessity, is not a material element of

the fraud. See Batiste, 659 F.3d at 1209-10 (holding that where the first-filed complaint "would suffice to equip the government to investigate SLM's allegedly fraudulent forbearance practices nationwide," the second-filed complaint's additional details "would not give rise to a different investigation or recovery").

As for Relators' other argument, the Court cannot discern a material difference in the scope of the scheme outlined in the two complaints. True, Relators here named more defendants, but both complaints alleged a nationwide scheme by Surgery Partners and Logan Labs across multiple offices to send unnecessary UDT to Logan Labs in order to reap millions in illegal reimbursements from Medicare and other government payors. This case is thus distinguishable from those cases where the first-filed action alleged only a localized or limited scheme and the later-filed action alleged a much broader, nationwide scheme, directed by a far-reaching corporate policy. See Heath, 791 F.3d at 121-22; Urquilla-Diaz, 2016 WL 3909521, at *4.

Thus, while Relators insist that "Ashton did not put the Government on notice of H.I.G.'s liability," (Doc. # 97 at 17), that is not the relevant standard. Instead, the question is whether the Relators here alleged a fraudulent scheme that

29

the Government would already be equipped to investigate based on the first complaint. See Infilaw, 347 F. Supp. 3d at 1083); see also United States v. Medco Health Sols., Inc., No. CV 11-684-RGA, 2017 WL 63006, at *10 (D. Del. Jan. 5, 2017)("Courts will find that two actions are related, despite different defendants, when the first-filed complaint provided 'enough information to discover' the fraud alleged in the second-filed complaint, including the identity of the new defendants."). Here, the allegations in the Ashton complaint were such that the Government was equipped to launch a broad, nationwide investigation into the UDT fraud perpetrated by Surgery Partners, including the potential culpability of Surgery Partners' corporate affiliates. See United States ex rel. Poteet v. Medtronic, Inc., 552 F.3d 503, 517 (6th Cir. 2009)("[T]he fact that the later action names different or additional defendants is not dispositive as long as the two complaints identify the same general fraudulent scheme"); see also Grynberg, 390 F.3d at 1279 ("Once the government is put on notice of its potential fraud claim, the purpose behind allowing qui tam litigation is satisfied. . . . Once an initial qui tam complaint puts the government and the defendants on notice of its essential claim, all interested parties can expect to resolve that claim in a single

30

lawsuit.").

For these reasons, the Relators' complaint is barred by the FCA's first-to-file rule.

###    B.    Leave to Amend

Dismissals based solely on the first-to-file rule should be without prejudice. Infilaw Corp., 347 F. Supp. 3d at 1081; see also Medco Health, 2017 WL 63006, at *12 (explaining that because a case ceases to be "pending" once it is decided or dismissed, dismissal under this rule "must be without prejudice to refiling once the earlier action is no longer pending"). Thus, Relators' claims are dismissed without prejudice.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   The Defendants' Motion to Dismiss the Relators' Second Amended Complaint (Doc. # 91) is **GRANTED.** Relators' second amended complaint is dismissed without prejudice based on the federal False Claims Act's first-to-file bar.

(2)   The Clerk is directed to **CLOSE** the case. Pursuant to the terms of the Settlement Agreement, the Court will retain jurisdiction, as appropriate, to determine Relators' and Relators' counsel's claims for reasonable costs and

attorneys' fees related to the Settlement Agreement under 31 U.S.C. § 3730(d).

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 26th day of August, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE